UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Sergiy Kurashov, an individual,

    Plaintiff,

    v.

Cargo Transport Alliance, LLC,
a Florida Limited Liability Company,

    Defendant.                        Case No. 0:16-cv-62498

_____/

Cargo Transport Alliance, LLC,
a Florida Limited Liability Company,

    Counter Claim Plaintiff,

    v.

Sergiy Kurashov, an individual,
and Miami Logistic Services, Inc.,
a Florida Corporation,

    Counterclaim Defendant.

_____/

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM TO COMPLAINT**

    Defendant, Cargo Transport Alliance, LLC, a Florida Limited Liability Company ("CTA",

"Sublessor", "Guarantee", or "Defendant"), hereby files this its answer, affirmative defenses and

counterclaim to Plaintiff, Sergiy Kurashov's ("Kurashov", "Guarantor", or "Plaintiff") Complaint

(DE 1)[1], and states:

---

[1] Now that Plaintiff in his Response (D.E. 7 @ pg. 12) has voluntarily withdrawn his claim for conversion (D.E. 1, Count II), which Count has been dismissed by Order of this Court (D.E. 17), what we are now left with is a one count Complaint brought solely under Florida state common law for unjust enrichment (D.E. 1, Count I).

## Answer

### Denials

1.      Defendant specifically denies as stated the allegations contained in ¶¶1, 2, 3, 6-10 & 12-14 of the Complaint, and demand strict proof thereof.

### Admissions

2.      Defendant admits the allegations contained in ¶4 of the Complaint.

### Legal Conclusions Which Do Not Require a Response

3.      Defendant submits that the allegations set forth in ¶5 of the Complaint, are complete legal conclusions, not anchored by any facts to which a response is required. Defendants admit that the law is what it is and speaks for itself, and to the extent that the allegations of said paragraphs characterize, contradict, draw legal conclusions from, or are otherwise at variance with the law, said allegations are denied, and strict proof is demanded thereof.

### Reassertion

4.      Defendant reaffirms and reincorporate its answers and denials, as set forth above, into its response to the reincorporation paragraph contained in ¶11 of the Complaint as if fully set forth herein.

5.      Since Plaintiff in his Response (D.E. 7 @ pg. 12) has voluntarily withdrawn his claim for conversion (D.E. 1, Count II), which has now been dismissed by Order of this Court (D.E. 17), there is no need for Defendant to respond to the allegations set forth in ¶¶15-19 of the Complaint.

6.      To the extent that any allegations of the Complaint have not been specifically admitted to, as set forth hereinabove, they are specifically denied and strict proof is demanded thereof.

**Affirmative Defenses**

1.       As and for its *first* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for lack of subject matter jurisdiction, under this Court's diversity jurisdiction under 28 U.S.C. §1332(a)(2), which states that the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between — "…citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State"

2.       28 U.S.C. §1359 states that "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." Plaintiff has done so in this instance. The manufacture of Federal jurisdiction was the very thing Congress intended to prevent by the enactment of §1359 and its predecessors, which applies to diversity jurisdiction arising from the alienage of a party as well as that based on residence in different States. The Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction.

3.       CTA submits that from the evidence it knows, Plaintiff is domiciled in Florida, and it is not clear that Plaintiff is not a permanent resident of the United States. CTA requests an evidentiary hearing as to whether Plaintiff even meets the residential jurisdictional requirements of §1332(a)(2).

4.       CTA, submits that this lawsuit is nothing but Kurashov creatively manipulating

diversity jurisdiction to forum shop a contractual dispute between a Florida corporation that he owns called Miami Logistic Services, Inc. ("MLS" or the "Sublessee"), and Defendant, CTA over two contracts between them, both dated September 15, 2015:

(a)     an Equipment Sub-Lease Agreement, with an incorporated (i) Delivery and Acceptance Certificate, (ii) Guaranty (the "Guaranty"), and (iii), Security Agreement, all executed by Kurashov  (collectively the "Sub Lease"), a true and correct executed copy of which is attached as Exhibit A hereto, and,

(b)     an Operating Agreement, with an incorporated Trailer Lease Agreement (the "Operating Agreement"), a true and correct executed copy of which is attached as Exhibit B hereto, regarding four 2012 Kenworth T700 commercial trucks that were subleased by CTA to MLS (the "Trucks"), and which were originally leased by CTA from Dakota Financial, LLC ("Dakota" or "Lessor") in or around August 14, 2015 a true and correct unexecuted copy of the Dakota lease is attached as Exhibit C hereto, (collectively the Sub Lease, the incorporated Dakota lease, and the Operating Agreement, and those agreements included therein, shall be referred to as the "Agreements").

5.     Both the Sub Lease and the Operating Agreement are signed by Kurashov, as MLS' Owner, and the Guaranty is signed by him individually.

6.     The Operating Agreement provides for the application of Florida law, and has a venue and jurisdiction selection clause requiring any disputes between them to be exclusively brought in the state courts of Broward County, Florida[2], and provides a merger, integration and non-modification clause.[3]

---

[2] ¶14.

[3] ¶17.

7.      Both the Sub Lease[4] and the Guaranty provides for the application of California law, and have venue and jurisdiction selection clause requiring any disputes between them be exclusively brought in the courts of Los Angeles, California[5], and both provide merger, integration and non-modification clauses.[6]

8.      Forum selection clauses can be either permissive or mandatory. Permissive clauses authorize both jurisdiction and venue in a particular forum, but they do not prohibit litigation in another forum. A mandatory clause is much more restrictive: a case can only be brought in the specified forum. A plaintiff subject to a mandatory forum selection clause, like Plaintiff as the Guarantor, is estopped from joining a lawsuit outside of the forum. As such, fraudulent joinder would be implicated in the face of a mandatory forum selection clause, like the one here.

9.      The entirety of the dispute described in the Complaint arises as a result of payments that Kurashov made on behalf of his closely held company, MLS, as its Guarantor, to CTA, under the Agreements for which MLS, and Kurashov, as Guarantor, is in default and owes a substantial amount of money to CTA, that is far in excess of the amounts already paid by Kurashov, as Guarantor, and on behalf of MLS to CTA.

10.     Kurashov has manufactured diversity jurisdiction in order to invoke the diversity jurisdiction of this Court, and avoid the fact that (i) he has waived his right to proceed in this forum under the venue and jurisdiction forum selection clauses under the Agreements, including the Guaranty he personally executed, and (ii) this is really a dispute between two Florida corporate entities for which diversity doesn't apply, and for which MLS has also waived its right to proceed

---

[4] ¶24.

[5] ¶24.of the Sub Lease, and pg. 3, 3rd full paragraph of the Guaranty.

[6] ¶22 of the Sub Lease, and last paragraph of the Guaranty.

in this forum under the venue and jurisdiction clauses under the Agreements.

11.     Kurashov is nothing but a sham Plaintiff, and this Complaint should be dismissed as nothing more than a fraud on this Court. The evidence of this fact is established in the attached September 14, 2016 demand letter from counsel for Kurashov, and MLS, a true and correct copy of which is attached as Exhibit D hereto (the "Demand Letter") where counsel acknowledges that this dispute is nothing more than a dispute between CTA and MLS under the Agreements, and attached thereto includes (a) a September 3, 2015 invoice from CTA to Kurashov asserting the amounts owing at the time from MLS and Kurashov to CTA, acknowledging that $130,000 was paid to that amount, and establishing that $126,000 was for the down payment for the financed Trucks, along with (b) an August 14, 2015 approval letter from CTA to Kurashov also establishing that $126,000 was for the down payment for the financed Trucks [7].

12.     Further evidence of the sham of this Complaint is that the Demand Letter implicitly threatens CTA and its principals with criminal action to secure an advantage in their civil dispute[8], in violation of Rule 4-3.4(g) of the Rules Regulating the Florida Bar (" A lawyer must not: …present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter"), 718 So.2d 1179 (1989), Fla. Bar Ethics Opinion 89-3 (March 1, 1989).

13.     The two letters attached to Plaintiff's Declaration[9] (the "Declaration"), nonetheless evidence by Plaintiff's own admission that this is nothing more than a contractual dispute between Plaintiff and MLS on one side, and Defendant on the other, and the Declaration even admits

---

[7] See pgs. 1 & 2.

[8] Invoking Fla. Stat. §817.5621 & §570 of the California Penal Code.

[9] D.E. 7-1

6

execution of the Agreements and Guaranty, which demonstrates that MLS, rather than Plaintiff, is the correct party Plaintiff, or should at least be joined as a party Plaintiff to this action.

14.     CTA submits that the issue of whether Kurashov is or is not a permanent resident foreign national residing in Florida is an issue of first import that must evidentially be decided by this Court before this Court can exercise jurisdiction over this dispute, and if he is, then this matter should be dismissed for lack of diversity under §1332(a)(2). As such this Complaint should be dismissed as a sham, and fraud on the Court, by which Plaintiff has manufactured diversity jurisdiction for the purposes of forum shopping.

15.     As and for its *second* affirmative defense, and for the same reasons as set forth in its first affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for failure to state a cause of action.

16.     As and for its *third* affirmative defense, and for the same reasons as set forth in its first and second affirmative defenses, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for failure to join or non-joinder of an indispensable party to this action, MLS. The two letters attached to Plaintiff's Declaration[10] demonstrates that MLS, rather than Plaintiff, is the correct party Plaintiff, or should at least be joined as a party Plaintiff to this action.

17.     As and for its *fourth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for failure to state a cause of action upon which relief can be granted, in that it does little by way of alleging facts that describe Defendant CTA's alleged conduct, either generally, or as it may relate to the specific claim of unjust enrichment being asserted before this Court. Instead, the Complaint is grounded upon

---

[10] D.E. 7-1

generalized allegations (and unsupported conclusions) that are vaguely and repeatedly attributed throughout. The Complaint fails to provide sufficient specificity to meet federal pleading requirements and, consequently fails to state claims as required to avoid dismissal under Fed. R. Civ. P. 12(b)(6). As such, Defendant respectfully submits that the Complaint is subject to dismissal.

18.     The sum and substance of the factual and conclusory allegations by Plaintiff against Defendant for unjust enrichment are set forth in ¶¶6-8, & 12-14 of the Complaint, which states:

a.  About August 2015, in Broward County, Florida, Plaintiff lent Defendant $168,238.50. See Exhibit "A", copies of receipts totaling $130,000.00. Plaintiff also gave Defendant cash in the amount of $38,238.50. Defendant offered no collateral and ***used the funds freely to finance some trucks***.

b.  While the $168,238.50 were never given to Defendant as a gift, there was no effective promissory note, but rather ***Defendant verbally and by conduct acknowledged the existence of debt and promised to repay it***.

c.  Plaintiff has declared the monies due for repayment. Defendant is duly indebted to Plaintiff. (emphasis added)

d.  Defendant ***has not repaid the loan*** to Plaintiff, and yet has had use of the proceeds.

e.  The use of the proceeds without repayment of the entire sum back to Plaintiff constitutes an unjust enrichment of Defendant at Plaintiff's expense.

f.  As a result of the unjust enrichment of Defendant, Plaintiff has been damaged in an amount in excess of $168,238.50.

19.     The Complaint relies exclusively upon legal conclusions that are not anchored to any specific factual allegations. The manner of blanket pleading that has been employed in the Complaint against CTA is undoubtedly insufficient to state a claim under applicable law. The complaint does not contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. The Complaint, as plead, lacks facial plausibility since Plaintiff fails to plead factual content that allows the court to draw the reasonable inference that CTA is liable for the misconduct alleged. The Complaint, as plead is nothing more than labels and conclusions, and

doesn't even go so far to even assert the most formulaic recitation of the elements of a cause of action for unjust enrichment. The Complaint fails to meet the requirements of Rule 8 since it tenders naked assertions devoid of further factual enhancement.

20.     As and for its *fifth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred because Plaintiff has failed to plead the essential elements of the cause of action of unjust enrichment under Florida law: which are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof. *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311 * (S.D. Fla. 2013). As a federal court sitting in diversity jurisdiction this Court under the *Erie* Doctrine, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), this court must apply Florida state substantive law to resolve this unjust enrichment claim under Florida state law.

21.     As and for its *sixth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for failure to state a cause of action under Florida state common law since the Complaint at its heart seeks to establish the existence of a contract for a loan by stating Defendant (a) "verbally and by conduct acknowledged the existence of debt and promised to repay it"[11], (b) "has not repaid the loan"[12], and (c) "has taken funds which were due to Plaintiff as a result of the loan."[13] Plaintiff's Response (D.E. 7), and Plaintiff's counsel in his demand, attached as Ex. D hereto, demonstrate Plaintiff's admission that this Complaint is nothing more than a dispute between two Florida corporate entities over trucks that one company,

---

[11] ¶7

[12] ¶12

[13] ¶16

Defendant, CTA, sublet to Kurashov's company, MLS, which MLS was to operate, under the Agreements, and to which obligations, Plaintiff had guaranteed. Further, the two letters attached to Plaintiff's Declaration[14] evidence by Plaintiff's own admission that this is nothing more than a contractual dispute between Plaintiff and MLS on one side, and Defendant on the other, and the Declaration even admits execution of the Agreements and Guaranty, which demonstrates that unjust enrichment is improper when there are now admitted to contractual Agreements and Guaranty between the parties.

22.     This unjust enrichment count is thus barred because it is well established that where a complaint shows on its face that there exists an adequate remedy at law, there is no jurisdiction in equity. *Greenfield Villages, Inc. v. Thompson*, 44 So.2d 679 (Fla. 1950). If Plaintiff's allegation are taken as true, and the oral loan agreement was formed, as plead, and then Plaintiff has an adequate remedy at law available, because suit on the alleged oral contract is available, rather than a suit in unjust enrichment.

23.     As with implied in law contracts, under Florida law, a claim of an implied in fact contract cannot survive where a valid, express contract exists that covers the same subject matter. *White Constr.*, 633 F. Supp. 2d at 1334-1335. Under Florida law, a plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists. *Id*. Under Florida law, the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract. *Id*.; *Ocean Communs., Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. 4th DCA 2007); *Cross v. Strader Constr. Corp.*, 768 So. 2d 465, 466 (Fla. 2d DCA 2000); *See also Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) ("Quantum meruit damages cannot be awarded when an enforceable contract exists."). In ¶6 of the Complaint,

---

[14] D.E. 7-1

Plaintiff acknowledges that the contract has to do with the financing of the Trucks, which is exactly the subject matter of the Agreements. As such, the Complaint for unjust enrichment must be dismissed with prejudice.

24.     As and for its *seventh* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment should be barred for failure to state a cause of action under Florida state common law since the Complaint at its heart seeks to establish the existence of an oral contract for a loan by stating Defendant (a) "verbally and by conduct acknowledged the existence of debt and promised to repay it"[15], (b) "has not repaid the loan"[16], and (c) "has taken funds which were due to Plaintiff as a result of the loan."[17] However, because from the vague pleading of the Complaint, Plaintiff doesn't identify the terms of the purported oral loan, and unto itself such an oral contract for a loan fails for lack of stating the essential terms of the purported oral loan agreement.

25.     As and for its *eighth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, which seeks to establish the existence of an unenforceable oral contract for a loan, should be barred because the oral representations allegedly made to Plaintiff, as the Guarantor under the Guaranty of MLS' debts to CTA under the Agreements, and upon which his claims in the Complaint are based, and from which they arise, must be excluded under Florida state substantive law, and bar the formation of the alleged loan agreement upon which the Complaint arise, and as such should be dismissed.

25.     As and for its *ninth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, which seeks to establish the existence of an

---

[15] ¶7

[16] ¶12

[17] ¶16

unenforceable oral contract for a loan, should be barred for the reasons set forth in its eighth affirmative defense herein above, and as a result of the merger, integration, and non-modification clauses, of the Agreements, including the Guaranty.

26.    The oral representations allegedly made to Plaintiff, as the Guarantor under the Guaranty of MLS' debts to CTA under the Agreements, and upon which his claims in the Complaint are based, and from which they arise, must be excluded under the merger, integration, and non-modification clauses, of the Agreements, including the Guaranty, and bar the formation of the alleged loan agreement upon which the Complaint arises, and as such should be dismissed.

27.    A contract may be discharged or extinguished by merger into a later contract entered into between the parties with respect to the same subject that replaces the original contract. Prior or contemporaneous oral agreements cannot vary or contradict the unambiguous language of a valid written contract with a merger clause. *White Constr. Co. v. Martin Marietta Materials, Inc.*, 633 F. Supp. 2d 1302, 1337 (M.D. Fla. 2009). Reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties. *Id.* at 1338. The merger, integration, and non-modification clauses under the Agreements bars the purported oral representations upon which Plaintiff relies to try and create the formation of an oral loan agreement, as such the Complaint must be dismissed in its entirety with prejudice.

28.    As and for its *tenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, which seeks to establish the existence of an unenforceable oral contract for a loan, should be barred for the reasons set forth in its eighth affirmative defense herein above, and as a result of the parol evidence rule.

29.    The oral representations allegedly made to Plaintiff, as the Guarantor under the Guaranty of MLS' debts to CTA under the Agreements, and upon which his claims in the Complaint are based, and from which they arise, must be excluded under the parol evidence rule,

and bar the formation of the alleged loan agreement upon which the Complaint arises, and as such should be dismissed.

30.     Parol or extrinsic testimony cannot be received to change, add to or subtract from the terms of a valid written contract. *Knabb v. Reconstruction Finance Corp.*, 197 So. 707 ** (Fla. 1940). As such, the parol evidence rule bars the purported oral representations upon which Plaintiff relies to try and create the formation of an oral loan agreement, and, as such the Complaint must be dismissed in its entirety with prejudice.

31.     As and for its *eleventh* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, which seeks to establish the existence of an unenforceable oral contract for a loan, should be barred for the reasons set forth in its eighth affirmative defense herein above, and as a result of Florida's general Statute of Frauds, Fla. Stat. §725.01.

32.     The oral representations allegedly made to Plaintiff, as the Guarantor under the Guaranty of MLS' debts to CTA under the Agreements, and upon which his claims in the Complaint are based, and from which they arise, must be excluded under Florida's general Statute of Frauds, Fla. Stat. §725.01, and bar the formation of the alleged loan agreement upon which the Complaint arises, and as such should be dismissed.

33.     The purported oral loan agreement arises from the Agreements, and the Guaranty by Plaintiff under the same. The Guaranty establishes Plaintiff's debt to CTA, and as such Plaintiff is a debtor under those Agreements, and Guaranty. The Sub Lease and Operating Agreement, by their very terms, where meant to be performed over a year, it just happens that Plaintiff and MLS defaulted under both those Agreements.

34.     Florida's general Statute of Frauds, Fla. Stat. §725.01, bars the purported oral representations upon which Plaintiff relies to try and create the formation of an oral loan agreement, and, as such the Complaint must be dismissed in its entirety with prejudice.

35. Florida's general Statute of Frauds, Fla. Stat. §725.01 states that:

No action shall be brought whereby to charge … upon any agreement that is not to be performed within the space of 1 year from the making thereof, unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

36. From the vague pleading of the Complaint, Plaintiff doesn't identify the terms of the purported oral loan, but the loan, as alleged was tied to the trucks and the Agreements governing them, and such Agreements were to be performed over more than the course of a year. As such, the general statute of frauds bars this oral loan agreement, and, as such the Complaint must be dismissed in its entirety with prejudice.

37. As and for its *twelfth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, which seeks to establish the existence of an unenforceable oral contract for a loan, should be barred for the reasons set forth in its eighth affirmative defense herein above, and as a result of Florida's Banking Statute of Frauds, codified as Florida Statutes §687.0304(2).

38. The oral representations allegedly made to Plaintiff, as the Guarantor under the Guaranty of MLS' debts to CTA under the Agreements, and upon which his claims in the Complaint are based, and from which they arise, must be excluded under Florida's Banking Statute of Frauds, codified as Florida Statutes §687.0304(2), and bar the formation of the alleged loan agreement upon which the Complaint arises, and as such should be dismissed.

39. The purported oral loan agreement arises from the Agreements, and the Guaranty by Plaintiff under the same. The Guaranty establishes Plaintiff's debt to CTA, and as such Plaintiff is a debtor under those Agreements, and Guaranty. The Sub Lease and Operating Agreement, by their very terms, where meant to be performed over a year, it just happens that Plaintiff and MLS defaulted under both those Agreements.

14

40.     Florida's Banking Statute of Frauds, codified as Florida Statutes §687.0304(2), provides that "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and debtor." §687.0304 "was an act to protect lenders from liability for actions or statements a lender might make in the context of counseling or negotiating with the borrower which the borrower construes as an agreement, the subsequent violation of which is actionable by the lender." *Brenowitz v. Cent. Nat'l Bank*, 597 So.2d 340, 342 (Fla. 2d DCA 1992). Florida's Banking Statute of Frauds governing credit agreements serves to bar any claims that are premised on the same conduct and representations that were insufficient to form a contract and are merely derivative of the unsuccessful contract claim. *Fla. Stat.* § 687.0304; *Dixon v. Countrywide Home Loans, Inc.*, 710 F. Supp. 2d 1325 (S.D. Fla. 2010). Put simply, under the Banking Statute of Frauds, parol evidence is not admissible to contradict the unequivocal written terms of a credit agreement. *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1342 (S.D. Fla. 2011). Accordingly, any claim "that is either directly or indirectly based on alleged oral representations not contained in" a written credit agreement fails as a matter of law. *Id.*

41.     The Banking Statute of Frauds is designed to prevent the enforcement of unfounded fraudulent claims by requiring credit agreements to be evidenced by writing. Its purposes are to intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendoes and to prevent perjuries. In operation, the Banking Statute of Frauds prevents lenders from being enmeshed in and harassed by claimed oral promises made in the course of negotiations not ending in credit agreements reduced to writing. Its primary object is to prevent the setting up of pretended agreements and then supporting them by perjury in swearing contests

where one person's word is pitted against that of another. *DK Arena, Inc. v. EB Acquisitions I, LLC*, 31 So. 3d 313 (Fla. 4th DCA 2010).

42.     The statute is strictly construed to prevent the fraud it was designed to correct, and as long as it can be made to effectuate this purpose, Florida courts are reluctant to take cases from its protection. *See e.g. Wolfson v. Moye*, 214 So. 2d 629 (Fla. 3rd DCA 1968). Thus, credit agreements not in writing or not evidenced by a note or memorandum signed by the party sought to be charged as required by the Banking Statute of Frauds are unenforceable. As such, Florida's Banking Statute of Frauds, codified as Florida Statutes §687.0304(2), bars the purported oral representations upon which Plaintiff, the Guarantor, relies to try and create the formation of an oral loan agreement, and, as such the Complaint must be dismissed in its entirety with prejudice.

43.     As and for its *thirteenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred for having been brought in the improper jurisdiction and venue. The Sub Lease, yet more importantly the direct privity Guaranty[18] signed by Plaintiff, Kurashov personally to Defendant, CTA, irrevocably calls for jurisdiction and venue of disputes between them "in connection with any action or proceeding arising out of or relating to th[e] Guaranty" in Los Angeles, California, not in federal court in Fort Lauderdale, Florida. There is no ambiguity to the fact that this Court is not located in Los Angeles, California.

44.     As and for its *fourteenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred under the doctrine of waiver for having been impermissible brought in this forum. The Sub Lease, yet more importantly

---

[18] D.E. 5-1, at pg. 13, third full paragraph.

16

the direct privity Guaranty[19] signed by Plaintiff, Kurashov personally to Defendant, CTA, irrevocably calls for jurisdiction and venue of disputes between them "in connection with any action or proceeding arising out of or relating to th[e] Guaranty" in Los Angeles, California, not in federal court in Fort Lauderdale, Florida. There is no ambiguity to the fact that this Court is not located in Los Angeles, California. Plaintiff, Kurashov has thus waived his right to sue CTA before this Court.

45.     As and for its *fifteenth* affirmative defense, Defendant, CTA would state that it is entitled to a setoff for any amounts owing by Plaintiff, Kurashov to CTA under the Guarantee of MLS's obligations owing to it under the Agreements, against any amounts that may be awarded to him under his Complaint for unjust enrichment, in the amounts set forth in Ex. D attached hereto.

46.     As and for its *sixteenth* affirmative defense, Defendant, CTA would state that it is entitled to recoup any amounts owing by Plaintiff, Kurashov to CTA under the Guarantee of MLS's obligations owing to it under the Agreements, against any amounts that may be awarded to him under his Complaint for unjust enrichment, in the amounts set forth in Ex. D attached hereto.

47.     As and for its *seventeenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred under the doctrine of unclean hands for his failure to pay to CTA those amounts set forth in Ex. D attached hereto that he owes to CTA under the Guarantee of MLS's obligations owing to CTA under the Agreements.

48.     As and for its *eighteenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred under the doctrine of in pari delicto for his failure to pay to CTA those amounts set forth in Ex. D attached hereto that he owes to CTA under the Guarantee of MLS's obligations owing to CTA under the Agreements.

---

[19] D.E. 5-1, at pg. 13, third full paragraph.

49.     As and for its *nineteenth* affirmative defense, Defendant, CTA would state that Plaintiff, Kurashov's Complaint for unjust enrichment, should be barred under the doctrine of payment in that the monies identified as having been paid to CTA in the Complaint were merely provided to CTA as payment under MLS, and Plaintiff's respective obligation as Guarantor, under the Agreements, as demonstrated by attached Composite Exhibit E, the pre Agreements email exchanges between Kurashov and Anatoly, which emails are translated in ¶¶15-55 of the Counter Claim below and incorporated herein by reference.

**WHEREFORE**, Defendant CTA, for the reason set forth above, respectfully requests that this Court enter judgment against the Plaintiff, and in CTA's favor, and an award of its costs, and reasonable attorney's fees, under the Agreements and Guaranty, and for such other relief as this Court deems is just and proper.

## COUNTERCLAIM

Counter Claim Plaintiff/ Defendant, Cargo Transport Alliance, LLC, a Florida Limited Liability Company ("CTA", "Sublessor", "Guarantee"), by and through undersigned counsel, hereby brings this its Counterclaim against Counter Claim Defendant/ Plaintiff, Sergiy Kurashov's ("Kurashov", or the "Guarantor") and Counter Claim Defendant, Miami Logistic Services, Inc., a Florida corporation owned by Kurashov  ("MLS" or the "Sublessee"), whose address is 3300 N.E.191st, # 1512, Aventura, FL 33180, and states:

1.   This Counter Claim for damages in excess of $75,000.00, exclusive of interest, and costs, against Kurashov, and MLS, as set forth in six counts:

(i)      against MLS for breach of that certain Equipment Sub-Lease Agreement, of the Dakota Financial, LLC ("Dakota" or "Lessor") Lease of four of the same 2012 Kenworth T700 commercial trucks (the "Trucks"), with an incorporated (a)

Delivery and Acceptance Certificate, (b) Guaranty (the "Guaranty"), and (c), Security Agreement, (collectively the "Sub Lease"), that Kurashov executed, both individually and on behalf of MLS, on September 15, 2015, a true and correct copy of which is attached as Exhibit A hereto;

(ii)     against MLS for breach of that certain Operating Agreement, with an incorporated Trailer Lease Agreement, for CTA to operate the Trucks for MLS (the "Operating Agreement"), that Kurashov executed, both individually and on behalf of MLS, on September 15, 2015, a true and correct copy of which is attached as Exhibit B hereto (collectively the Sub Lease and the Operating Agreement, and those agreements included therein, shall be referred to as the "Agreements");

(iii)    against MLS for account stated on the outstanding account balance statement and invoices attached hereto as Composite Exhibits F & G,

(iv)     against MLS for open account on the outstanding account balance statement and invoices attached hereto as Composite Exhibits F & G,

(v)      against MLS for services rendered, provided and sold, as set forth in Composite Exhibits F & G, and,

(vi)     against Kurashov for breach of the Guaranty;

and is brought pursuant to Fed. R. Civ. P. 13(a) & (b) because it arises out of the transaction or occurrence that is the subject matter of Kurashov's claim for unjust enrichment under the Complaint, in that the entirety of the dispute described in the Complaint arises as a result of the Upfront Payment (defined herein below) that Kurashov made on behalf of his closely held company, MLS, as its Guarantor, to CTA, under the Agreements for which MLS, and Kurashov, as Guarantor, is in default and owes a substantial amount of money to CTA, that is far in excess of the amounts already paid by Kurashov, as Guarantor, and on behalf of MLS to CTA, which

Agreements contain merger, integration and non-modification clauses barring any allegations of the creation of an oral loan agreement as alleged in the Complaint.[20]

2.      Kurashov is an individual, over the age of 18 years old, who is sui juris, and has submitted himself to the jurisdiction of this Court by bringing the Complaint in this action.

3.      CTA submits that upon information and belief and from the evidence it knows, Kurashov is domiciled in Florida, and it is not clear that he is not a permanent resident of the United States, since he owns and operates MLS in Miami, in the Southern District of Florida.

4.      MLS is joined as a party to the Counter Claim under Fed. R. Civ. P. 13(h), 19(a)(1) & 20(a)(2) because MLS is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction, and in MLS's absence, the court cannot accord complete relief among Kurashov and CTA, MLS has an interest in the Trucks by virtue of the Agreements and is so situated that disposing of the action in MLS' absence may subject CTA to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest, and any right to relief is asserted against MLS jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and questions of law or fact common to both Kurashov and MLS will arise in the action.

5.      CTA incorporates the admissions and denials of its Answer, as well as the allegations set forth in its affirmative defenses as set forth above as if fully set forth herein in to this Counter Claim.

6.      CTA is a Florida Limited Liability Company, whose principal place of business is 3500 S.W. 50th Ave., Davie, Florida 33314.

---

[20] ¶17 of the Operating Agreement, ¶22 of the Sub Lease, and last paragraph of the Guaranty.

7.      CTA has been in the long haul commercial trucking business since 2015, owning, leasing and/or operating more than 50 fully equipped trucks and tractors (including both dry and refrigerated) for the purposes of servicing its customers' needs by transporting their cargo throughout the continental United States, and employs as independent contractors a team of drivers to service those customers' needs.

8.      Since its inception CTA has been and is fully licensed and insured to engage in the intra-state long haul trucking business, and provides amongst its services safety, dispatch, technical, accounting and maintenance functions from its Davie base which includes its own yard, repair shop and a team of a full-time specialized mechanics along with all the equipment necessary to service its trucks and those of its sub lessors and operating partners, to whom CTA also provides dispatch, quality and profitability control, fleet management, business consulting and provisioning for motor carrier services.

9.      Anatoly Galnov ("Anatoly") and his wife, Marina Galunova ("Marina") are the Managing Members of CTA, who is also managed by its Manager, Khristopher Slusser ("Khris").

10.     MLS is a Florida corporation, who has been doing business from 3300 N.E. 191st, # 1512, Aventura, Miami-Dade County, in the Southern District of Florida since September 10, 2015.

11.     Kurashov is the owner, registered agent and President of MLS.

12.     MLS was created by Kurashov for the purposes of entering into the intra-state long haul trucking business, by subletting trucks and equipment from CTA pursuant to the Sub Lease, and because he had no prior long haul intra-state trucking experience in the United States, by also retaining CTA to operate those trucks, for him and his company, MLS, under the Operating Agreement.

13.     In approximately July of 2015, Kurashov first approached Anatoly, with whom he

21

had no prior personal or business relationship, who was introduced to him as a fellow Russian

speaker and immigrant who had successfully engaged in the trucking business in the United States,

because Kurashov was interested in also entering into said business to establish himself and move

his family to the United States from Ukraine.

     14.    Attached as Composite Exhibit E hereto are true and correct copies of the emails

from July 24, 2015 through August 31, 2015, in Russian, translated herein in ¶¶15-55 of this

Counter Claim below, into English, between Kurashov and Anatoly concerning the subject matter

of this action, including the matters set forth in the Complaint and the Counterclaim, and which

reflect that the monies provided by Kurashov to CTA, and referenced in Ex. A to the Complaint,

were not a loan to CTA as alleged in the Complaint, but were rather payments to CTA by MLS,

and Kurashov pursuant to their obligation to CTA under the Agreements defined herein.

     15. First, on July 24, 2015, Kurashov sent an email to Anatoly in Russian, translated below

into English, which stated that:

> Anatoly Hello! I would like to inform you that everything goes according to plan, even
> afraid to jinx it.
> We have tickets to 09.06.2015. I would like to confirm our agreement, and ask to assist
> me, as surely it will be mutually beneficial, given that it is vitally important to me. I hoping
> for Citibank's favorable attitude towards me, **and I ask you to give the order to start
> searching for me, like we discussed, 4 pieces of equipment in those parameters that
> we discussed.** Our homeland is again in pre-revolutionary state, I'm afraid that would not
> have developed it to fly away.
> Can you recommend me a neighborhood at your choice, in which to rent an apartment, and
> then buy it.
> Say hello to your family, see you soon. With regards, Kurashov SV

     16. That same day, on July 24, 2015, Anatoly responded by email to Kurashov in Russian,

translated below into English, which stated that:

> Sergey, good afternoon!
> I have already held preliminary talks with the Finance company and with truck suppliers
> and with the insurance company. Generally, everything is positive.
> We also began to hire additional drivers. In order to get you oriented, I will describe in
> detail how the whole process will look like and what you must be prepared for. (I'll send
> you by Monday)

Regarding the rent/buy a house/apartment: I recommend you to start to see here these two sites. They are both rental and sale.
http://www.zillow.com/miami-fl
http://www.homes.com/#search
Sincerely, Anatoly.

17.     Thereafter, on July 27, 2015, Anatoly sent another email to Kurashov in Russian,

translated below into English, which was attached as an exhibit to the Demand Letter, attached as

Exhibit D hereto, which stated that:

Sergey, good afternoon!
As promised, I want to describe in more detail the upcoming process.
1. Search for the appropriate trucks. We are faced with the task of finding trucks such as 2010-2012 YOM, with a mileage of 350-400 thousand miles. You better buy all trucks from one customer (the ability to get a discount and after-sales warrantee). We have already established business relationship with a company (one of the US leaders in the sale, operation and maintenance). You can see their site https://www.mhc.com
I talked to them last week, they have some good trucks in Kansas City with low mileage (they bought a fleet of about 30 units from trucking company) and we can choose 4 trucks with the same parameters with low mileage. It should be understood that the market is quite dynamic. The fact that they have now, a week later can be sold. (Especially with such parameters as we need). As a rule, the trucks with lower mileage get sold out faster, this is not surprising. What we gonna do in this case? **We will select the specific units, negotiate price and send it to you for approval. If we are all satisfied, you will need to pay a deposit in order to remove trucks from sale** and reserved for us. (Usually $ 5,000 per truck). In order to find the "right trucks", we need a few days. Therefore, **I would like to advise you that the first $20,000 be ready for next week.** We call this "first installment ". Of course, the deposit will be documented. **First you will receive a formal written proposal, which will have specified VIN numbers of the trucks and offered price and conditions.** You sign the offer and then you are charged for the deposit, which will be offset in the amount of the purchase of these trucks.

2. **After the deposit is paid and the trucks are reserved, we start working on financing. A copy of the above proposal (with VIN numbers, price and coordinates of the Seller) are sent to the financial Company for the consideration of the transaction financing conditions.** This process can take anywhere from one to two weeks. If the credit committee approves the transaction, it will send a written proposal on the amount, terms and conditions of financing, which will be valid for 30 days. **If financing conditions suit you, we sign (accept) the proposal and give "go ahead" for the transaction. You will be billed for the amount of the initial down payment (including the deposit already paid), which must be paid for the transaction. It can be 40-50% of the transaction amount**, but in view of our relationship, we will try to agree on 30%. It will be "second installment ". (There will be a third installment, and the fifth ... but more on that later). Then the financiers themselves communicate with the seller and make out a deal. It takes about two weeks. (Now a month has passed ... )

23

3. Now let's calculate what we can expect?

The average price of trucks that we need - $ 60-75,000. (Cheaper - so older and higher mileage is strongly discouraged. **Keep in mind that we buy Trucks on "AS IS" conditions (as is), this means that once you have bought the truck, all further costs for maintenance are on you.** For old trucks is no longer possible to put them on the warranty, they are more likely to break, costly (the cost is usually unexpected and at the worst possible moment) But the most unpleasant thing is that when the truck break down:. a) it does not earn money, b) we forced to cancel scheduled loads, c) we lose our reputation in the eyes of partners, etc. d) if it is perishable cargo - we have huge losses / penalties e) drivers tend to quit (no one will wait until the repaired truck) and pay driver for layover - very expensive. For reference, here in America **they do repairs very slowly, but the lease payments do not stop (they need to be paid no matter the state of truck).** Well, it's so lyrical digression.

Long story short, I recommend to take the truck that does not exceed 450,000 miles, so they could buy a warranty for at least 200,000 miles / 2years or 375,000 miles / 3 years. In this case, you are covered, at least against unexpected expenses.

Go back to the figures. Let's take for calculation the minimum price of truck (we'll try our best do) let it be 60 thousand, then we go out on the transaction amount to $ 240,000.

Let the sum of the initial payment - 30%. ($ 72,000, respectively) (ie, the first installment - 20,000, and the second - 52,000)

4. **Prior to the completion of the sale it is necessary to pay insurance.** There are 3 mandatory types of insurance: 1). Truck itself (physical damage) on the full value (the amount of the transaction). Now rate is 5.3% (not every insurance company will take it). Total 4 truck = $ 12.720. 2). Cargo Insurance (goods carried by truck) (about 1,850 on track for the year = $ 7,400 and 3). Auto Liability in an amount not less than $ 1 million. This is the most expensive insurance. For beginners rate can be up to 25 thousand per truck per year. We will count on $ 11,700 per truck. total 4 truck = $ 46,800.

Thus, the total cost of insurance on the 4 trucks will be: 12.720 + 7,400 + 46,800 = $ 66.920. This amount we will finance also. I hope to agree on 25% down payment plus 9 monthly payments.

Then you need to pay only $ 16.730 for the insurance. (This is the "Third installment")

5. **Now you must register the trucks and get the Plate numbers.** (Depending on the truck, and the State of registration - from $ 1,700 to $ 2,500). I propose to register on our IRP account (in Florida) will be $ 1750 per truck. Total 4 truck = $ 7,000. This "fourth installment".

6. **Now you need to find the trailers.** (As I understand, you do not want to buy trailers) (for reference: the new trailer is worth about 75 thousand dollars, 2011-2012 - $44 - 53,000.). I recommend - refrigerators. (Easier to find drivers. It is possible to form a team. It is very difficult to find good drivers on the flat-bed). Now is a high season for reefers, but we will try to find it. I rent a trailer for $ 1,200 a month. (1-month deposit plus first

month prepayment total:  $2400 per truck). Let us assume that we will find the same conditions for you. Then the 4 truck  = $ 9,600 (This is the "fifth installment")

7. Total money:
1 installment of 20,000 (a deposit for reservation)
2 installment of 52,000 (down payment for buying)
3 installment of 16.730 (the initial payment for the insurance)
4 installment of 7,000 (registration)
5 installment of 9,600 (trailer rental)
Total: $ 105.330 (about an amount you voiced)

In fairness, we must remind you that we have not considered the cost of an additional warrantee (from 4,950 to 9,650 per truck). I will do my best to include this amount in the price as an additional discounts). **It should also be borne in mind that there will be an additional cost to equip each truck with refrigerator, microwave, power transformer, cargo locks, tools and various small things, such as labels with MC, DOT numbers (a requirement of the authorities), the installation of GPS, electronic transponders (for Tolls), permits in some states, etc.** It may be necessary "change tires"  (big companies use "super singles". We do not need it). But all this we'll find out after we send our technicians to physical inspection. And of course do not forget about the travel costs of the inspection, and then to pick up trucks and trailers from dealership, and to prepare for the trip.

Now I will explain why I wrote about it.
As you can see, the process is not fast. If there will be no delays in financing - takes about 1.5 - 2 months. If we'll start from next week – we have a good chance to get trucks on the road by mid-September. I think this is very important. If you start working in September - then fall into the "good" season (business activity after the summer and the approaching Merry Christmas holidays (always associated with the movement of large quantities of goods). End of December will be slow. Plus -... The winter (the weather), you know what I am saying? If we will start the process after your arrival in September, we will "go to work" in the lowest season in December, which is extremely undesirable (especially to you).

Sergey, it is half past midnight. I'm going to bed. **You carefully read all that I have written,** and I'll write tomorrow the second part (more pleasant) about what you should expect from the operation of your 4 trucks. I will try to write and communicate clearly and realistically.
Hello family. Sincerely, Anatoly.

P.S. I apologize for any errors, misprints and style. :)

18.    That same day, on July 27, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

Anatoly Hello!

With grammar and styling - all excellent! Your writing style is very close to me and it means a lot. But it is better to sleep at night.

**All that you presented me match with my vision, so the program is approved in full and everything.** I thank you for participating in our lives and at the same time convinced that my participation would be feasible and responsible to the company's expansion.

I trust you and your skill in choosing the equipment, since of its technical condition will depend your reputation and results of the company. I also agree to rent refrigerators, because you already feel the market and a review authority for me.

Now the questions:

1. I'll scan copy my passport and a tourist visa. What to do with the transfer of money before my arrival?

I trust you so **I will ask you to accept in America $ 200-250 thousand cash, which I will give here (in Ukraine) by telephone confirmation.** But it may not be in Miami. Will it be difficulty for you?

2. Is it possible to purchase trucks, insurance etc. without my presence?

3. I want you to employ me in you company. Is it possible? And what needs to be done?

The rest I have here according to plan. I wait from my lawyer "my story", which I am going to file (to immigration office).

I am looking forward to the new information. Kurashov

19.     That same day, on July 27, 2015, Anatoly responded by email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon!

Here are answers to your questions.

1). Money Transfer: there are two options.

1. Transfer cash, as you suggest. Physically get the money here in USA is not a problem (including in another city). Much bigger problem is the legalization of this amount. US authorities have a very negative attitude towards cash (especially in big amount). I have a good friend (a powerful lawyer, worked in the International Commission for the Prevention of Money Laundering). He told me many interesting examples and stories. I will not tell it all, I will say only one thing: it is strongly recommended not to mess with cash. (This may have a negative impact on your immigration case and a decision on the financing of the business). Believe me, they do not like cash, with unknown origins, especially from the "Russian".

2. I can offer you a completely legal and "nice" way (which, actually, I've taken advantage of). I can give you an account of the company in Latvia (European bank). You transfer money to this account (if you have cash money, the transfer of cash to non-cash payment, you can still earn a plus 2-3%, which is a trifle, but nice.) The reason for the money transfer will be a contract for the purchase of a 4-Trucks (all as it actually is). And from there the money will be transferred to the United States. The method proved, legal and safe, fully controlled by me personally.

26

2). Acquisition and truck insurance are absolutely possible without your presence. Moreover, your presence is not necessary. You and I will sign all contracts by email. Originals will send by courier DHL. **Since it is not a direct purchase (100%) but the financing, the "Titles" of the Trucks will be transferred to your name only after the last leasing payment done (after 48 months). The truck titles will be issued on the name of the Finance company and operates by our transportation company.**

**There will be 2 types of relations between you and us:**
**1. Leasing agreement (lease contract with subsequent purchase option of 4 trucks). As part of this agreement will be referred to your initial Down payment for the purchase and financing conditions and purchase option.**
**2. The contract for operation of the trucks (you as the owner of trucks pass us on their operation). Our reward will be 12% of sales.**

3). Formal employment in our company is currently impossible. For formal employment in any American company, you must have Work Authorization in this country. You can apply for this permission only after obtaining the appropriate status (in your case, after the approval and acceptance by the authorities of your immigration case and provide you with political refugee status).

Now let's see what we can expect from the operation of trucks.

The profitable part:
1. "Solo", the driver can do on the truck 3-3,5 thousand miles per week Schedule: 3 weeks ... on the road / 1 week Home time. Total: 10-11 thousand miles per truck per month (let's call it "Pessimistic forecast "= 10,000 miles per month on truck)
2. "team" can make 5-6 thousand miles a week.  And also 3 weeks per month on the road. Total per month per truck: 15-18 thousand miles (designated as "optimistic forecast " = 15 000 miles a month on the truck)
3. At the moment, our average rate is 1.87 - 1.93 $ per mile. (We assume for $ 1.90 / mile).

Thus, the estimated Gross revenue /month:
Pessimistic (10,000 miles): $ 19,000 x 4 = $ 76,000
Optimistic (15,000 miles): $ 28,500 x 4 = $ 114,000

Expenditure part:
1. The lease payment is $ 6,600 (Total 4 truck per month)
2. $ 5,600 Insurance (all 3 types for all 4 truck per month)
3. Maintenance $ 8,000 (wheels, brakes, oil and minor damage to all 4 trucks)
Total fixed costs: $ 20,200

Operating expenses:
| Pessimistic | Optimistic |
|---|---|
| 1. Fuel $ 4,600 x 4 = $ 18400 | $ 6.800 x 4 = $ 27,200 |
| 2. $ 4,800 Drivers x 4 = $ 19,200 | $ 8,250 x 4 = $ 33,000 |
| 3. Administrative (12%) $ 9120 | $ 13680 |

4. Trailer Rental $ 1,200 x 4 = $ 4,800          $ 1,200 x 4 = $ 4,800
Total: $ 51520                                    $ 78680

Financial result:
Pessimistic                                      Optimistic
$ 4480                                           $ 15120

Average expected: $ 8,000 - $ 10,000 per month.
(When taking into account investments of $ 100 000 - $ 120 000 or pessimistic scenario ($ 4500 per month): the project apr is around of 50% (in the first 4 years) + after 4 years you have 4 Trucks as your property, with total residual value $ 180.00 - $ 192,000).

Sincerely, Anatoly.

20.     On July 28, 2015, Kurashov responded by email to Anatoly in Russian, translated

below into English, which stated that:

Anatoly welcome! I need a time to think and explore the financial component of my entry, because our banks take the money (especially in a currency) with pleasure, and don't let them go out... Getting cash in Miami I have been confirmed today. I have to think.  In regards to the preparation of documents, go ahead. What do you need? I feel readiness. And convert cash into cashless  - I'll do it in America. This is the situation today in our Country. Even "money changers" dumped currency and I was able to successfully implement this wave of house and so on.
I am waiting for your instructions and documents. SW Kurashov

21.     That same day, on July 28, 2015, Anatoly responded by email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon!
I did not insist on the transfer of money through the Baltic States, it is just an option. If you already have a confirmation of Miami - do through Miami.
The only thing I want to understand - the time frame in which you are ready to finance the project, so that we can start to search trucks, trailers and hire additional drivers.
Our insurance company LLOYDS of London is very conservative and very worry of rapid growth companies. They strongly recommend that we do not add more than 2 trucks a month.
**I have 2 owners here who want to Lease their trucks to us. If we'll start a project with you, then I will refuse them and will negotiate with the insurance company about adding your 4 truck during the August and September.**
Sincerely, Anatoly.

22.     That same day, on July 28, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

**I'm ready. I have money in Miami in City bank, so go ahead. Please give me the preference.** With hope Kurashov

23.     That same day, on July 28, 2015, Anatoly responded by email to Kurashov in

Russian, translated below into English, which stated that:

I will send you now short "Letter of Intent" (within an hour) (I'm in a meeting).

Attached to that email was the following Letter of Intent, in Russian, translated below into English, which stated that:

### LETTER OF INTENT dated July 28th, 2015

Miami, Florida

| | |
|---|---|
| **Lessor:** | **Cargo Transport Alliance LLC,** having its principal offices at 1525 NW 167th St., Suite 115, Miami Gardens, FL 33169. State of Formation ID# FL L15000019251 |
| **Lessee:** | **Mr. Sergey Kurashov** |
| **Equipment:** | **4 (Four) 2011-2012 Semi Truck Tractors** Make: Peterbilt / Kenworth / International / Freightliner |
| **Price Range:** | **$55,000 - $70,000** per each Truck (plus sales taxes if applicable) |
| **Transaction:** | Cargo Transport Alliance LLC shall use best efforts to arrange the Lease-purchase of the above-referenced Trucks to Lessee under the most attractive technical, commercial, and financial terms possible with lowest miles available. |
| **Inspection:** | Lessee shall have the right to inspect the Trucks and the Records to determine the satisfactory condition of the Trucks. Such inspection shall be upon reasonable advance notice to Seller and at a mutually agreeable time and at Lessee's sole cost. |
| **Financed Amount:** | TBD |
| **Term:** | 48 months. (*Can be corrected by mutually agreement.) |
| **Security Deposit:** | **$ 20,000.00 (Twenty thousand US Dollars)** ($5,000 per each truck) shall be remitted to Lessor at the account provided below **upon signing this LOI** and shall be credited against the Purchase Price/Down Payment. |
| **Down payment:** | TBD. |

Shall be remitted to Lessor at the account provided below **upon signing the Equipment Lease-Purchase Agreement.**

| | | |
|---|---|---|
| **Bank Details:** | Beneficiary's Bank: | CITI BANK |
| | Beneficiary Name: | Cargo Transport Alliance LLC. |
| | Account No.: | 3290325343 |
| | ABA Routing #: | 067004764 |

**Insurance:**        The vehicles have to be Insured by the Lessee on his own expense.

**Registration:**        The vehicles have to be registered under the "Cargo Transport Alliance LLC" FMCSA/USDOT numbers at the Lessee's own expense.

Please sign below your acceptance of terms and email **ceo@cta-fl.com**

I HAVE READ AND UNDERSTOOD THE TERMS OF THIS LETTER OF INTENT

**Sergey Kurashov** _____

24.     On July 29, 2015, Kurashov responded by email to Anatoly in Russian, translated below into English, which stated that:

Anatoly,
**I am sending a signed LOI**. **Upon receipt of the Invoice we will decide together how to pay for it from my account in Miami**. I am waiting for your new directives. Kurashov

25.     That same day, on July 29, 2015, Anatoly responded by email to Kurashov in Russian, translated below into English, which stated that:

Sergey, good afternoon!
The signed LOI received, thank you.

Today, we have started an active search for trucks. The situation is as follows:

Let me remind you that we have identified in our LOI price range of 55-70 thousand for the truck and 2011-2012 YOM. In preliminary calculations we relied on 60 thousand for the truck (without ext. Warrantees).
Fleet of Peterbilts (which we discussed last week, sold out ) 350-450 thousand miles no longer exists, there is a range of 550-700 thousand miles (that does not really want to).

There are a huge number of trucks 2012-13 with low mileage, but the price starts from 77 - 80 thousand. (I did not consider such options, the price parameters)

What is available: (which deserves attention from expensive to cheaper):

**1. There KENWORTH T700, 2012,** Detroit 455 hp engine, Automatic transmission, aluminum wheels with mileage 418, xxx + thousand miles, with the APU, excellent condition (one fleet).

Price $ 69.950 (without warranty). Additional warranty (on all, including DPF, transmission and engine) for 1 year / 120,000 miles = $ 4,450, 2 years / 200,000 miles - $ 6,950, 3 years / 370,000 miles - $ 9,250.

I must say - the price is very good for such a truck (For comparison, in April, I was looking for KW T700 for one person - the cheapest, that have been found: 2012 T700 327XXX miles - $ 77950.00).

We have not traded yet "To the last drop" (I first want to consult with you - before I start fight), but based on existing relations and the fact that we have already purchased 5 Trucks from them and will buy another 4, I look forward to discount 1,5-2 thousand per unit. I do not guarantee, but I'll try to "break" the inclusion of the warranty (4,450) to the specified price and agree to the second year we bought a warranty at the end of next year. (So we additionally save money now when you buy). With a warrantee you can play, so we can get an additional discount on the four Trucks $ 17,800.

(Pictures enclosed)

Just a comment:

KW T700 - elegant machine, very reliable. On the positive side - a huge number of service centers all ower USA (any truck-stop). You can fix it at KW, Freightliner or International. A huge advantage - pre-installed APU. This will save you $ 50-60 per day (especially in winter time), there is a $ 1,500- $ 1,800 per month and, accordingly 18-20 thousand per year per truck!

For reference, self-installed APU will cost 20-25,000)

American drivers are very fond of American trucks (easier to find drivers) and better to take auto-transmission (some of drivers do not like the stick, some of them do not know how to drive it (they will kill the clutch).

Disadvantage - a little expensive toy in our situation, a little distracting for the current budget, but well worth it!

**2. There KENWORTH T660, 2011**, Detroit 455 hp engine, Automatic transmission with mileage 527, xxx thousand miles, with the APU, excellent condition.

Price $ 61,500 (without warranty).

(Pictures enclosed)

Comments: a good truck (we have one T660 in the fleet ). From negatives: mileage 527hhh (too much), and it is only one (the other over 600 miles) (there is also a 2012, but price is $74,500)

3. There is another fleet of **Freightliners, Cascadia.** 2010. Mileage 446hhh miles., APU, auto (same fleet).

Price $ 58,500 (without warranty).

Comments: "Russian" drivers like Freightliner (We have 2 Freightliner Cascadia, 2016

YOM, but the price is $167,000 each). Positive: reliable truck, suitable running (450hhh +) huge number of service centers across the United States (at every truck stop). Of the minuses: 2010. (Good driver It is  hard to pull good driver to old track (everyone wants 2016).

(Pictures enclosed)

We are working hard to find alternatives, but I must say – it will be no big difference from today's list.

The final price we will get after physical inspection. And of course, this is only the first stage (simple), the second phase will be much more difficult - to get the approval of the financiers.

**Sergey, I need your opinion, to which option do you lean: newer, but more expensive or cheaper, but older.**
(Do not forget that you can go to "a combination of" 2 + 2 or 3 + 1, all in our hands).
Each method has its pros and cons, and the degree of risk. **(To be fair - all the trucks are break down, even a brand new).**

**I look forward to your advice.**

Sincerely, Anatoly.

26.    The  next  day,  on  July  30,  2015,  Kurashov  responded  by  email  to  Anatoly  in

Russian, translated below into English, which stated that:

Tolia!
I've  always  preferred  the  lower  millage,  and  check  if  it  is  not  twisted  and  technical condition.  **And  10-15  thousand  dollars  should  not  interfere  acquire  a  good  truck. Therefore,  consider  the  possibility  of  increasing  costs,**  where  we  hope  to  increase  the performance. But this blue T-700 is a handsome man. Of course saving request to all where possible.
I have a lot of worries for the preparation of emigration case. I am waiting for an answer to  the  question  of  how  to  pay  20  thousand  from  the  account  at  a  distance. With  respect  to communication

27.    That  same  day,  on  July  30,  2015,  Anatoly  responded  by  email  to  Kurashov  in

Russian, translated below into English, which stated that:

Sergey, good afternoon!
**Your position is clear.**
As  for  the  transfer:  you  can  do  it  online.  Go  to  your  account  in  Citibank  in  the  section "Payments and Transfers" select "Citibank global transfers - US / abroad" further - "transfer to  a  Citibank  client".  The  system  will  request  to  add  the  new  recipient  (in  this  case  - it's

Cargo Transport Alliance).

Go to "Add recipient account" enter the required data and save. In the following, you will be able to do the translation by pressing the "one button" (Prepare your American phone that you specified in the bank when opening the account. The system will send you an SMS with the code on the phone)

This type of money transfer for free.

You can also select the "wire transfer", but it costs 17 to $ 25 for the transfer.

Sincerely, Anatoly.

28.     The next day, on July 31, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

Anatoly! I tried to wire online yesterday. No luck. This is first time for me. According to me, there are restrictions. I called to the reference phones, consulted (they speaks Russian). I'll try again tonight. Kurashov

29.     That same day, on July 31, 2015, Anatoly responded by email to Kurashov in

Russian, translated below into English, which stated that:

Nothing wrong. Understand.

Good luck!

30.     Then, on August 2, 2015, Kurashov responded by email to Anatoly in Russian,

translated below into English, which stated that:

Anatoly! Check account, I experimentally transferred $ 1,000. I'm not sure that my wife and I have done all right? **However, if it does not work, then on August 17-18, I'm going to ask you to take $200 thousand cash through the "money changers" from which you will begin to pay the necessary expenses.**

We are preparing for departure. Lawyer loaded the questions that were quite troublesome in the decision.

Good weekend.

31.     That same day, on August 2, 2015, Anatoly responded by email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon,

I'll check account on Monday morning (they do not update the status of the account on weekends). That's how people live here. They are not in a hurry! :)

**Still working on financing. I am trying to find the best conditions for you.** We have a preliminary approval for $ 175,000 (ie approximately 3 truck) and 50% down payment. There are at least 2-3 other options. Working on it.

I'll keep you informed.

Sincerely, Anatoly.

32.     That same day, on August 2, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

> Anatoly Hello,
> As I understand, that the money is not received, since no news from you. Nothing I can do
> for now. **Anatoly if you have something worthwhile, you book from your working
> capital, and I will reimburse you immediately once I come**. Or you do not hurry to pick
> the options before my arrival. For me, it is strange to make a transfer without an account,
> but only by company name.
> I did not expect that would fall as worries realizing their intentions. So far, according to
> the plan. Kurashov

33.     On August 4, 2015, Anatoly responded by email to Kurashov in Russian, translated

below into English, which stated that:

> Sergey, welcome,
> **Money is not received**. But I am confused by your comment that you are transferring only
> the account without a name. It certainly did not take place.
> You can find all the bank details and account number in our letter of intent, look closely.
> In any case, once again.
> Beneficiary's Bank: CITI BANK
> Beneficiary Name: Cargo Transport Alliance LLC.
> Account No .: 3290325343
> ABA Routing #: 067004764
>
> As for trucks – we are working on it. Everything we like mileage wise (around 400,000
> Miles) we do not like price wise ($75,000 and above).
> Still working on financing.
> **Of course we can reserve trucks using our money, if something will fall very good, do
> not worry.**
> Sincerely, Anatoly.

34.     A week later, on August 11, 2015, Anatoly sent an email to Kurashov in Russian,

translated below into English, which stated that:

> Sergey, good afternoon!
> I want to share information. Throughout the past week we have been actively "fighting"
> with the financiers. The two main parameters: first - to raise the amount of the transaction
> up to 300 thousand (so that we can buy 4 trucks), and the second - to reduce the percentage
> of down payment. Initially, we received approval for $ 175,000 and 50% down. Today we
> have  $180,000 and 42% of down plus an additional deposit (one of our trailers or such),
> or 280,000 and 50% (same conditions from two Landers)

Another Lander is in the process of formation their offers (we expect a response within 1-2 days).

I keep on "Hold" 6 drivers (very experienced guys ready to leave and go to us) hired another manager (working for a brokerage company), is now working for us. Through him we have "access" to previously inaccessible to us large brokers (respectively - to more expensive contracts).

We launch to implement a new system of electronic log-books (a requirement of the authorities, shall enter into force in September 2015) to introduce a new electronic operating system for control and accounting of fleet / load and operating activities. Implemented new requirements and standards of US regulators quality control and compliance system.

In general, all according to plan. We are working to develop and grow.

I'll keep you informed.

Sincerely, Anatoly.

35.     Two days later, on August 13, 2015, Anatoly sent another email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon!

**I need your advice.**

**Today we received approval to 300,000 and 45% down.** These are our financiers, (Dakota Finance) we are already working with them. (For reference, in America, there are several types of lending: traditional, based on credit history and the presence of a social security number (which is unavailable) and second type - collateral based loans (what we are currently working with) based on the collateral property, down payment (typically 50%), or combinations thereof.

Since we raised the amount requested from 175,000 to 300,000 - the risks are increased and they cannot go to a substantial reduction in the Down payment (all that we have achieved - 45%)

I can try to put as an additional collateral one of my truck or trailer that will probably give us an opportunity to reduce down-payment to 40%. (Most likely - this is the most that you can count).

The second lender - they promised us the better conditions, but we have not worked with them, and most likely they will not go for a large amount on the first deal and offer to buy 1 or 2 trucks only. I spoke to them, waiting for a response from both a "like the cake out of the oven."

Now trucks:

We went through all the possible options. For example, Volvo 2013 (very good) - 96,650 $, Freightliner 2012 - $ 75-82,000 and so on. (More than 40 trucks in the United States). Prices are very high everywhere, (now the season and no one "drop off" trucks during the season). By making "victory lap" we went back to the MHC.

a)We have already bought the trucks from them and satisfied with the quality,

b) Trucks in a good conditions

a) a fair price.

35

We secured 4 trucks (2012 KW T700) for $ 69.950 including the warranty.

**Now, the question itself:**
**In fact, we have the approval of a deal no more than 300,000 with Down 45%. This means that if we take 4 T700 in the MHC, the amount of the deal - $ 279.800 and down - $ 125.910**
If we put our truck and trailer, it is possible to lower down to 40% = $ 111.900

**What do you think?**

We spent nearly 2 weeks "fierce" bids and finally got written approval from Seller and Lender. Now, they are beginning to put pressure on me and demand a final decision.

Personal comment:

- Who financing with?
I can stall for time and wait for the second Laender one-two days. My prediction: most probably we will get very similar offer to what we have from Dakota. Most likely they will offer to go "half" transactions (2 truck), and most likely we will get what we have now (or very similar to this). Since we have not worked with them, not sure how much they are clear and efficient in the process. I do not expect a fundamental difference in the offer, so maybe it makes sense to settle for what we have now. (As they say: why look for better if you have the best)

- Down Payment.
High down payment is a strain factor at the beginning (now), but thus we reduce the burden on the subsequent monthly payments (for example, I pay for each Freightliner about 4,350 a month, and you will have (in case of 45% of down) the monthly payment in the range of $ 1,600-1,800). So, you'll get more money from operating activities, and to get more moral satisfaction from the activity (not the impression that you are working only for the payment of the truck).

- Whom buy Trucks from?
It's the same: the shortest way - a familiar way. MHC is a company with a name, respected, reliable and we have already held two transactions with them.

Conclusion: **Everything is ready to complete the transaction.** Personally, I say "yes."

**In any case, I expect the final decision from you.**

Sincerely, Anatoly.

36.     That same day, on August 13, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

Anatoly Good day!

**MHC and 125 thousand**, since I assume that we will be more comfortable with them. But offer from competitors still interesting. This is my opinion but I'm relying more on you. Do not see people unfortunately yet. We do health things before leaving. Want to leave but still keep some papers on emigration case. Thank you for participating in our situation. Kurashov

37.     Four days later, on August 17, 2015, Anatoly sent another email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon!
These trucks are operated in TransAm - a well-known company. Their trucks are always in very good condition. **We have everything ready; only what we waiting from you is down payment.  What are your thoughts, plans, terms?**
Thank you. Anatoly.

38.     The next day, on August 18, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

Tolia hello!
Just came from the banks. Nothing changes, a bunch of restrictions on the transfer from the Ukraine. Neither Swift nor Western work. As I said in the last week, I'll pass $200 grands in Miami. September 7th Arrive and first week will be in the "Hilton", than rent an apartment. **Therefore, if there is a possibility to pay your money, do it. That would not lose the rhythm**.
Busy with sale of cottages, garages etc. Of course, I got a little ahead of schedule and could fly out next week, but already booked tickets etc to September 6th. Something like this. Kurashov

39.     The next day, on August 19, 2015, Anatoly sent another email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, welcome!
**Look, I want us both to clearly understand the situation.**

The fact is that now everything is ready for the transaction as a whole. We are now in the "low start". (Trucks, financing, insurance, drivers, matching drivers with an insurance company, rental trailers, etc.)

The process is started and all agreed. **Everyone just waiting for your "visual signal". We are not talking about $ 20,000 (first installment / deposit for trucks to remove them from sale and secure for us). We are talking about the principal amount of the transaction ($ 126,000) for the purchase of trucks. As I said, I will certainly cut off $20,000 of my money (to remove trucks from sale), but it makes no sense.** If we need 2-3 days to complete the transaction, we can assign this

date and do not "break up" payment.

But if I will pay a deposit for the trucks now, I will confirm that the transaction will take place. This deposit will be non-refundable in case if we suddenly cancel the deal without giving any reason.

**For accurate understanding: If you mean by the phrase: "to pay your money", meaning: to make a payment to $126,000, I have no such possibility.**
In a previous letter to you I have targeted 200,000 for August 17-18, we brought these terms and "readiness" of the transaction.

**Once again, try to make the most accurate prediction of when you will be able to transfer the necessary amount for the transaction?**

In other words:
I can pull the time during this week (before the start of the next). If suddenly, for whatever reason, you will not be able to transfer money or decide not to transfer, and bring the money with you (September 7), then nobody will wait you one more month. **In this case we have to cancel the deal.**

Sergey, please do not take this letter as a kind of "pressure" or blackmail, such as "now or never!" Absolutely not! Nothing fatal will happen.  We will lose these trucks – no problem, there are plenty of others. We will lose these drivers – no problem, we will look for others. Dealer and Lander will yell and scream that will no longer trust us, etc. (Yes, that's bad, but no one died). **The only thing I need from you now - this is the honest answer:  are we doing this deal now or not?**

Thank you. Anatoly.

40.     The same day, on August 19, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

Anatoly! Not in any way I may think about some blackmail. The money transfer depends on the "money changers" who I am going to meet with today, and get a final decision. I'll know exact date by your morning time. **These 200 thousand will be transferred exactly. What concerns "to pay your money", I meant $20,000.**  Do you have any idea how to convert cash? **Nobody will cancel deal.** This is my full exact name Sergey Kurashov as in my passport. As soon as I get the specifics of wire, I will call.

41.     The next day, on August 20, 2015, Anatoly sent another email to Kurashov in

Russian, translated below into English, which stated that:

Sergey, good afternoon!
I do not know what to say. I still continue to promote our project on the "full speed." Currently, for example, sign contracts with two new drivers (only fill out all documents in accordance with the requirements of the Ministry of Transport takes 40-50 minutes). An

hour later, I meet another candidate for Manager (due to the increased number of trucks). Has already received a confirmation and an invoice from the insurance company. There is a project of the contract for the rental of trailers (by the way, is very difficult to find a good trailer at a reasonable price). But you must understand that all of these proposals have a limited validity period.

Lender and the seller call and write several times a day. I spoke with one of the owners of trucks. He wants us to put his 3 trucks on Monday and asks us to give an answer before the end of the week. Otherwise, he will look for another company. Why am I telling you all this? You should be determined.

I do not know whether I should advise you? I would say to myself. I can (even love) to work in the "multi-tasking", but you need to understand exactly "sequence of events". In this situation, I do not like passive waiting, since there is a risk to lose the other deal while waiting on one. If I see that people are starting to "slip" I take the initiative in my hands.

In your case with "money changers". If they start: "... oh, you know, I have to talk to my people ..." - for me it's a"signal." It seems that the guys take the case, but do not realize what to start from? If your "money changers "working on something" - it means they do not have an accurate and verified plan. (If you have a working plan, which is tested and reliable, why do something else? They have to tell you: you transfer cash in Kiev / Odessa, this is a man (that's his name and phone number), and you will get there-and-so from our representative (that's his name and phone number). This is the price and time frame. Period! Lack of confidence - risk factor.

Next point. How to explain the origin of cash here on such amount? If someone had imported from abroad - where is a Customs declaration? If this is an income in the United States - where is the Tax return? 10-20, 50K well, you can do something about, and that takes time. With a large amount - longer and harder. In this country, such actions "extremely limited" and not very welcome. (I have already spoken about this). My principle is: if you can make it "right" - you need to do it right. Option proposed by me - absolutely legal, safe, tested and guaranteed. And most importantly - do not need to wait for anything. Tomorrow you pass the money - on Monday buy your trucks.

I would never offer a dubious scheme like: "we are solving the issues." It's not his "business" to do this type of operations. It can be done solely at personal request and in "single" copy. He is a well-known Ukrainian businessman, the owner of a large business. My good friend, partner and neighbor (neighboring house in Miami). He translated their funds in such way to buy a business and real estate in the United States. Phone in Ukraine: +380 (XX) XXX-XX-XX. Name.

You decide. You can wait for your "money changers", can take advantage of my offer. I need your decision till tomorrow.

Thank you. Anatoly.

42.     The same day, on August 20, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

> Tolia! I also have an account in City Bank in Miami. They can transfer from offshore, my "salary" and I will try once again to make electronic payments. As an option that came to mind. Consult, I am ready for any scheme as long as it is proper.

43.    The next day, on August 21, 2015, Anatoly sent another email to Kurashov in Russian, translated below into English, which stated that:

> Sergey, good afternoon! Look. Your passport is not needed to transfer money.
> Money come from the company "X" marked "Deposit, according to Lease-purchase agreement of 4 trucks # 6377/S between Kurashov and CTA."
> I will send to our bank a copy of this agreement and tell them that we are waiting for wire transfer from the "X" company. It will be no questions. We will sign a further letter from you to the CTA that a deposit for the purchase of trucks under the contract # 6377 / S will go from the company "X". It is our internal relationships.
>
> I do not recommend to make transfer into your personal account.
> 1) It will be question from both banks (here and there) what is the purpose of the payment? Money can be simply frozen (well, if not arrested). Recently, my Citibank froze a check for $26,000 and I spent a few days in order to give an explanation and return the money (with my experience and good English). Suspicious payment of more than 25,000 automatically comes under investigation by the FBI. If you want to practice English with an officer of the FBI – go ahead. :)
> 2) you can't make a payment from your account to ours. The money simply get stuck in your account and we will lose the deal.
> Believe me, we will offer you the easiest, fastest and best option.
> Call this guy. He is waiting for you tomorrow in Odessa.
> He has the Bank details for the transfer.
> Sincerely, Anatoly.

44.    The same day, on August 21, 2015, Kurashov responded by email to Anatoly in Russian, translated below into English, which stated that:

> I'm leaving to Odessa tomorrow morning. Will call them on my way. **If I'll send you 230 thousand, will you be able to give me the difference on my personal expenses?** I will call you on this occasion in the morning.

45.    The same day, on August 21, 2015, Anatoly responded by email to Kurashov in Russian, translated below into English, which stated that:

> **Of course, the difference will be refunded to you. There will be a difference anyway. (even in lesser amount).** All will be done in the best possible way. Do not worry. Good luck on the road.

46.     Five days later, on August 26, 2015, Anatoly sent an email to Kurashov in Russian, translated below into English, which stated that:

> Sergei, good afternoon. The first part (70k) has come today. We expecting the second part (60k). I'll keep you informed.
> Anatoly

An acknowledgment of the August 26, 2015 receipt of the $70,000 is attached as part of Ex. A to the Complaint, and the Demand Letter attached as Ex. D hereto.

47.     The same day, on August 26, 2015, Kurashov responded by email to Anatoly in Russian, translated below into English, which stated that:

> Thank God and you! make a decision on their further movement without damage to the reputation of the company. From SW Kurashov

48.     The next day, on August 27, 2015, Anatoly responded by email to Kurashov in Russian, translated below into English, which stated that:

> Sergei good day. 60k came. Now we send the whole bunch for the purchase of trucks. We will need money for the insurance next week. Everything - according to plan. I'll keep you informed.
> Anatoly

An acknowledgment of the August 27, 2015 receipt of the $60,000 is attached as part of Ex. A to the Complaint, and the Demand Letter attached as Ex. D hereto.

49.     Two days later, on August 29, 2015, Anatoly sent an email to Kurashov in Russian, translated below into English, which stated that:

> Sergey, welcome!
> We all turn out. We managed to close the deal on Friday. (Transaction fully paid). Next week we will arrange titles and deal registration. (will not get registration without insurance). Money will be needed for registration and insurance.
> We are going to order the ELD, signs and equipment for all trucks.
> (Also prepaid).
> 2 truck are located in Atlanta, two others - in Kansas City. Trailers - Indiana. We need money for travel expenses.
> Tell me, how do you plan to transfer money?
> Thank you. Anatoly.

50.     The same day, on August 29, 2015, Kurashov responded by email to Anatoly in Russian, translated below into English, which stated that:

Tolia! Prepare the amount considering the remaining balance if any. I will send you a letter from my attorney where she proposes to take the money from my card. Can you take the money from my card? I'll give you details of my US Citibank card.
Tolia, I believe the cost of insurance and registration has been included in the scenario "126"? Or I do not understand? How registration of trucks can be done without my presence?
In other words, give me a real deal amount that I orient in my capabilities.
From SW Sergey

51. The next day, on August 30, 2015, Anatoly responded by email to Kurashov in Russian, translated below into English, which stated that:

Sergey, good afternoon!
I received a letter. You are right, the exact amount I can give you on Monday and further, accordingly. We are already at the final stage. I am going to get trucks ready on next week. **Once again, for your understanding: 126,000 - this is only the initial payment** (45%) of the value of trucks. **It does not include the cost of registration, insurance, additional equipment, pre-paid for the lease of trailers, as well as the cost of tickets for drivers and the cost of delivery (deadhead) trucks and trailers. (I have described this process in the first letter).** Compared to the initial calculations, we only increased the amount of the initial deposit (in connection with a slight increase in prices for trucks instead of the planned 30-35%, we approved the funding at 45% of down). Registration and insurance are at the same level (rise slightly) and also depend on of the cost of the equipment.
Sincerely, Anatoly.

52. The same day, on August 30, 2015, Kurashov responded by email to Anatoly in Russian, translated below into English, which stated that:

Anatoly welcome! **This is great!** How do you register trucks without my documents and me? Is that possible? Or do you do it for the company? With SW Sergey

53.     The same day, on August 30, 2015, Anatoly responded by email to Kurashov in Russian, translated below into English, which stated that:

Sergey, welcome.
There are two key points needed for registration: the Owner and the Operator.
**Since the trucks have not fully paid yet  - the Title issued on Financial Company name (since formally they are the owner of the trucks)** (we have paid only part of the amount, and they paid the full cost to the Seller. This is common practice for any truck financed, except those purchased for 100% (without funding.). **As soon as you pay the final**

**payment (48 months), the Title will be overwritten in your name.**

Now the Operator. Since these trucks are not for personal use but for commercial activities – it has to be registered with transportation company (the operator), which has a valid certificate/license and is legally responsible for compliance with safety requirements. This is our company. We request the authorities to register trucks under our MC and we will take responsibility for the operation of these vehicles in accordance with the requirements. Sincerely, Anatoly.

54.     The same day, on August 30, 2015, Anatoly followed that email up with another

email to Kurashov in Russian, translated below into English, which stated that:

Sergey, welcome. In continuation of our correspondence about the future expenses (next week).

1. Insurance. (The most expensive).
Liability Insurance: $ 12,300 x 4 = $ 49,200
Cargo insurance: 1,850 x 4 = $ 7,400
Physical Damage Insurance (5.3% of the value). $ 280,000 x 5.3% = $ 14,840
Total: $ 71.440 full cost of insurance for a year. (we will finance it)
It is necessary to pay: $ 17.860 Down payment: (25%)

2. Registration of trucks: find out the exact amount after application. Approx: $ 1,800 - $ 2,000 per truck.
Total: it is necessary to pay: 7,500 - 8,000 $

3. Installation of satellite electronic devices (ELD). Each unit costs $ 200 + $ 20 + $ 30 shipping installation and configuration. Total $ 250 each.
Needed: $ 1,000

4. Sending drivers for Trucks and trailers.
2 drivers in Atlanta (GA), 2 driver in Kansas City (MO).
Flights 4 x $ 150 = $ 600 taxi from the airport to the dealer $ 100 x 2 = $ 200
Deadhead to trailers (Indiana or Chicago):
Fuel: $ 300-350 per truck = $ 1,400
Payment drivers: $ 300 x 4 truck = $ 1,200
Total: $ 3,400

5. Trucks must be equipped with:
Voltage converter: $ 260
Refrigerator: $ 110
Microwave: $ 60
Load locks: $ 200 kit
Total: $ 630 x 4 = $ 2,520

Total: $ 32.780

55.     The next day, on August 31, 2015, Kurashov responded by email to Anatoly in

Russian, translated below into English, which stated that:

> **Anatoly good morning! Everything is logical and understandable, the order of numbers is clear. Financing from my card,** if possible (according to a lawyer letter) **or take the opportunity to pay from your own cash flow, and I will give you cash 9.7.15** (this option is preferable for me, and I think easier and more legitimate for you). Keep me Informed. I am waiting for letters. From SW Kurashov

56.     As demonstrated by the emails cited in ¶¶15-55 above, Kursahov asked Anatoly about, and Anatoly did advise him in detail about the income, profits, costs, insurance and licensing requirements for entry into this field of business, including the time and regulatory requirements necessary to becoming properly licensed to enter into the intra-state trucking industry in the United States.

57.     As demonstrated by the emails cited in ¶¶15-55 above, Kurashov was looking to invest about $175,000 to enter into this business, and it became apparent to him from his discussions with Anatoly that purchasing trucks and trailers would not be cost effective and that leasing the trucking equipment and having someone operate the trucks for him made more economic sense, especially in light of Kurashov having no prior credit in the United States nor prior experience in this field.

58.     As demonstrated by the emails cited in ¶¶15-55 above, eventually Kurashov decided that rather than purchasing the trucks for himself that he would set up a new company, MLS, which in turn would sublet four of the same Trucks from CTA, who in turn would lease the Trucks from one of CTA's existing equipment leasing companies, Dakota, and that CTA would operate the Trucks for MLS, and pay to MLS any net profits after deducting costs and expenses, including CTA' operating fee.

59.     In the trucking industry, as in most industries, equipment lessors like Dakota pay the cost to purchase the equipment, which in this case was the Trucks, and then finance the purchase through an equipment lease, requiring period rental payments from the lessee to the

lessor, securitized by the collateral purchased, with a significant lease deposit, and the lessee, would retain a residual right to purchase the equipment (the Trucks) at the end of the lease term.

60.     As demonstrated by the emails cited in ¶¶15-55 above, at the insistence, instruction and agreement of Kurashov, in August 2015, CTA, utilizing its own credit and placing its own credit at risk for the benefit of MLS, leased the Trucks from Dakota on MLS's behalf, at which time Dakota, as per the terms of its Lease required a $126,000 cumulative deposit for the Trucks ($31,500 per Truck), which was paid by MLS, and is reflected in Ex. A to the Complaint in this action, and mischaracterized by Kurashov in the Complaint as a loan.

61.     The above arrangement was demonstrated by the August 14, 2015 approval letter from CTA to Kurashov establishing that $126,000 was for the down payment for the financed Trucks, that was attached as an exhibit to the September 14, 2016 Demand Letter from counsel for Kurashov, and MLS, a true and correct copy of which is attached as Exhibit D hereto.

62.     On September 3, 2015, CTA sent to Kurashov, an invoice, a true and correct copy of which is attached as an exhibit to the Demand Letter attached as Exhibit D hereto, asserting the amounts owing for the Upfront Payment (as defined herein below) at the time from MLS and Kurashov to CTA as $168,238.50, acknowledging that $130,000 was paid by Kurashov toward that amount, established that $126,000 of the $130,000 was for the down payment for the financed Trucks, and that an additional $38,238.50 was still due and owing from Kurashov to CTA on the Upfront Payment.

63.     Thereafter, on September 15, 2015, Kurashov, both individually and on behalf of MLS, memorialized his agreement with CTA, and executed and entered into with CTA, the Sub Lease, a true and correct copy of which is attached as Exhibit A hereto.

64.     Under the Sub Lease, Kurashov, both individually and on behalf of MLS, acknowledged delivery and acceptance of the Trucks, personally guaranteed MLS' obligations to CTA, and provided CTA with a security interest in the Trucks.

65.     Under the Sub Lease, MLS was obligated to pay to Dakota through CTA, and Kurashov guaranteed those periodic rental payments due to Dakota under the master lease between Dakota and CTA, attached as Ex. C hereto.

66.     After MLS' initial payment of the $130,000 deposit, neither MLS, nor its guarantor, Kurashov, have ever paid any of the periodic rental payments on the Trucks to Dakota, or CTA, thereby requiring CTA to make those payments to Dakota at risk of having the Trucks repossessed by the master Lessor, Dakota, as per Ex. C, the Dakota Lease.

67.     The total amount of past due lease payments (all Invoices including late fees) due and owing to CTA from MLS, and its Guarantor, Kurashov, under the Sub Lease, and Guaranty, is $133,229.85, (the "Sub Lease Amounts Owing"), pursuant to the Statement of Lease payments attached as Exhibit F herein.

68.     At the same time as the execution of the Sub Leasse, on September 15, 2015, Kurashov, both individually and on behalf of MLS, executed and entered into with CTA the Operating Agreement, a true and correct copy of which is attached as Exhibit B hereto.

69.     Both the Sub Lease and Operating Agreement are signed by Kurashov, as MLS' Owner.

70.     Since execution of the Agreements CTA has been continuously operating the Trucks for MLS' benefit pursuant to the terms of the Operating Agreement, and making payment to Dakota, on MLS' and Kurashov's behalf under the Dakota Lease and Sub Lease.

71.     None of the Agreements have ever been terminated.

72.     CTA provided to MLS the Services it was required to do under the terms of the Operating Agreement, and billed and invoiced MLS the amounts incurred by it for the Services it rendered to MLS under the Operating Agreement, as set forth in Exhibit B hereto.

73.     Neither MLS nor Kuraashov ever objected to any of the Services provided by CTA, nor objected to any of the bills or invoices, provided to it by CTA.

74.     After MLS' initial payment of the $130,000 deposit, and subsequent payment of $38,238.50, for a total upfront payment of $168,238.50, acknowledged to be an upfront payment, and not a loan, by the September 3, 2015 invoice attached as part of the Demand Letter, attached hereto as Ex. D (the "Upfront Payment"), and notwithstanding being provided detail billings under the Operating Agreement, neither, MLS, nor the Guarantor, Kurashov, have ever paid any of the Sub Lease Amounts Owing, nor paid any of the further expenses and costs associated with operating the Trucks, as they are obligated to do under the terms of the Sub Lease, Operating Agreement, and Guaranty.

75.     The total amount of unpaid expenses and costs associated with operating the Trucks, coupled with the Sub Lease Amounts Owing due and owing to CTA from MLS, and its Guarantor, Kurashov, under the Agreements, after application of the Upfront Payment, is $159,210.73 (the "Balance Owing"), including 3 adjustments: #1Additional Maintenance for 2015, #2 IFTA and Permits reimbursement , #3 Additional Maintenance for 2016, pursuant to the Summary Statement attached as Exhibit G herein.

76.     MLS only paid the Upfront Payment, but not all of the bills and invoices, as reflected, and as set forth, in Composite Exhibit G.

77.     CTA has made repeated demands upon MLS, MLS, and Kurashov, as Guarantor, both orally and in writing for the payment of the remaining outstanding Balance Owing, and as reflected on Composite Exhibit G.

78.     MLS, through and Kurashov, has acknowledged the Balance Owing to CTA, yet continues to fail to pay CTA the Balance Owing.

79.     MLS and Kurashov, as Guarantor have both failed to pay the Balance Owing to CTA, despite demand made upon them for payment, thereby necessitating the bringing of this action.

80.     MLS and Kurashov, as Guarantor's refusal to pay the Balance Owing constitutes a breach of each of the Agreements, and Guaranty, resulting in damages owing to CTA for the Balance Owing.

81.     Under the terms of the Agreements, CTA is entitled to the recovery of its reasonable attorney's fees and costs incurred in bringing and defending this action.

82.     CTA has obligated itself to pay undersigned counsel and law firm its reasonable fees and costs to defend and bring this action.

83.     All conditions precedent to the bringing of this lawsuit have been met, excused, waived and/or have been performed.

## Count I – Breach of the Sub Lease

84. CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

85. This is a claim for breach of the Sub Lease against MLS.

86. MLS has breached the Sub Lease with CTA by failing to pay it the Sub Lease Amounts Owing of $133,229.85, pursuant to the Statement of Lease payments attached as Exhibit F herein.

87.     As a result of MLS's breach and failure to pay CTA, CTA has been damaged.

88.     There now remains the Sub Lease Amounts Owing of $133,229.85 from MLS to CTA as of the date of this Counter Claim as a result of the breach of the Sub Lease.

**WHEREFORE**, CTA respectfully requests entry of judgment against MLS for breach of the Sub Lease for compensatory damages in the amount of the Sub Lease Amounts Owing of

$133,229.85, interest, costs, and reasonable attorney's fees under the Sub Lease, and requests such further relief as this Court deems just and proper.

## Count II – Breach of the Operating Agreement

89.     CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

90.     This is a claim for breach of the Operating Agreement against MLS.

91.     MLS has breached the Operating Agreement with CTA by failing to pay it the remaining outstanding Balance Owing of $159,210.73, pursuant to the Summary Statement attached as Exhibit G herein.

92.     As a result of MLS's breach and failure to pay CTA, CTA has been damaged.

93.     There now remains the Balance Owing of $159,210.73 from MLS to CTA as of the date of this Counter Claim as a result of the breach of the Operating Agreement.

**WHEREFORE**, CTA respectfully requests entry of judgment against MLS for breach of the Operating Agreement for compensatory damages in the amount of the Balance Owing of $159,210.73, interest, costs, and reasonable attorney's fees under the Operating Agreement, and requests such further relief as this Court deems just and proper.

## Count III – Account Stated

94.     CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

95.     This is a claim for account stated to recover money owed by MLS to CTA in which CTA and MLS had agreed to the Balance Owing, but in which MLS has never paid.

96.     MLS and CTA engaged in periodic billing as related to the Services provided by CTA to MLS, as reflected on Composite Exhibit G, in which some, but not all, of those billings were paid.

97.     CTA duly stated and rendered a statement of account to MLS in the amount of the Balance Owing, as reflected on Composite Exhibit G, and the same was retained without objection.

98.     MLS failed to object, at any time, to the invoices, as reflected in Composite Exhibits F & G, which raises a presumption of assent to the same.

99.     MLS has never paid, and owes to CTA the Balance Owing, pursuant to the invoices, reflected in attached Composite Exhibits F & G.

100.    MLS has admitted its default and liability to CTA.

101.    By reason thereof an account was taken and stated between the parties hereto.

**WHEREFORE**, CTA respectfully requests entry of judgment against MLS for an account stated for compensatory damages in the amount of the Balance Owing of $159,210.73, interest, and costs, and requests such further relief as this Court deems just and proper.

## <u>Count IV – Open Account</u>

102.    CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

103.    This is a claim to recover money owed on an open account against MLS, who received CTA's Services and was rendered periodic billings for the same, which billings remain outstanding and unpaid for the Balance Owing.

104.    MLS had an account with CTA, and CTA rendered MLS a statement for the Balance Owing, as reflected in Composite Exhibits F & G.

105.    The Balance Owing from MLS to CTA has never been paid.

**WHEREFORE**, CTA respectfully requests entry of judgment against MLS on an open account for compensatory damages in the amount of the Balance Owing of $159,210.73, interest, and costs, and requests such further relief as this Court deems just and proper.

## Count V – Services Rendered, Provided And Sold

106.    CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

107.    This is a claim to recover money owed on for Services rendered, provided and sold by CTA to and against MLS.

108.    CTA provided MLS the Services it was required to provide under the Agreements.

109.    MLS purchased those Services.

110.    The price for those Services that was agreed to under the Agreements is the Balance Owing, as reflected in Composite Exhibits F & G.

111.    The Services Levitan provided to MLS were never paid for, as reflected in Composite Exhibits F & G.

**WHEREFORE**, CTA respectfully requests entry of judgment against MLS for Services rendered, provided and sold, as compensatory damages in the amount of the Balance Owing of $159,210.73, interest, and costs, and requests such further relief as this Court deems just and proper.

## Count VI – Breach of the Guaranty

112.    CTA incorporates those allegations set forth in ¶¶1 through 83 above of this Counter Claim, and the above affirmative defenses as if fully set forth herein.

113.    This is a claim for breach of the Guaranty against Kurashov.

114.    In connection with the Agreements, Kurashove executed in favor of and delivered to CTA the Guaranty, which is absolute, continuing, unlimited, and unconditionally guaranteeing the payment of all amounts due and owing CTA by MLS under or pertaining to the Agreements.

115.    As a result of MLS's failure to pay the Balance Owing, the Agreements guaranteed

by Kurashov are now in default.

116.    In the event of a default under the terms and conditions of the Agreements guaranteed by Kurashov, all obligations under each have now become due and payable, and CTA has accelerated the payments due under the Agreements.

117.    There is currently due the Balance Owing from MLS on these obligations under the Agreements, and from Kurashov, on the Guaranty.

118.    MLS has now defaulted under the Agreements, by failing to pay the Balance Owing.

119.    Pursuant to the Guaranty, Kurashov, guaranteed the payment and performance of MLS under the Agreements.

120.    CTA made demand upon MLS and Kurashov to pay the Balance Owing.

121.    MLS and Kurashov have failed to pay, and have refused to pay the Balance Owing to CTA under the Agreements and the Guaranty.

122.    CTA has duly and substantially performed all of its obligations under the Agreements and the Guaranty.

123.    Kurashov has breached the Guaranty with CTA by failing to pay it MLS' remaining outstanding Balance Owing of $159,210.73 to CTA, pursuant to the Summary Statement attached as Exhibit G herein.

124.    As a result of MLS, and its Guarantor's breach and failure to pay CTA, CTA has been damaged.

125.    As the direct and proximate result of the breach of the Guaranty, CTA has sustained damages in an amount of the Balance Owing, which amount continues to accrue daily, and which amount exceeds $75,000.00.

126.    There now remains the Balance Owing of $159,210.73 from Kurashov to CTA as

of the date of this Counter Claim as a result of the breach of the Guaranty.

**WHEREFORE**, CTA respectfully requests entry of judgment against Kurashov for breach of the Guaranty for compensatory damages in the amount of the Balance Owing of $159,210.73, interest, costs, and reasonable attorney's fees under the Guaranty and Agreements, and requests such further relief as this Court deems just and proper.

Dated: June 6, 2017

**SHENDELL & POLLOCK, P.L.**
*Counsel for Defendant,*
*Cargo Transport Alliance, LLC*
2700 N. Military Trail. Suite 150
Boca Raton, FL  33431
Tel: (561) 241-2323

/s/ Ivan J. Reich
Ivan J. Reich
Fla Bar No. 778011
ivan@shendellpollock.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 6th day of June, 2017, (a) electronically upon all parties that have registered for the CM/ECF service, including (i) Sergiu Gherman, Esq. counsel for Plaintiff , Gherman Legal, PLLC, 23 SE 2nd Ave., Suite 808, Miami, FL 33131—1603, at sgherman@ghermanlaw.com.

/s/ Ivan J. Reich
Ivan J. Reich

W:\Files\CTA-FL Adv. Kurashov\Pleadings\PLEAD - CTA Answer Affirmative Defenses And Counterclaim 6-6-17.Docx