

*EQUIPMENT SUB-LEASE AGREEMENT*
*Lease #6377/S*

**LESSOR:** **Cargo Transport Alliance, L.L.C.**
FL State of Formation ID#: L15000019251
1525 NW 167th Street, Suite 115,
Miami Gardens, FL 33169

**LESSEE:** **Miami Logistics Services Inc.**
FL State of Formation ID#: P15000075573
EIN: 47-5080303

**EQUIPMENT DESCRIPTION:**
2012 Kenworth T700, Vin#: 1XKFDP9X2CJ296617,
2012 Kenworth T700, Vin#: 1XKFDP9X5CJ293405,
2012 Kenworth T700, Vin#: 1XKFDP9X7CJ293377,
2012 Kenworth T700, Vin#: 1XKFDP9X4CJ293387.

**SCHEDULE OF LEASE PAYMENTS:**
**Security Deposit:** $126,000.00
**Monthly Rent:** $ 5,495.00
**Number of Rent Payments: 48 Months**

## TERMS AND CONDITIONS

*THIS LEASE IS SUBJECT TO THE TERMS AND CONDITIONS PRINTED HEREON AND ON THE*
*FOLLOWING PAGES, ALL OF WHICH ARE MADE A PART HEREOF.*
*PLEASE READ CAREFULLY BEFORE SIGNING.*

**1. LEASE.** Cargo Transport Alliance, LLC ("Lessor") leases to the above-named Lessee ("Lessee"), and Lessee hereby leases from Lessor, all items of equipment (collectively, the "Equipment" and each an "Item" of Equipment) listed above and/or in a separate schedule attached hereto and made a part hereof (each a "Schedule"). The terms "Item" and "Equipment" shall also mean and include all replacements, repairs, substitutions, additions, and accessions therefore and/or thereto. Lessor and Lessee agree that this Lease is a "Finance Lease" as defined by California Commercial Code ("Cal. Com. C.") Section 10103(a)(7). Lessee acknowledges that Lessor has not selected, manufactured or supplied any Equipment used by Lessor to Lessee and that Lessor has acquired the Equipment and has the right to possession and use of the Equipment in connection with entering into this Lease with Lessee. Lessee further acknowledges that Lessee has received a copy of any contract or Supply Contract (as defined by Cal. Com. C. §10103(a) (25)) by which the Lessor acquired the Equipment and the right of possession and use of the Equipment before signing this Lease. Lessee further acknowledges that approval of the Supply Contract from the vendor, manufacturer or other Supplier (as defined by Cal. Com. C. §10103(a)(24)) is a condition to the effectiveness of the Lease. Lessee further acknowledges that before executing this Lease, it has received an accurate statement designating the policies and warranties, and any disclaimers or warranties, indications or modifications or remedies, or liquidated damages, including those of a third party, such as the manufacturer of the Equipment, provided to Lessor by the Supplier in connection with Supplier's part of the Supply Contract by which the Lessor acquired the Equipment and its right to possession and use of the Equipment. Lessee further acknowledges that Lessee is informed of the identity of the Supplier of the Equipment to Lessor and Lessee further has selected the Supplier and directed the Lessor to acquire the Equipment to obtain the right to possession and use of the Equipment from that Supplier. Lessee further acknowledges that it is entitled under Division 10 of the Cal. Com. C. to all promises and warranties, including those of any third party, provided to Lessor by the Supplier or manufacturers of the Equipment. Lessor and Lessee further acknowledge that Lessee may communicate with Supplier of the Equipment. Lessor shall lease to Lessee and Lessee shall lease from Lessor an Item of Equipment, all of the Equipment, goods and other personal property described in the schedule now or hereafter from time to time executed by Lessor and Lessee and made a part hereof, all upon the terms and conditions hereinafter set forth or supplemented with respect to each Item of Equipment by the terms and conditions set forth in each schedule or any written addenda or agreement executed by Lessor and Lessee. It is the intent of Lessor and Lessee that this Lease is a true lease and not a lease intended as security pursuant to Cal. Com. Code Section 1201(36). However, if for any reason this Lease is not deemed to be a true lease, which is contrary to the terms herein and the intent of Lessor and Lessee, then Lessor is granted a first priority security interest in the Equipment and the other property described in any Schedule and proceeds

Initial: _SK_ Miami Logistics Services Inc.

thereof including but not limited to (1) the proceeds from a sale or transfer of any right, title or interest of intangibles and claims and rights to recover any amounts in respect of the Equipment against the manufacturer and/or seller of the Equipment; (2) insurance proceeds, and requisition, indemnity or other payments of any kind for the Equipment.

**2. TERM.** The "Term" of this Lease shall commence on the first day of the month in which Lessee executes and delivers to Lessor the Delivery and Acceptance Certificate in a form prescribed by Lessor that corresponds to each Schedule to this Lease (each a "Delivery and Acceptance Certificate"), and ends on the last day of the last month of the number of months stated above as the Term. If any Term is extended, the word "Term" as used herein shall be deemed to refer to each and every extended or renewal term of this Lease. All provisions of this Lease shall apply during any extended Term except as may be otherwise specifically provided in this Lease, in any applicable Schedule to this Lease, or any subsequent written agreement of Lessor and Lessee. With respect to each Schedule, if for any reason the Equipment has not been delivered, installed and accepted by Lessee within ninety (90) days after it is ordered by Lessor, or if Lessee fails to accept the Equipment and execute a Delivery and Acceptance Certificate within 14 days following delivery of the Equipment, Lessor may, at Lessor's option, deem the Term to have commenced and Lessee shall thereafter be liable for all obligations due pursuant to the terms of this Lease. Alternatively, Lessee may terminate Lessor's obligations under such Lease and Lessee shall, on demand of Lessor, pay Lessor all amounts paid or owing by Lessor in respect to the purchase of such Equipment and indemnify and hold Lessor harmless from any and all liabilities, claims, costs and expenses to the Supplier of the Equipment or any other party, arising out of or relating to the Equipment or the Lease. Upon payment of such amounts, Lessor, at Lessee's request, shall execute a quitclaim bill of sale with respect to such Equipment to Lessee on an "AS IS", "WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT ANY WARRANTIES EXPRESS OR IMPLIED BY LESSOR, AS TO ANY MATTER WHATSOEVER other than a warranty that such Equipment is free and clear of all liens and encumbrances arising from Lessor's actions. Lessee shall upon such payment be subrogated to Lessor's claims, if any, against the Supplier of such Equipment. Lessee agrees that its remedies, should it find fault with any of the Equipment, shall be and are solely against the Supplier.

**3. RENT.** Lessee shall pay Lessor the total rent for the Term, which shall be the total amount of all rent payments stated in the "Schedule of Lease Payments" above or in any Schedule, plus such additional rents as may arise under this Lease. All monthly payments of rent shall be payable in advance, starting on the Commencement Date set forth above in this Lease and on the same day of each month thereafter, whether or not Lessor has rendered an invoice therefore, at the office of Lessor set forth herein or to such other place as Lessor may from time to time designate in writing. If Lessee fails to pay any rent or other sum to be paid by Lessor hereunder within ten (10) days after the due date hereof, Lessee shall pay Lessor (a) an amount calculated at the rate of ten cents ($.10) per one dollar ($1.00) of each such delayed payment, and shall pay within ten (10) days after the original due date, as compensation for Lessor's internal operating expenses arising as a result of such failure, (b) amounts paid by Lessor to others relevant to the collection thereof, and (c) interest on such unpaid rent or other amount, at the rate of eighteen percent (18%) per annum based on a 360 day year or at such lesser rate as may be permitted by law, computed from the date due to the date paid. If any check made to pay rent or any other sum paid by Lessee to Lessor hereunder is returned unpaid for any reason whatsoever, Lessee shall pay Lessor the additional sum of twenty-five dollars ($25.00) as Lessor's operating expenses resulting from such unpaid check.

**4. ADVANCE RENTS.** Lessee shall make a non-refundable payment to Lessor of "Advance Rents" or "Advance Payments" as set forth in the "Schedule of Lease Payments" above or in any other Schedule. Lessor may, but shall not be obligated to, apply any such amount to cure any default of Lessee hereunder, in which event Lessee shall promptly restore any amount so applied within five (5) business days after Lessor's written demand for such amount.

**5. SECURITY DEPOSIT.** Any security deposit paid by Lessee at the inception of or at any time during the Term shall be held by Lessor to secure payment for potential damages or excessive wear and performance of the obligations of Lessee hereunder. In the event Lessee performs each and every obligation under the terms of this Lease, such security deposit or so much thereof that has not been applied by Lessor shall be returned to Lessee. Lessee hereby grants to Lessor a first priority security interest in any security deposit and proceeds thereof. Any security deposit so taken shall be non-interest bearing, does not have to be segregated by Lessor, and may be commingled with other deposits or money of Lessor. Lessor may, but shall not be obligated to, apply any security deposit to cure any default of Lessee, in which event, Lessee shall promptly restore any amount so applied within five (5) business days after Lessor's written demand for a replacement deposit.

**6. SELECTION OF EQUIPMENT: DISCLAIMER OF WARRANTIES.** Lessee has selected both the Equipment and the Supplier from whom Lessor covenants to purchase the Equipment at Lessee's request. LESSEE ACKNOWLEDGES THAT LESSOR HAS NO EXPERTISE OR SPECIAL FAMILIARITY ABOUT OR WITH RESPECT TO THE EQUIPMENT. LESSEE AGREES THAT THE EQUIPMENT LEASED HEREUNDER IS LEASED "AS IS" AND IS OF A SIZE, DESIGN AND CAPACITY SELECTED BY LESSEE AND THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR LESSEE'S PURPOSES, AND THAT LESSOR HAS MADE NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE SUITABILITY OR DURABILITY OF SAID EQUIPMENT FOR THE PURPOSES AND USES OF LESSEE, NOR ANY OTHER REPRESENTATION OR

Initial: _S K_   Miami Logistics Services Inc.

WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT THERETO, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. If the Equipment is not properly installed, does not operate as represented or warranted by the Supplier and/or manufacturer, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the Supplier and/or manufacturer and shall, nevertheless, pay Lessor all rent payable under this Lease and shall not set up against Lessee's obligations any such claims as a defense, counterclaim, claim, cause of action, set off or otherwise. So long as Lessee is not in breach or default of this Lease, Lessor hereby assigns to Lessee, solely for the purpose of making and prosecuting any such claim any rights, which Lessor may have against the Supplier and/or manufacturer for breach of warranty or other representation respecting any Item of Equipment. All proceeds of any warranty recovery by Lessee from the Supplier and/or manufacturer of any Item of Equipment shall first be used to repair or replace the affected Item of Equipment.

LESSEE ACKNOWLEDGES THAT NEITHER THE SUPPLIER NOR ANY SALESMAN, EMPLOYEE, REPRESENTATIVE OR AGENT OF THE SUPPLIER ("SUPPLIER") IS AN AGENT OR REPRESENTATIVE OF LESSOR OR VICE VERSA, AND THAT NO SUPPLIER IS AUTHORIZED TO WAIVE OR ALTER ANY TERM, PROVISION OR CONDITION OF THIS LEASE, OR MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THIS LEASE OR THE EQUIPMENT. LESSEE AGREES AND ACKNOWLEDGES THAT SUPPLIER IS LESSEE'S AGENT AND NOT LESSOR'S AGENT WITH RESPECT TO THE EQUIPMENT, THE OPERATION AND ACQUISITION OF THE EQUIPMENT, AND ANY AND ALL REPRESENTATIONS AS TO THE EQUIPMENT. Lessee further acknowledges and agrees that Lessee, in executing this Lease, has relied solely upon the terms, provisions and conditions contained herein and any other statements, warranties, or representations, if any, by the Supplier, or any salesman, employee, representative or agent of the Supplier, have not been relied upon and shall not in any way affect Lessee's obligation to pay the rent and otherwise perform as set forth in this Lease. TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ALL OF ITS RIGHTS AND REMEDIES CONFERRED UPON A LESSEE UNDER SECTIONS 10508 THROUGH 10522 OF THE CAL. COM. C. AND LESSEE WARRANTS THAT THIS PROVISION HAS BEEN NEGOTIATED BY LESSOR AND LESSEE.

**7. COMMERCIAL RISK.** Lessee bears all risk that the Equipment may become unusable for any reason, including without limitation, loss, theft, damage, destruction, defect, governmental regulation, prohibition, impracticability of use, obsolescence or commercial frustration. Unless otherwise provided herein, no inability to use the Equipment shall result in the termination of this Lease or relieve Lessee of any of its obligations under this Lease. In addition, Lessee is responsible for obtaining all licenses necessary to use the Equipment and under no circumstances shall Lessee bring any action against Lessor for patent, trademark, copyright, any intellectual property or software infringement and all such defenses and claims are expressly waived.

**8. LOCATION; INSPECTION; USE.** The Equipment shall be delivered to Lessee and installed by Lessee, at Lessee's own expense, and thereafter kept at the location specified on the schedule above or attached hereto. Lessee shall not remove the Equipment from the aforementioned location without Lessor's prior written consent. Lessee shall use the Equipment strictly for business or commercial use, in a careful and proper manner and shall comply with all laws, regulations and ordinances relating to its possession, use or maintenance. Lessor shall have the right from time to time during reasonable business hours, to enter upon the Lessor's premises for the purpose of inspecting the Equipment. Lessee shall, whenever requested by Lessor, advise Lessor of the exact location of any and all Items of Equipment.

**9. ALTERATIONS; MAINTENANCE.** Lessee shall, at Lessee's own expense, maintain the Equipment in good operating condition, repair and appearance, furnish all parts and labor required to keep the Equipment in such condition, protect same from deterioration other than normal wear and tear, and only use the Equipment in the regular course of Lessee's business and within normal capacity. For the purpose of assuring Lessor that the Equipment will be properly serviced, Lessee shall cause the Equipment to be maintained by the Supplier pursuant to the Supplier's standard preventative maintenance contract, if any. All parts furnished in connection with maintenance or repair shall immediately become part of the Equipment. All such maintenance, repair and replacement services shall be paid for and discharged by Lessee when due with the result that no Lien (as defined in Paragraph 12 below) will attach to the Equipment. Only qualified personnel of Lessee shall operate the Equipment. The Equipment shall be used only for the purposes for which it was designed. Lessee shall not make or permit any changes or alterations to the Equipment without Lessor's prior written consent, which will not be unreasonably withheld. All accessories, replacements, parts and substitutions for or which are added or attached to the Equipment shall become the property of Lessor, be included in the definition of Equipment and be subject to this Lease.

**10. INSURANCE.** Lessee shall obtain and maintain insurance on the Equipment for all risks of loss or damage from every cause whatsoever in an amount not less than the greater of replacement value (as new) or the aggregate amount of all unpaid rents plus the Residual Value of the Equipment (as defined in Paragraph 16) as of the Commencement Date of this Lease with a deductible or co insurance acceptable to Lessor. Each "all risk" policy shall (i) provide for each insurer's waiver of its right of subrogation against Lessor and Lessee, and (ii) provide that such insurance (A) shall not be invalidated by any action of Lessee, or any breach by Lessee of any provision of any of its insurance policies, and (B) shall waive set-off, counterclaim or offset against Lessor. Lessee shall also obtain and maintain for the Term,

Initial: __SK__  Miami Logistics Services Inc.

comprehensive public liability insurance, with a severability of interest endorsement or its equivalent, covering liability for bodily injury, including death, and property damage resulting from the purchase, ownership, leasing, maintenance, use, operation, sale or return of the Equipment in an amount satisfactory to Lessor. Lessor, its successors or assigns, shall be named the additional insured and the sole named loss payee with respect to insurance for damage to or loss of the Equipment and shall be named additional insured on the public liability insurance. Each liability policy shall (a) provide that such insurance shall have cross-liability and severability of interest endorsements (which shall not increase the aggregate policy limits of Lessee's insurance). All insurance policies shall provide that Lessee's insurance shall be primary without a right of contribution of Lessor's insurance, if any. Lessee shall pay all premiums for such insurance and shall deliver to Lessor the original policy or policies of insurance, or other documentation satisfactory to Lessor evidencing the insurance required thereby, along with proof, satisfactory to Lessor, of the payment of the premium therefore; provided, however, that Lessor shall be under no duty to ascertain the existence of or to examine such insurance policy or to advise Lessee in the event such insurance coverage shall not comply with the requirements hereof. Lessee hereby agrees and instructs that upon request, any insurance carrier, broker or claims adjuster shall immediately provide to Lessor a copy of any insurance policy and all amendments, modifications, and endorsements thereto. All insurance shall provide for at least thirty (30) days advance written notice to Lessor before any cancellation or material modification thereof. Lessee hereby irrevocably appoints Lessor, as Lessee's attorney in fact to make claim for, settle, receive payment of, and execute and endorse all documents, checks or drafts received in payment for loss or damage under any such insurance policy. Lessee agrees if Lessee shall fail to procure, maintain and pay for such insurance, Lessor shall have the right, but not the obligation, to obtain such insurance on behalf of and at the expense of Lessee. In the event Lessor does obtain such insurance, Lessee agrees to pay all costs thereof, with the next rent payment. Lessee shall obtain insurance from a carrier with an A-rating or better in Best's Key Rating Guide.

**11. RISK OF LOSS.** Lessee shall bear the entire risk of loss, theft, destruction, damage or disrepair of the Equipment or any part thereof for any cause whatsoever. No such loss, damage, theft, destruction or disrepair of the Equipment shall relieve Lessee of the obligation to pay rent or from any other obligation under this Lease. In the event of any of the above, Lessee shall notify Lessor within 10 days of its damage, theft or destruction or disrepair, and Lessee, at Lessee's own expense and at Lessor's sole and exclusive option, shall either (a) repair the Equipment, returning same to its previous condition, and in compliance with this Lease, unless unrepairable, or (b) replace same with like Equipment of equivalent value, useful life, in good condition and acceptable to Lessor, which shall become the property of the Lessor, or (c) immediately pay Lessor all rent due and to become due under this Lease together with the Residual Value of the Equipment discounted to present value as of the date of such damage, theft, destruction or other loss (at the rate set forth in Paragraph 16(B)) or such amount equivalent to the fair market value as may be allocated by Lessor to specific Items of Equipment. All proceeds of insurance received by Lessor as a result of such loss or damage shall, where applicable, be applied toward the replacement or repair of the Equipment or the payment of the obligations of Lessee hereunder. Upon payment of all sums due from Lessee hereunder, this Lease shall be terminated with respect to such lost, stolen, or damaged Equipment so paid for and Lessee shall thereupon become entitled to such Equipment "AS IS", "WHERE-IS" and "WITH ALL FAULTS" and without any warranty, express or implied, with respect to any matter whatsoever (other than a warranty that such Equipment is free and clear of all liens and encumbrances arising from Lessor's actions).

**12. ENCUMBRANCES AND TAXES.** Lessee shall comply with all laws and regulations relating to, and shall promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes, municipal, state and federal, which may now or hereafter be imposed upon the purchase, ownership, possession, leasing, renting, operation, control, use, maintenance, delivery, sale and/or redelivery of the Equipment and to prepare and/or file, upon request by Lessor, any schedules required by taxing authorities in connection therewith. In the event Lessee does not pay all sums specified above, Lessor has the right, but not the obligation, to pay the same. If Lessor shall so pay any of the aforementioned, then the Lessee shall remit such amount with the next installment of rent after written notice from Lessor. In addition to the foregoing, Lessee shall keep the Equipment free and clear of all liens, claims, security interests, mortgages and/or encumbrances (each a "Lien" or collectively "Liens"), and shall pay promptly when due, and shall indemnify and hold Lessor harmless from all Liens. Lessor, as owner of the Equipment, shall be entitled to any and all depreciation provided under the Internal Revenue Code of 1986, as amended from time to time, and any other state and federal income tax benefits which may now or hereafter be available to an owner of such Equipment. The Lessor and Lessee intend this Lease to be a true lease for all purposes.

**13. REDELIVERY.** Upon the expiration or earlier cancellation or termination of this Lease, Lessee shall, at Lessee's sole cost, expense and risk promptly return the Equipment by delivering it, packed and ready for shipment, to such place or carrier as Lessor may specify in good condition as received, less reasonable wear and tear. No such return shall constitute termination of this Lease unless Lessor shall agree so in writing, and Lessor will not so agree until all of Lessee's obligations under this Lease have been fulfilled. Should Lessee not timely return the Equipment after the end of the Term, Lessee shall be liable for rent at the rate of 125% of each month's rent set forth in the Schedule of Lease Payments until such time as the Equipment is returned to Lessor. This remedy is in addition to any and all of Lessee's remedies set forth in Paragraph 16. The acceptance of said rent by Lessor shall not waive Lessor's right to have the

Initial: _SK_   Miami Logistics Services Inc.                                                                                       4

Equipment promptly returned to Lessor pursuant to the provisions hereof, nor shall the acceptance of said rent be deemed to be an extension of the existing Term. When any Equipment is returned to Lessor, it shall (i) be in the condition and repair required under Paragraph 9 of this Lease, (ii) be free of all evidence of advertising or insignia placed on it by Lessee, (iii) be free of all Liens except Liens created by Lessor, and (iv) meet all legal and regulatory conditions necessary for the Lessor to sell or lease it to a third party. Lessee shall pay to Lessor on demand, as additional rent hereunder, the cost of any repairs necessary to then place the Equipment in the condition required pursuant to Paragraph 9 of this Lease. The Equipment will be deinstalled and, if applicable, recertified for maintenance by the manufacturer's technicians or manufacturer-approved technicians at Lessee's expense. Returned Equipment will be accompanied by all manuals, service and repair records and descriptive brochures. Lessee shall be responsible for software licensing or related fees upon resale of the Equipment. Lessee will provide, at no expense to Lessor, 120 days of free storage at the current location of the Equipment. The Equipment will be stored in accordance with the manufacturer's recommendations regarding storage. If an equipment auction is necessary, Lessor will be permitted to auction the Equipment in place at Lessee's premises.

**14. INDEMNIFICATION.** Lessee assumes liability for, and does hereby indemnify and hold harmless Lessor, its agents, employees, officers, directors, successors and assigns from and against any and all liabilities (including, but not limited to, any and all claims, actions, causes of action, costs, and expenses, including reasonable attorneys' fees, of every kind and nature, including without limitation, for property damage, wrongful death or personal injury and for trademark, patent or copyright infringement) arising out of or relating to the purchase, sale, use, condition (including latent and other defects whether or not discoverable by Lessee or Lessor), operation, ownership, selection, delivery, sale, leasing or return of any Item or Equipment, regardless of where, how and by whom operated, any failure on the part of Lessee to perform or comply with any conditions of this Lease or any loss to the extent permitted by law by Lessor of the benefit of any accelerated depreciation or other tax benefits to the extent that Lessor has any claim for any accelerated depreciation or other tax benefits with respect to any particular Lease or schedule, or the right to claim the same, with respect to the Equipment. Without limiting the foregoing, this indemnification shall extend to claims made by any person, including Lessee, its agents and employees, and shall apply whether such liabilities, claims, etc. are based on negligence (passive or active) of Lessor or another, breach of warranty, strict liability, products liability or otherwise. The indemnities and assumptions of liabilities and obligations provided for in this Paragraph and Lessee's indemnities elsewhere in this Lease shall continue in full force and effect notwithstanding the expiration or other termination of this Lease. For the purpose of any indemnification, Lessee is an independent contractor and cannot make any binding representation or contract on behalf of Lessor.

**15. DEFAULT.** Any of the following events or conditions shall constitute an "Event of Default" hereunder: (a) If Lessee shall default in the payment when due of any obligation or other indebtedness (i) under this Lease or any other document, instrument or agreement executed and/or delivered in connection with this Lease or (ii) under any other agreement for borrowed money between Lessee and Lessor arising independently of this Lease; (b) if Lessee fails to pay any other monies or charges on the due date, or fails to observe any other term or condition of this Lease when due, including any failure to obtain, maintain and evidence insurance coverage required under this Lease; (c) if Lessee ceases doing business as a going concern; (d) if Lessee becomes insolvent or makes an assignment for the benefit of creditors; (e) if a petition is filed by or against Lessee under the Federal Bankruptcy Code; (f) if Lessee applies for or consents to the appointment of a receiver, trustee, conservator, or liquidator of Lessee or such receiver, trustee, conservator, or liquidator is appointed without the application or consent of Lessee; (g) if any statement, representation or warranty heretofore or hereafter furnished by Lessee shall be untrue or unperformed in any material respect; (h) if a creditor of Lessee or any other person or entity attaches or levies execution against Lessee and the attachment or levy is not released within 48 hours; (i) if Lessee makes a bulk transfer of its furniture, fixtures, furnishings, or other equipment or inventory; (j) if Lessee breaches any of the terms of any lease or other credit agreements with Lessor or any other person or entity, or defaults thereunder or if the condition of Lessee's affairs shall so change as to, in Lessor's opinion, increase the credit risk involved in this Lease; (k) if individual Lessee or any guarantor of Lessee dies or any event described above occurs with respect to any guarantor; (l) if the Lessee is a corporation and 50% or more of the then issued and outstanding voting capital stock of Lessee shall be acquired by any person, entity or group who are not such owner on the date of execution of this Lease; (m) any event of default occurs under any agreement, document or instrument now or hereafter existing and relating to this Lease; (n) if Lessee is a limited liability company or partnership and 50% or more of the members' interests or partnership interests change; or (o) Lessee manifests any conduct that would result in a repudiation of the Lease.

**16. REMEDIES OF LESSOR.** Upon the occurrence of any Event of Default and at any time thereafter Lessor may without demand or notice to Lessee and without terminating or otherwise affecting Lessee's obligations hereunder exercise one or more of the following remedies, as Lessor in its sole discretion shall elect: (a) declare the entire balance of rent for the remaining Term to be immediately due and payable and recover such rent and all other rent and sums due hereunder, such payments to be discounted to present value as set forth below in this Paragraph 16; (b) require Lessee to assemble the Equipment and make it available to Lessor at a place designated by Lessor as provided in Paragraph 13

above; (c) take and hold possession of the Equipment and/or render the Equipment unusable, and for this purpose enter and remove the Equipment from any premises where the same may be located without liability to Lessee for any damage caused thereby; (d) immediately take possession of and sell or lease the Equipment or any part thereof at public or private sale or other disposition (and Lessor may be purchaser at such public sale) for cash, on credit or otherwise, without representations or warranties, and upon such other terms as shall be acceptable to Lessor, and for such purposes of sale or lease, Lessor may use Lessee's name, voice, signature, photograph or likeness, in any manner and for any purpose, including, but not limited to, advertising or selling, or soliciting the purchase of, any or all of the Equipment or other related goods or services; (e) enter, use and occupy the premises of Lessee for the purpose of taking, holding, reconditioning, displaying, selling, auctioning or leasing the Equipment, without cost to Lessor or liability to Lessee; (f) proceed by appropriate action either at law or in equity to enforce performance by Lessee of the covenants of this Lease or to recover damages for the breach of such covenants; or (g) exercise any and all rights accruing to a lessor under any applicable law upon a default by a lessee. If notice is required by law, any written notice to Lessee of any such sale or lease, given not less than ten (10) days prior to the date thereof, shall constitute reasonable notice to Lessee unless otherwise allowed by law. Any sale or lease of the Equipment by Lessor after default shall be free and clear of any rights or interest of Lessee. Without limiting any of the foregoing remedies, Lessor may immediately recover the following from Lessee to the extent permitted by law: (A) all unpaid rents, late charges and other sums due as of the date of default; (B) all unpaid rents to become due from the date of default through the last day of the Term discounted to present value at the federal discount rate announced at The Federal Reserve Bank in San Francisco then in effect; (C) any and all costs or expenses paid or incurred by Lessor in connection with the repossession, holding, repair, reconditioning and subsequent sale, lease or other disposition of the Equipment, including but not limited to, attorneys' fees and costs, whether or not litigation is commenced; (D) the Residual Value of any Item of Equipment which Lessee fails to return to Lessor as provided above or which Lessee converts or destroys, or which Lessor does not or is unable to repossess; (E) all other costs or expenses paid or incurred by Lessor at any time in connection with the execution, delivery, administration, amendment and enforcement or exercise of any of the Lessor's rights and remedies under this Lease and all taxes (and interest and penalties relating thereto) imposed by any governmental agency (other than taxes measured on the net income of Lessor); (F) to the extent such benefits are available to Lessor, in connection with any particular Lease or schedule, any actual or anticipated loss of federal or state tax benefits to Lessor (as determined by Lessor) resulting from Lessee's default or Lessor's repossession or disposition of the Equipment; and (G) any and all other damages, including incidental damages pursuant to Cal. Com. C. §10530, proximately caused by Lessee's default. Unless otherwise agreed in writing, "Residual Value" is defined in this Lease as the value of the Equipment at the end of the Term which shall be the fair market value of the Equipment as valued on a "replacement value" and/or "in place and operational basis", as Lessor shall determine, and which shall in no event be less than 20% of its original cost funded by Lessor for and related to such Equipment.

All rights and remedies of Lessor under this Lease are in addition to all rights and remedies contained in any other agreement, instrument or document available to Lessor at law or in equity. All such rights and remedies are cumulative and not exclusive and may be exercised successively, concurrently and repeatedly. No default by Lessee or action by Lessor, including repossession, sale or re-leasing of Equipment, shall result in or constitute a cancellation or termination of this Lease unless Lessor so notifies Lessee in writing, and no cancellation or termination hereof shall release or impair any of Lessee's obligations hereunder. No exercise of any right or remedy shall constitute an election of remedies and preclude exercise of any other right or remedy. If any legal action or other proceeding is brought to enforce the terms of this Lease, or to protect or enforce the ownership of the Equipment or the priority of the Lessor with respect to the Equipment or with respect to any collateral of Lessor, whether in state, federal or bankruptcy court (including, but not limited to, such actions as relief from the automatic stay, to obtain administrative expense claims, with respect to avoidance actions, and with respect to Lessor's treatment in a plan) or in any administrative or other proceeding of any kind, or with respect to any alleged dispute, breach, default, misrepresentation, or otherwise in connection with any provisions of this Lease, Lessor shall be entitled to recover its reasonable attorneys fees, including costs of in-house counsel, whether litigation has or has not been commenced, and all other reasonable costs incurred in that action or proceeding, in addition to any other remedies, reasonable costs and reasonable expenses to which Lessor may be entitled. In addition, Lessor shall be entitled to all collection costs of any kind arising out of the enforcement or administration of this Lease. Lessor and Lessee agree that any amount payable by Lessee pursuant to subsection (a) of this Paragraph 16 represents liquidated damages for the loss of Lessor's bargain and not a penalty. If there be more than one Lessee party to this Lease, the liability of each shall be joint and several and any release of or forbearance with respect to one Lessee shall not release any other Lessee. Lessor shall be entitled to specific performance of any and all of its rights under this Lease whether or not an adequate remedy at law exists.

**17. ASSIGNMENT BY LESSEE.** WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR WHICH LESSOR MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION, LESSEE SHALL NOT VOLUNTARILY OR INVOLUNTARILY (a) SELL, ASSIGN, TRANSFER, PLEDGE, GRANT A SECURITY IN INTEREST IN, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT, ANY ITEM OF EQUIPMENT,

Initial: _SK_  Miami Logistics Services Inc.

OR ANY INTEREST IN THE LEASE OR THE EQUIPMENT; (b) SUBLET OR LEND ANY ITEM OF EQUIPMENT, ANY PART THEREOF, OR LESSEE'S INTEREST IN THIS LEASE; OR (c) PERMIT ANY ITEM OF EQUIPMENT OR ANY PART THEREOF TO BE USED BY ANYONE OTHER THAN LESSEE OR LESSEE'S EMPLOYEES.

**18. ASSIGNMENT BY LESSOR.** Lessor may, at any time, with or without notice to Lessee, mortgage, grant a security interest in, or otherwise transfer, sell or assign all or any right, title or interest in this Lease or any Equipment or any rent or other amounts due or to become due hereunder. Lessee agrees with Lessor and any such assigns (including any assignee to which such rights have been assigned by a prior assignee) that, upon receipt by Lessee from Lessor or such assignee of notice in writing of any such assignment, Lessee will make all further payments due or to become due hereunder directly to such assignee at the address specified in such notice of assignment and will recognize such assignee as the person or entity entitled to exercise all other rights of Lessor hereunder. Lessee further agrees with Lessor and any such assignee that in any action brought by such assignee against Lessee to enforce Lessor's rights hereunder, Lessee will not assert against such assignee, and expressly waives as against an assignee, any breach or default on the part of Lessor hereunder and any and all other defenses, claims, counterclaims or causes of action which Lessee may have against Lessor, Supplier or any other person or entity either hereunder or otherwise. Lessee shall file no complaints, counterclaims, third party complaints, or cross-complaints for any reason or purpose against assignee except for those actions arising out of assignee's willful misconduct. Unless otherwise agreed in writing, no such assignee shall be obligated to perform any obligation, term or condition required to be performed by Lessor hereunder arising or relating to the period before the assignment to such assignee.

**19. PURCHASE OPTION.** Provided that the Lease has not been terminated or cancelled and that no default or Event of Default has occurred and is continuing, on the last day of the Term, Lessee shall have the option to purchase the Equipment for a price equal to the following "Purchase Option Price": $126,000. Lessor and Lessee acknowledge and agree that such price represents the estimated fair market value of the Equipment as of the date of the Lease. If Lessee wishes to purchase the Equipment on the last day of the Term, it shall deliver to Lessor written notice of its intent to purchase the Equipment (such purchase to be on an "AS-IS", "WHERE-IS" AND "WITH ALL FAULTS" BASIS, without any warranty whatsoever except that Lessor has not created any lien, claim or encumbrance on or in respect of the Equipment) not less than one hundred and twenty (120) days (but not more than one hundred eighty (180) days) prior to the last day of the Term. Upon receipt of the Purchase Option Price, Lessor shall deliver to Lessee a bill of sale transferring title to the Equipment from Lessor to Lessee without representation or warranty on an "AS IS", "WHERE IS," "WITH ALL FAULTS" basis other than a warranty that since the date of this Lease, Lessor has not assigned, sold or transferred in whole or in part its title to the Equipment except in accordance with this Lease, and that such title is free and clear of all Liens created by, through or under Lessor (other than this Lease). If Lessee fails to deliver the Purchase Option Price to Lessor on the last day of the Term, Lessee shall be deemed to have waived its right to exercise this purchase option and shall return the Equipment to the Lessor in accordance with this Lease. Upon full and indefeasible payment by Lessee to Lessor of the Purchase Option Price and all amounts due under the Lease, Lessor will, on Lessee's request, provide such termination statements and other documents as Lessee may reasonably request to evidence the termination of the Lease and the rights of Lessor in respect of the Equipment.

**20. OWNERSHIP; PERSONAL PROPERTY.** The Equipment is, and shall at all times be and remain the sole and exclusive property of Lessor. The Equipment is, and at all times shall remain, personal property notwithstanding that the Equipment or any Item thereof may now be, or hereafter become, in any manner affixed or attached to, or imbedded in, or permanently resting upon real property or any improvement thereof or attached in any manner to what is permanent. Prior to or at any time during the Term hereof with respect to an Item of Equipment, Lessee will obtain and deliver to Lessor waivers of interest or Liens in recordable form, satisfactory to Lessor, from all persons claiming an interest in the real property on which such Item is installed or located including all appropriate landlord and mortgagee waivers. Plates, labels or other markings stating that the Equipment is owned by Lessor shall be affixed to or placed on the Equipment by Lessor or, at Lessor's request or if required by law, by Lessee at Lessee's expense, and Lessee shall keep the same in a prominent position thereon.

**21. NET LEASE; NO OFFSET.** THIS IS A NET LEASE AND ALL RENT AND ALL OTHER SUMS PAYABLE BY LESSEE HEREUNDER SHALL BE PAID UNCONDITIONALLY WHEN DUE, WITHOUT ABATEMENT, DEDUCTION, COUNTERCLAIM OR SETOFF OF ANY NATURE, INCLUDING, WITHOUT LIMITATION, ANY DEFENSE, COUNTERCLAIM OR SETOFF ARISING OUT OF ANY PRESENT OR FUTURE CLAIM LESSEE MAY HAVE AGAINST LESSOR, OR ANY ASSIGNEE OF LESSOR, OR THE VENDOR, MANUFACTURER OR OTHER SUPPLIER OF THE EQUIPMENT, OR ANY OTHER PARTY AND ALSO INCLUDING, BUT NOT LIMITED TO, ANY CLAIM, COUNTERCLAIM OR DEFENSE ARISING OUT OF COMMERCIAL FRUSTRATION, IMPRACTICABILITY, FEASIBILITY OR IMPOSSIBILITY. In no event, except as otherwise expressly provided herein, shall this Lease expire, cancel or terminate or shall any of the Lessee's obligations be affected by reason of any defect in or damage to or loss or destruction of all or any part of the Equipment, from any cause

Initial: _SK_   Miami Logistics Services Inc.

whatsoever, or any interference with Lessee's use of the Equipment by any person or entity (other than Lessor, its successors or assigns or anyone acting through Lessor) or for any other cause whatsoever.

**22. MISCELLANEOUS.** Lessee shall provide Lessor with a copy of Lessee's annual financial statement, including balance sheet and profit and loss statement within ninety (90) days after the close of Lessee's fiscal year, in addition to any other information normally provided by Lessee to the public and/or such other financial data or information relative to this Lease and the Equipment as Lessor may from time to time reasonably request. This Lease shall be binding upon Lessor and Lessee, their successors, legal representatives and assigns and is a valid and subsisting legal instrument, and no provision which may be deemed unenforceable shall in any way invalidate any other provision or provisions, all of which shall remain in full force and effect. All Paragraph headings are inserted for reference purposes only and shall not affect the interpretation or meaning of this Lease. This Lease constitutes the entire contract and agreement between Lessor and Lessee hereto, and no representation, oral or written, shall constitute an amendment or modification hereto unless signed in writing by an authorized officer of Lessor. Any and all prior representations, oral or written, are merged herein. This Lease and the other Lease Documents may be executed or authenticated in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same document. No oral agreements by Lessor and Lessee shall ever be enforceable. Time is of the essence with respect to this Lease and each and all of its provisions. NONE OF THE PROVISIONS OF THIS LEASE MAY BE AMENDED, MODIFIED OR WAIVED EXCEPT IN A WRITING SIGNED BY LESSOR AND LESSEE.

Initials _____ *SK*

**23. NOTICES.** Any written notice or demand under this Lease may be given to a party by mailing it to the party at the party's address set forth herein, or at such address as the party may provide in writing from time to time. Unless otherwise set forth in writing, any and all notices to Lessor and to Lessee pursuant to the terms of this Lease are deemed to be conclusively received and given by mailing such notice to the addresses set forth in page 1 of this Lease. Such notice shall be conclusively deemed to have been received three (3) days from the date of mailing, charges prepaid, if mailed by first class mail, or one (1) day if sent by Federal Express charges prepaid, or such other similar overnight courier service; or if personally delivered, charges prepaid, on the day it is personally delivered and received by Lessor and/or Lessee at the address indicated above.

**24. GOVERNING LAW; VENUE; JURY TRIAL WAIVER.** Lessee acknowledges that the last act necessary to the formation of this Lease is the acceptance and execution of this Lease by Lessor at Lessor's principal place of business, which is in Los Angeles, California. The exclusive jurisdiction and venue of any claim or controversy arising out of this Lease shall be in federal or state court in Los Angeles, California, unless Lessor, at its sole option, chooses to commence litigation in another state because the Equipment or any Item of Equipment is located in that state. However, under no circumstances will litigation filed against Lessor be filed by way of complaint, counterclaim, cross-complaint or cross-action in any court other than in Los Angeles County, California. The choice of law under which this Lease shall be interpreted is California law. LESSEE HEREBY KNOWINGLY AND VOLUNTARILY WAIVES TRIAL BY JURY AND THE RIGHT TO INTERPOSE ANY NON-COMPULSORY COUNTERCLAIM OR OFFSET OF ANY NATURE OR DESCRIPTION IN ANY LITIGATION BETWEEN LESSEE AND LESSOR OR ITS ASSIGNEES, WITH RESPECT TO THIS LEASE, AND THE EQUIPMENT OR THE REPOSSESSION THEREOF. Lessee further agrees that it shall have no right to institute or maintain and shall not institute any action or proceeding, whether judicial, administrative or arbitral in nature, against Lessor unless Lessee: (a) notifies Lessor in writing of the alleged breach, default or other act which the Lessee contends caused Lessee damage no more than 60 days after occurrence of the alleged breach, default, or other act, and (b) institutes such action or proceeding before the first anniversary of the date of the alleged breach, default or other act which the Lessee contends caused Lessee damage.

**25. FURTHER ASSURANCES; POWER OF ATTORNEY.** Lessor and Lessee each hereby agrees to execute, deliver and file or record at Lessee's expense such further instruments, certificates and other documents, including, without limitation, financing statements under the Uniform Commercial Code ("UCC"), and to do such further acts and things as may reasonably be requested by each other in order to assure to each other that the rights conferred or intended to be conferred by this Lease or to protect Lessor's right, title and interest in the Equipment are properly protected. Notwithstanding the foregoing, Lessor is granted a power of attorney by Lessee to insert, at any time, in any equipment order or invoice, schedule, UCC financing statement, amendment or assignment, or in any other appropriate document as is necessary to register, perfect, or evidence Lessor's ownership interest or security interest in the Lease, the Equipment, or any interest of Lessor hereunder, any information, signature, serial number, description, date or amount to be inserted in such documents and to endorse any checks or payments made payable to Lessee on behalf of Lessee to apply to the obligations due under this Lease. Lessee specifically gives Lessor a power of attorney to act as its attorney in fact with any State's Department of Motor Vehicles or Secretary of State or County recorder to take any such action as is necessary or contemplated to protect Lessor's rights as set forth in this Lease. No officer, employee, or agent of Lessor shall have the power to waive any of the terms or provisions hereof or to incur additional obligations on behalf of Lessor unless such waiver or additional obligations are in writing signed by a duly authorized officer of Lessor. Lessor is

Initial: *SK*   Miami Logistics Services Inc.                                                                 8

further authorized to file any UCC or other documentation with respect to its rights, title or interest in this Lease, related documents, instruments and agreements, Equipment and other property covered hereby and thereby.

**26. WAIVER.** No delay or omission on the part of Lessor in exercising any right hereunder shall operate as a waiver of any such right or of any other right hereunder, and a waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.

**27. LESSOR'S PAYMENT.** In case of failure of Lessee to procure or maintain proper insurance or pay such fees, assessments, duties, charges and taxes or to keep any Item of Equipment free and clear of all Liens or in good repair, condition and working order, all as herein before provided, Lessor shall have the right, but not the obligation, without notice to or demand upon Lessee, and without releasing Lessee from any obligation herein before specified, to effect and pay for such insurance or to pay such fee assessments, duties, charges and taxes or to keep such Equipment in good repair, condition and working order, as the case may be, and to pay, purchase, contest or compromise any Lien which in the sole judgment of Lessor appears to affect such Equipment, and in exercising any such right, to incur any reasonable liability and expend whatever reasonable amounts in its absolute discretion it may deem necessary therefore. All sums so incurred or expended by Lessor shall immediately become due and payable by Lessee upon payment by Lessor and shall thereafter bear interest at the rate of 18% per annum, but not greater than the highest rate permitted by any applicable law. It is not the intent of Lessor to violate or evade any usury laws and to the extent that any payment in this Lease or in any schedule is deemed to be usurious, such usurious payments shall be applied to costs, fees, and interest and lease balance and yield thereon which shall be the greatest amount allowable by law in such manner or order as Lessor shall designate.

**28. LESSEE'S REPRESENTATIONS.** THE UNDERSIGNED LESSEE(S) ATTEST THAT THEY HAVE READ ALL DOCUMENTS WHICH ARE PART OF THIS LEASE, RELATED DOCUMENTS, INSTRUMENTS AND AGREEMENTS AND ARE FULLY AWARE OF ALL THE TERMS AND CONDITIONS CONTAINED HEREIN AND THEREIN. LESSEE ALSO REPRESENTS THAT THERE IS NO ACTION OR PROCEEDING PENDING OR, INSOFAR AS LESSEE KNOWS, THREATENED AGAINST LESSEE BEFORE ANY COURT OR ADMINISTRATIVE AGENCY WHICH MIGHT HAVE A MATERIALLY ADVERSE EFFECT ON THE BUSINESS, CONDITION OR OPERATIONS OF LESSEE. THE UNDERSIGNED FURTHER GUARANTEE THAT ALL REQUIRED CORPORATION, PARTNERSHIP OR LIMITED LIABILITY COMPANY ACTION HAS BEEN TAKEN AND THAT ALL DOCUMENTATION HAS BEEN AUTHORIZED TO BE EXECUTED BY THE SIGNATORIES BELOW.

*THIS LEASE IS NON-CANCELLABLE AND IS SUBJECT TO THE TERMS AND CONDITIONS STATED HEREIN, WHICH LESSEE ACKNOWLEDGES THAT LESSEE HAS READ, UNDERSTANDS, AND AGREES TO.*

This Lease shall not be binding upon Lessor or become effective until and unless Lessor accepts the same in writing in the State of Florida.

Date: 9/15/2015

Cargo Transport Alliance LLC
By: Anatoly Galunov, Pa...

Date 09/15/2015

Miami Logistics Services Inc.
By: Sergiy Kurashov, Owner

*DELIVERY AND ACCEPTANCE CERTIFICATE*

Lessee: MIAMI LOGISTICS SERVICES INC.

RE: Equipment Sub-Lease Agreement No.: 6377/S

To: Cargo Transport Alliance LLC, ("Lessor")

All of the Items of Equipment referred to in the above-referenced Lease No. 6377/S dated as of September 15, 2015, between Lessor and Lessee, have been delivered to assembled and installed for, and accepted by, the undersigned and are in good working order and condition according to the supplier's, vendor's, or manufacturer's specifications. All installation or other work necessary prior to the use of such Equipment has been completed. The Equipment has been examined and tested, and is in all respects satisfactory and complies with all terms of the Lease.

The undersigned acknowledges that based on the execution of this Delivery and Acceptance Certificate, the term of the Lease will commence. The Lease is non-cancellable and the undersigned acknowledges and agrees that if the Equipment fails to perform as expected or represented by vendor, manufacturer, supplier, or anyone else, the undersigned will continue to comply with all of the terms of the Lease and make all payments to Lessor in accordance with the Lease. In addition, the undersigned will look solely to the supplier, vendor or manufacturer of each Item of the Equipment for all training, if any, promises, performance and warranties and any damages by virtue of the failure of the Equipment to perform as represented.

The undersigned acknowledges that Lessor is neither the manufacturer, distributor, supplier nor vendor of any of the Equipment nor an agent of any of them, and has no control, knowledge or familiarity with the condition, capacity, or functioning of the equipment and is a finance lessor as defined in Commercial Code, Section 10103(a)(7).

NOTICE TO THE LESSEE: Do not sign this Delivery and Acceptance Certificate until the Equipment has been delivered, assembled, installed and accepted by you as satisfactory in all respects. Payment to the supplier, vendor, manufacturer or any other person or entity will not be made until this Delivery and Acceptance Certificate is properly signed and returned to Lessor.

Date: September 15th, 2015

_____
Miami Logistics Services Inc.

Case 0:16-cv-62433-WJZ  Document 18-1  Entered on FLSD Docket 06/06/2017  Page 11 of
105
Case 0:16-cv-62433-WJZ  Document 5-1  Entered on FLSD Docket 12/09/2016  Page 11 of 39

**GUARANTY**

Lessor: Cargo Transport Alliance LLC

Lessee: MIAMI LOGISTICS SERVICES INC.

RE: Equipment Sub-Lease Agreement No.: 6377/S

Cargo Transport Alliance, LLC (the "Lessor") and Miami Logistics Services Inc. (the "Lessee") have entered into an Equipment Sub-Lease Agreement, Lease No. 6377/S (the "Lease"), dated September 15, 2015.
The undersigned (collectively or individually, as the context requires, "Guarantor") has a financial interest in Lessee and recognizes that Lessor would be unwilling to enter into the Lease with Lessee without this Guaranty (the "Guaranty"). If more than one Guarantor signs this Guaranty, then each Guarantor shall be obligated hereunder on a joint and several basis. Each Guarantor hereby absolutely and unconditionally guarantees the due and punctual payment and performance by Lessee of all Obligations (as defined below) before or after any Event of Default by Lessee (as defined in the Lease). Guarantor promises to pay all Obligations under the terms of the Lease. Guarantor hereby absolutely and unconditionally covenants and agrees that it is independently liable for the Obligations and Lessor or its assignees may proceed directly against Guarantor without proceeding against Lessee, any collateral or any leased Equipment.

As used herein, the term "Obligations" means: (a) any and all liabilities, obligations and duties of every kind and character of Lessee to Lessor or any assignee of Lessor arising pursuant to or related to the Lease, or any agreement, document, instrument, certificate or agreement related to the Lease whether now or hereafter existing or arising, including this Guaranty (collectively, with the Lease, the "Lease Documents"), regardless of whether such present or future liabilities, obligations or duties be direct or indirect, primary or secondary, joint, several, or joint and several, fixed or contingent including further, without limitation, the duty to pay rent, indemnities and other sums to Lessor under the Lease Documents; (b) any and all indebtedness, obligations, liabilities, covenants, duties, guaranties, agreements separate and independent of the Lease whether now due or hereafter entered into or owing by Guarantor to Lessor or any assignee of Lessor and whether direct or indirect, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Guarantor may be liable jointly with others or individually; (c) any and all renewals, extensions, modifications and increases of such liabilities, obligations and duties, or any part thereof, described in items (a) and (b) of this paragraph; (d) all costs, expenses and fees, including, but not limited to, court costs and attorneys' fees, arising in connection with the collection of any or all amounts, such liabilities, obligations and duties of Lessee to Lessor and any assignee of Lessor described in items (a) (b) and (c) of this paragraph, including costs, expenses and fees arising in connection with the enforcement of this Guaranty.

This Guaranty is a continuing one and shall terminate only upon full payment and performance of all Obligations, including, without limitation, the payment in full of all rents and all other sums due under the Lease Documents.

Either before or after revocation hereof, Guarantor authorizes Lessor at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of the Lease by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of the Lease including the rental amount thereof, (c) accept partial payment on the Lease, (d) accept new or additional instruments, agreements or documents relative to the Lease, (e) release, substitute or add one or more endorsers, cosigners or guarantors for the Lease, (f) enter into forbearances with Lessee even though the result of such forbearance is to increase the cost, fees and/or expenses attributable to the Lease, (g) amend or modify the terms of any guaranty executed by a co guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of the Lease and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in whole or in part, existing, after-acquired or later acquired property, Equipment, or collateral securing obligations under the Lease or any guaranty therefor on such terms as Lessor at its sole discretion shall determine, (j) subordinate payment of all or any part of the Lease to other creditors of Lessee or other persons or entities on such terms as Lessor deems appropriate, (k) apply any sums received from Lessee, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any obligation of Lessee whatsoever in any order and regardless of whether or not such obligation guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of any of Lessee's obligations in any order regardless of whether or not the obligations are secured by collateral or are due and payable, and (m) exercise any right or remedy Lessor may have with respect to the Lease or any collateral securing the Lease, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or the Lease.

Initial: _SK_ __ Miami Logistics Services Inc.

1

Guarantor waives any rights to require Lessor to: proceed against Lessee, proceed against or exhaust any security held from Lessee, or pursue any other remedy in Lessor's power whatsoever.

Guarantor acknowledges that Guarantor may have certain rights under applicable law, which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a) To require Lessor to disclose any information with respect to the Lease, Lessee, or any other guarantor, co-signer or endorser, or with respect to any collateral; or to require Lessor to notify Guarantor of (a) any payment made under or in connection with any Lease Document, (b) any sale or other disposition of security for the Lease, (c) acceptance of this Guaranty, (d) any amendment or extension of any Lease Document or of any other agreement, instrument or document pertaining to all or any part of the Obligations, (e) the execution and delivery by Lessee and Lessor of the Lease or of Lessee's execution and delivery of other documents in connection therewith, (f) the occurrence of any breach by Lessee or default by Lessee under the Lease or any other Lease Document, (g) Lessor's transfer or disposition of the Obligations, or any part thereof, (h) protest, proof of non-payment or default by Lessee, (i) any other action at any time taken or omitted by Lessor, and generally, all demands and notices of every kind in connection with this Guaranty or any document or agreements evidencing, securing or relating to any of the Obligations, except as otherwise specifically provided herein, (j) any default of Event of Default under the Lease, or (k) disposition of any collateral security granted by Lessee or Guarantor.

(b) That Guarantor's obligation under this Guaranty must be commensurate with that of Lessee;

(c) To be discharged based upon the absence of any liability of Lessee, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Lessee or any other guarantor, endorser or co-signer;

(d) To be discharged if any of the terms, conditions or provisions of the Lease are altered in any respect;

(e) To be discharged upon acceptance by Lessor of anything in partial satisfaction of the Lease, and/or if Lessor designates the portion of the Lease to be satisfied;

(f) To be discharged upon any modification of the Lease or the release by Lessor of Lessee or any other guarantor, endorser or co-signer;

(g) To require Lessor to proceed against Lessee, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lessor's power;

(h) To receive the benefit of or participate in any and all security for payment of the Obligations and/or performance of the Lease;

(i) To have any security for the Lease first applied to satisfy or discharge the Lease;

(j) To be discharged based upon any failure by Lessor to perfect or continue perfection of any lien or use due diligence to collect all or any part of any Lease, or if recovery against Lessee becomes barred by any statute of limitations, or if Lessee is not liable for any deficiency after Lessor realizes upon any collateral; and

(k) To be discharged due to the release or discharge of any collateral for the Lease or Guaranty, or relating to the validity, value or enforceability of any collateral.

Guarantor also waives all rights and defenses that Guarantor may have because the Lessee's obligations under the Lease are secured by real property. This means, among other things: (1) Lessor may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Lessee; (2) If Lessor forecloses on any real property collateral pledged by the Lessee: (A) The amount of the Lease obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, (B) Lessor may collect from Guarantor even if Lessor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Lessee and has destroyed Guarantor's right of subrogation and reimbursement against the principal by operation of Section 580d of the California Code of Civil Procedure or otherwise. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Lessee's debt is secured by real property. The unconditional waiver of rights and defenses by Guarantor include, but are not limited to, any rights or defenses directly or indirectly based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

Any and all indebtedness of Lessor now or hereafter owed to Guarantor and all claims of Guarantor against Lessor, whenever arising, are hereby subordinated to the Obligations and assigned to Lessor as additional collateral. If Lessor so

requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Lessee shall be delivered to Lessor, and such indebtedness and all claims of Guarantor against Lessee shall be collected, enforced and received by Guarantor as trustee for Lessee and be paid over to Lessor on account of the Obligations but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Lessee and pay the proceeds to Lessor, Lessor, as Guarantor's attorney in fact may do such acts and sign such documents in Guarantor's name as Lessor considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lessor as Guarantor's attorney in fact for such purposes. If Lessee is a corporation, partnership, or limited liability company, Guarantor will not withdraw or accept, without Lessor's prior written consent, any return of any capital invested or equity interest in Lessee.

To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Obligations, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Lessee, which operates to toll any statute of limitations as to Lessee, shall likewise toll the statute of limitations as to Guarantor. Guarantor agrees to pay to Lessor, on demand, reasonable attorneys' fees and all other costs and expenses which may be incurred by Lessor in the collection or attempted collection from Lessee with respect to the Lease or with respect to this Guaranty and/or in the interpretation, enforcement or attempted enforcement by Lessor of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings which have anything whatsoever to do with the Lease or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INSTITUTED BY Lessor OR GUARANTOR WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS GUARANTY, THE LEASE, ANY COLLATERAL THEREFOR OR ANY MATTER ARISING THEREFROM OR RELATING HERETO OR THERETO.

Guarantor agrees that the Guaranty is entered into in Los Angeles County, California and hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lessor and Guarantor.

All rights, remedies, powers and benefits granted to Lessor under this Guaranty, the Lease, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lessor's discretion.

Lessor shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest granted to Lessor hereunder or Lessor's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lessor. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lessor of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lessor would otherwise have on any future occasion whether similar in kind or otherwise. Any failure by Lessor to file or enforce a claim against any estate (whether in administration, bankruptcy, probate or other proceeding) of Lessee or of any others, shall not affect Guarantor's liability hereunder.

Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lessor expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

This is a continuing guaranty of the Lease. Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lessor by certified or registered mail, return receipt requested at 11755 Wilshire Blvd. Suite 1670, Los Angeles, CA 90025, or at any other office of Lessor designated in a written notice mailed by Lessor to Guarantor at its address set forth below. Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to the Lease or Guaranty existing before the revocation became effective or as to any renewals, extensions or modifications of

Initial: _SK_   Miami Logistics Services Inc.

3

any obligations, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rental amount under the Lease, or for post revocation interest and other costs and collection expenses accruing or incurred by Lessor with respect thereto. Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lessor has received payment in full of all the Obligations, which are guaranteed hereby.

The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lessor by Guarantor) are superseded hereby. This Guaranty may be modified only by a written instrument signed by the parties hereto.

Date _____ 09/15/2015 _____

"Guarantor" _____
Sergiy Kurashov
Miami Logistics Services Inc.

## SECURITY AGREEMENT IN SUPPORT OF LEASE OBLIGATIONS

SECURITY AGREEMENT, dated as of 9/15/2015 (as amended, supplemented or restated from time to time, this "Security Agreement"), between Cargo Transport Alliance, LLC (and its designees, successor and assigns, "Lessor") and Miami Logistics Services Inc. (and his permitted heirs, successors and assigns, "Lessee").

**RECITALS:**

Lessee and Lessor have entered into that certain Equipment Sub-Lease Agreement dated as of 9/15/2015 (as amended, supplemented or restated from time to time "Lease Documents"). As part of the transaction, Lessee grants to Lessor a first priority security interest in certain collateral to secure its obligations under the Lease Documents. The Lease Documents and the other documents, instruments, certificates and agreements related to the Lease Documents are hereafter referred to as the "Lease Documents". This Agreement and the Lease Documents, as amended, modified, supplemented or restated from time to time, and any Guaranty for the Lease Documents are collectively referred to as the "Transaction Documents".

This Security Agreement is secured by the Collateral (as hereinafter defined) and all other personal property, described in Annex A attached hereto from time (collectively, the "Property").

In consideration of the promises and agreements herein, Lessor and Lessee ("the parties") agree as follows:

**1. Grant of Security Interest.** Lessee grants to Lessor a security interest in the Property and to all now or hereafter existing proceeds, products, and books and records relating to or arising out of or from the Property including, but not limited to (i) property, accounts, general intangibles, contract rights, inventory, equipment, chattel paper, electronic chattel paper, tangible chattel paper, software, cash, money, warehouse receipts, bills of lading, goods, purchase orders, deposit accounts, payment intangibles, investment property, stock, documents, letter of credit rights, commercial tort claims, promissory notes, and all other tangible or intangible property not specifically described herein (ii) all leases and subleases of the Property and the personal property described herein, (iii) all chattel paper and general intangibles related to the Property and the personal property described herein, including all product warranties relating to the Property, (iv) all security deposits and other cash collateral accounts related to the Property and the personal property described herein, (v) all books, records, writings and software related to or evidencing the personal property and Property described herein; (vi) all replacements, substitutions and accessions related to the Property and the personal property described herein; and (vii) all proceeds of all of the foregoing, including, but not limited to, all amounts payable under any insurance policy relating to the Property and the personal property described herein. All of the Property, personal property described herein in subparts (i)-(vii) herein are collectively referred to collectively as "Collateral."

**2. What Obligations the Collateral Secures.** Each item of Collateral shall secure all present and future Obligations of Lessee under the Lease Documents or pursuant to any other obligation of Lessee to Lessor including, but not limited to the Lease. As used herein, the term "Obligations" means: (a) any and all liabilities, obligations and duties of every kind and character of Lessee to Lessor or any assignee of Lessor arising pursuant to or related to the Lease Documents, whether now or hereafter existing or arising, including this Security Agreement, regardless of whether such present or future liabilities, obligations or duties be direct or indirect, primary or secondary, joint, several, or joint and several, fixed or contingent including further, without limitation, the duty to pay rent, indemnities and other sums to Lessor under the Lease Documents; (b) any and all indebtedness, obligations, liabilities, covenants, duties, guaranties, or contracts now due or hereinafter owing by Lessee to Lessor or any assignee of Lessor whether direct or indirect, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined and whether Lessee may be liable jointly with others or individually; (c) any and all renewals, extensions, modifications and increases of such liabilities, obligations and duties, or any part thereof, described in items (a) and (b) of this paragraph; (d) all costs, expenses and fees, including, but not limited to, court costs and attorneys' fees, arising in connection with the collection of any or all amounts, such liabilities, obligations and duties of Lessee to Lessor described in items (a), (b) and (c) of this paragraph, including costs, expenses and fees arising in connection with the enforcement of this Security Agreement; (d) all amounts advanced or incurred by Lessor on account of Lessee under this Agreement or for the maintenance or preservation of the Collateral;

**3. Assignment of Insurance Policy and Proceeds.** Notwithstanding the grant of a security interest in the Property and in the Collateral, Lessee assigns to Lessor all of its right, title and interest in and to any proceeds arising out of the insurance policy covering the Property and Collateral for all purposes. In addition, Lessor shall be covered under the insurance policy or any subsequent insurance policy as a co-insured and the sole loss payee. Lessee shall not cause any

$SK$

insurance policy to be canceled without 30 days notice to Lessor and if the insurance policy is not replaced and such replacement is not approved by Lessor, then this Security Agreement shall be declared in default.

**4. Lessee's Covenants, Warranties and Representations.** Lessee covenants, warrants and represents:
(a) that except for the security interest granted by this Agreement, the Collateral is free from and will be kept free from all levies, liens, claims, security interests, mortgages and/or other encumbrances (individually or collectively, as the context requires, sometimes herein called a "Lien") or filings under the Uniform Commercial Code or other law, rule or regulation in connection therewith or herewith; and
(b) that Lessee (i) has full authority to enter into the Transaction Documents or any other contracts, agreements, leases, notes, conditional sale contracts, or other documents now or at any time hereafter ("Future Transaction Documents") to which it is, or may become, a party and, in so doing, (ii) is not violating its organizational documents, any law or regulation or agreement with third parties, (iii) has taken all such action as may be necessary or appropriate to make the Transaction Documents or Future Transaction Documents from time to time executed and/or delivered in connection herewith binding upon it, and (iv) has executed Transaction Documents that are valid, binding and enforceable against it.

**5. Lessee's Agreements.** Lessee agrees:
(a) to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral, the Transaction Documents related thereto, and any Future Transaction Documents and the Obligations herein shall survive the termination of the Transaction Documents or any Future Transaction Documents;
(b) that if a certificate of title be required or permitted by law, Lessee shall obtain such certificate with respect to the Collateral, showing the Lien of Lessor thereon and in any event do everything necessary or expedient to preserve or perfect the security interest of Lessor;
(c) that the security interest granted by Lessee to Lessor shall continue effective irrespective of any retaking or redelivery of any Collateral and irrespective of the payment of the amount described in any Transaction Document or any Future Transaction Documents so long as there are any Obligations of any kind owed to Lessor; provided, however, that upon any assignment of this Security Agreement, the Assignee shall thereafter be deemed for the purpose of this Paragraph to be the Lessor under this Security Agreement as and to the extent the of the rights, remedies, privileges and Collateral assigned hereunder;
(d) upon the request of Lessor, if any of the Collateral consists of software, to inform Lessor of the name of the licensor of such software and to provide Lessor with a copy of the license agreement or other documents relating to the software of rights thereto or therein and a collateral assignment of such Collateral;
(e) that Lessee will (A) report any loss or destruction of Property within five (5) business days and (B) provide notice of any material adverse change in the business or condition, financial or otherwise, of the Lessee or any guarantor of, or other obligor with respect to, the Obligations.

**6. Representations and Warranties.** Lessee hereby represents and warrants to Lessor the following:(a) Lessee has good and marketable title to all Collateral, free of all claims, liens, mortgages, pledges, security interests, encumbrances or charges of any kind (except in favor of or otherwise known by Lessor) ;(b) all information, including, but not limited to, financial statements, or other reports, schedules, or documents delivered or to be delivered to Lessor by Lessee is and will be correct and true as of the date given and will not omit to state a fact necessary in order to make the statements contained herein or therein not misleading;(c) Lessee has taken all action necessary to obtain the approval of all appropriate persons to grant the security interest in the Collateral as stated herein and to execute the terms of this Agreement and the person executing this Agreement, warrants and represents that all such appropriate action has been taken and that he is authorized to execute this Agreement on behalf of the Lessee.

**7. General Covenants of Lessee.** Unless otherwise excepted by this Agreement or by written amendment executed by Lessor, Lessee agrees:
(a) to perform or cause to be performed all Obligations secured hereby when due;
(b) to indemnify Lessor against any loss, claims, demands and liabilities caused by or arising from the Collateral;
(c) not to change its name, business structure or identity, principal place of business or chief executive office, the location of Collateral or the place where Lessee keeps its records concerning the Collateral without the prior written consent of Lessor, or add any new fictitious name; and prior to any such change to which Lender so consents, Lessee agrees to execute and deliver or cause to be delivered to Lessor any additional documents, instruments and agreements, including, without limitation, financing statements, waivers and subordinations, as Lessor may request;
(d) to keep its/their business properties and the Collateral in good repair;
(e) to furnish Lessor with such information and reports concerning Lessee and the Collateral, as Lessor may request, including complete and accurate records regarding Lessee's business and all Collateral;

Initial: _SK_ Miami Logistics Services Inc.

(f) to permit Lessor and its designees at any time during normal business hours on 24 hours notice to inspect the Collateral; to have free access and right of inspection to any papers, instruments and records pertaining thereto; and make photocopies, at Lessee's expense, from Lessee's books, records and writings pertaining to the Collateral;

(g) Other than such proceedings presently pending, to promptly notify Lessor in writing of the details of any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or that would result in any material adverse change in Lessee's business, properties, assets, goodwill or condition, financial or otherwise;

(h) upon an Event of Default to pay all costs and expenses, including attorneys' fees incurred by Lessor and relating to the perfection, preservation, realization, enforcement and exercise of Lessor's rights, remedies and powers hereunder;

(i) to insure the Collateral for at least the amount due to Lessor under any of the Obligations due to Lessor. Lessor shall be furnished with a copy of any and all such policies and any certificates evidencing the foregoing from the insurers and will instruct its carriers, brokers and claims adjusters to immediately and without delay to send such policies to Cargo Transport Alliance. Lessor is granted a power of attorney to act as attorney in fact to obtain copies of all insurance information and documents from such carriers, brokers and claims adjusters. Lessee further covenants and agrees that until Lessor has been paid in full on all of the Obligations, that Lessee will immediately notify Lessor of any losses arising out of the damage or destruction of the Collateral, that it will not receive any insurance proceeds from the loss or destruction of the Collateral, that any and all such insurance proceeds from any insurance claims will be paid directly by the insurer or adjuster to Lessor, that it will instruct any insurance carriers, brokers and claims adjusters to pay Lessor and only Lessor, and if any insurance proceeds come into possession of the Lessee, that they will be held in trust for the benefit of Lessor and paid to Lessor within 5 days of receipt. In the event that Lessor receives insurance proceeds, Lessor, in its sole and absolute discretion, may apply the insurance proceeds to the amount due to Lessor on any of the Obligations or use the proceeds to repair or replace any damaged Collateral.

**8. Specific Covenants of Lessee.** Unless otherwise excepted by this Agreement or by written amendment executed by Lessor, Lessee agrees:

(a) without the prior written consent of Lessor, not to sell, assign or transfer the Collateral;

(b) to pay before they become delinquent all charges, liens, taxes, assessments and insurance premiums charged against the Collateral, and upon the failure of Lessee to do so, Lessor may, at its option, pay any such charge, the amount of which shall be added to the Obligations and bear interest at the rate provided in any Transaction Documents or Future Transaction Documents or other agreement or contract evidencing the underlying obligation;

(c) to preserve and protect all Collateral and at all times maintain the Collateral in good condition and repair, not causing or permitting any waste or unusual or unreasonable depreciation;

(d) to register, use, operate and control the Collateral in accordance with all relevant statutes, laws, ordinances and regulations; and

(e) to execute such documents, including, without limitation, fixture filings, landlord waivers, mortgagee waivers, assignments, and endorsements of certificates of title, and do such things as Lessor may reasonably request for the purpose of perfecting, preserving and enforcing its security interest in the Collateral and to consummate all of the transactions contemplated by this Agreement or any other agreement between Lessee and Lessor.

**9. Powers of Lessor, Authorizations, and Power of Attorney.** Lessee hereby authorize Lessor and its designees at any time and whether or not a default exists:

(a) to perform any obligation of Lessee's hereunder in Lessee's name or otherwise and to make such payments and perform such acts as Lessor may deem necessary to preserve and insure the Collateral or its value of Lessor's security interest, including, without limitation, filing any financing statement and any action which Lessee shall have agreed to take pursuant to the terms of this Agreement;

(b) to assign its rights in this Agreement in full or in part; and

(c) grants Lessor a Power of Attorney for the purpose of endorsing all checks and any sums payable from insurance companies or anyone else to Lessee when Lessor deems it necessary to do so in its sole discretion and to endorse or execute any documents or instruments necessary with insurance companies to obtain the proceeds from any insurance resulting from the loss of the Collateral and file any UCC-1 Financing Statements perfecting Lessor's lien on the Collateral or to state any ownership interest it may have in Collateral. Lessee also grants Lessor a power of attorney to act as attorney in fact with any State's Department of Motor Vehicles to file any such documents on its own behalf or on behalf of the Lessee as is reasonably necessary to perfect its lien or state its ownership interest in any such collateral or property or to change the title, or to correct incorrect property descriptions or anything else that Lessor deems to be necessary. The Power of Attorney given to Lessor is for the purpose of allowing Lessor to take any and all action reasonably necessary to protect its interests in any Collateral and to be paid for damage, destruction or obtaining proceeds from any insurance company or other person or entity with respect to the Collateral.

**10. Events of Default; Acceleration. The following constitute "Events of Default" under this Security Agreement:**

Initial: _S K_  Miami Logistics Services Inc.

(a) any of Lessee's Obligations to Lessor under any of the Transaction Documents to which it is a party is not paid promptly when due;

(b) any default or Event of Default shall have occurred under any of the Lease Documents, including any failure on the part of Lessee to pay all rental and all other sums when due to Lessor;

(c) Lessee breaches any warranty, representation or covenant or other provision in any of the Transaction Documents or with respect to any Future Transaction Documents, or any documents evidencing any Obligations by Lessee to Lessor or other transaction between Lessee and Lessor;

(d) any default or Event of Default shall occur under any Guaranty executed by a guarantor;

(e) any default or Event of Default on any Future Transaction Documents by a guarantor;

(f) any default occurs by allowing any insurance policy protecting Collateral or required to be maintained by Lessee or a guarantor to lapse and is not replaced. In addition, Lessor must be assigned and/or granted a security interest in the new insurance policy and be a co-insured and sole loss payee so that at no time there is a gap in coverage on the Collateral for any reason or purpose;

(g) any material adverse change in the financial condition of Lessee;

(h) if Lessee makes an assignment for the benefit of creditors, makes or sends a notice of bulk transfer, or any petition is filed under the Federal Bankruptcy Code, or if there is an appointment of a receiver or trustee for any of Lessee's assets; and

(i) Lessee or any guarantor dies or fails to maintain its corporate, partnership of limited liability company existence in good standing or the usual business of any Lessee or guarantor is terminated, suspended or dissolved.

**If Lessee shall be in default or if an Event of Default hereunder occurs under the Lease, the Obligations shall, if Lessor shall so elect, become immediately due and payable without any notice or demand and Lessee specifically waives any such notice or demand.**

**11. Lessors Remedies After Default.** Upon the occurrence of any Event of Default that has not been cured in accordance with any agreement with Lessor and at any time thereafter, in addition to all other rights and remedies of Lessor granted by any other agreement with Lessee or by any statute or rule of law, or otherwise, Lessor may at its discretion and without notice to or consent by Lessee

(a) accelerate payment of all Obligations, demand immediate payment thereof from Lessee and any guarantor to Lessor and terminate any agreement for the granting of further credit and, at Lessor's discretion, obtain the appointment of a receiver to enforce Lessor's rights hereunder;

(b) enter upon any premises on or in which the Collateral may be located and take possession thereof to complete the processing, repairing and reconditioning of the Collateral, to store the Collateral, to effect the sale, foreclosure or other disposition thereof or for any other purpose, all without compensation to Lessee, and Lessor may remove any and all of the Collateral from said premises for the same purposes. Lessee shall, at the request of Lessor, assemble or deliver all or any part of the Collateral at such place or places as Lessor designates in its request. In the event Lessor institutes an action to recover any Collateral, whether by prejudgment remedy or otherwise, Lessee waives the posting of any bond that might otherwise be required. In addition, Lessee agrees that Lessor may auction the Collateral from any location where it is located without paying any storage or rental costs and Lessee specifically consents to Lessor entering on to any premises for that purpose.

(c) collect, foreclose, receive, appropriate, set off and realize upon any and all Collateral, or sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral at such prices or terms as Lessor may deem reasonable for cash, upon credit or for future delivery, with Lessor having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right of equity or redemption of Lessee, which right of equity or redemption is hereby expressly waived and released by Lessee. Ten (10) days' prior notice by Lessor to Lessee designating the time and place of any public auction of Collateral or the time after which any private sale or other disposition of Collateral may take place shall be deemed to be reasonable notice thereof, and Lessee waives any other notice;

(d) repair or recondition any Collateral to the extent Lessor deems necessary and any sum expended by Lessor for processing or repair shall be added to the Obligations secured by this Agreement;

(e) apply the cash proceeds of Collateral actually received by Lessor from any sale, lease, foreclosure or other disposition of the Collateral to the payment of (i) all costs and expenses of every kind or nature incurred or paid by Lessor in connection therewith, including, without limitation, reasonable attorneys' fees, and (ii) all and any of the other Obligations, in whole or in part, and in such order as Lessor may elect, whether then due or not due. The costs and expenses incurred or paid by Lessor with respect to any sale, lease, foreclosure or other disposition of the Collateral may further include, without limitation: (i) expenses of retaking, holding, reconditioning, assembling, preparing for sale or lease, advertising, storing, repairing, completing, selling, leasing, foreclosing or otherwise disposing of the Collateral; (ii) premiums on bonds and undertakings; (iii) sales, use and other taxes; (iv) fees and expenses of custodians, warehousemen, brokers, appraisers, auctioneers, sheriffs and others; (v) legal expenses and attorneys' fees; and (vi) all

Initial: _SK_  Miami Logistics Services Inc.

other expenses that may be incurred or paid by Lessor in attempting to collect the Obligations and to foreclose upon the Collateral. Lessee shall be liable to Lessor for the payment on demand of all such costs and expenses. Lessee shall be liable for any deficiency with interest at the rate set forth in any written loan document, note, agreement or other writing evidencing the Obligations;

(f) exercise all of the rights and remedies of a secured party under the California Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; and

Lessor shall have the right at its sole discretion to determine which rights and remedies and in which order any of the same are to be exercised, and Lessor may at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Obligations. Lessor may, at any time or times, proceed directly against Lessee, any guarantor, person or entity to enforce payment of the Obligations and shall not be required to take any action of any kind to preserve, collect or protect Lessor's rights in the Collateral. Lessee shall remain liable for any deficiency after sale, lease or other disposition of the Collateral or any part thereof. All rights, remedies, powers and benefits granted to Lessor by Lessee, or by applicable law, are cumulative and not exclusive and enforceable alternatively, successively, or concurrently on any one or more occasion.

**12. Miscellaneous.**

(a) Lessor may correct any errors herein in this Agreement and fill in such blanks as serial numbers, date of first payment and the like herein or in any other Transaction Documents or Future Transaction Documents. Lessee authorizes Lessor to file all financing statements for Lessee with respect to the Collateral as Lessor may deem necessary or desirable.

(b) All notices provided for herein shall be in writing and shall be deemed to have been given when delivered personally, when telecopied, or if deposited in the United States mail, when received addressed to Lessee at the address set forth for Lessee under its signature page hereon and for the Lessor as follows (or other address provided in writing by the respective parties to the other from time to time):

If to Lessor:          Cargo Transport Alliance, LLC
                       1525 NW 167th St, Suite 115
                       Miami Gardens, FL 33169
                       Telephone: 954-889-3223
                       Attention: Managing Partner

(c) This Agreement shall be governed by and subject to the laws of the State of California (without regard to conflicts of laws principles).

(d) LESSEE HEREBY IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT OR ANY OF ITS ASSETS WITH RESPECT TO THIS SECURITY AGREEMENT MAY BE BROUGHT IN ANY JURISDICTION WHERE LESSEE OR ANY OF ITS ASSETS MAY BE FOUND, or in any court of the State of California or any federal court of the United States of America located in Los Angeles, California, United States of America, or both, or any other jurisdiction in the State of California where any assignee of the Lessor is located, as Lessor or any assignee of the Lessor may elect, and by execution and delivery of this Security Agreement, Lessee hereby irrevocably submits to and accepts with regard to any such action or proceeding, for itself and in respect of its assets, generally and unconditionally, the jurisdiction of the aforesaid courts. (e) Except as otherwise provided herein, Lessee waives and agrees not to assert or take advantage of the defense of any statute of limitations in any action hereunder or for the collection of any Obligations or the performance of any obligation secured hereby;

(f) Lessee waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Obligations or of any action or non action on the part of Lessee, Lessor, any guarantor, endorser, or any other person whosoever, in connection with any obligation or evidence of indebtedness held by Lessor as collateral or in connection with any indebtedness secured hereby.

(g) No delay or omission on the part of Lessor or its assignee in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement. No waiver by Lessor of any default shall operate as a waiver of any other default of at the same default on a future occasion. Lessor's acceptance of any partial or delinquent payment from Lessee or any other person or entity shall not waive any Obligation or modify this Agreement.

(h) Neither this Agreement nor any provision hereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lessor expressly referring to this Agreement and to the provision so amended, modified or discharged. This Agreement, together with any other agreement signed in connection with it representing or securing the underlying Obligations, constitute the entire understanding and agreement between the parties.

(i) If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be ineffective only to the extent of such invalidity or unenforceability, without invalidating the remainder of such provision or any remaining

Initial: _SK_ Miami Logistics Services Inc.

provisions of this Agreement. Paragraph headings used in this Agreement are for the convenience of the parties and shall not be used to interpret the meaning of any provision.

(j) All references to the term "Lessor" wherever used herein shall be deemed to mean and include its parent, affiliates, subsidiaries, agents, correspondents, representatives, bailees, and each of their successors and assigns. Further, any assignee of Lessor shall have all of the rights and powers of Lessor under the terms of this Agreement.

(k) Under no circumstances shall Lessor be deemed to have assumed any responsibility for or obligation or duty of any nature or kind with respect to any Collateral, or any matter or proceeding arising out of or relating thereto, but the same shall be at the sole risk of Lessee at all times. Lessee agrees to indemnify and hold Lessor harmless from and with respect to any and all losses, claims, demands or liabilities of every kind caused by the Property or Collateral subject to this Agreement and upon request by Lessee defend Lessor from any all such claims, losses. demands or liabilities.

(l) This Agreement shall be for the benefit of Lessor, its successors and assigns, and shall bind the heirs, executors, and successors in interest of Lessee.

(m) All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

(n) In the event that Lessor employs attorneys to remedy, prevent, or obtain relief from a breach or default of this Agreement or the documents and instruments executed in connection with this Agreement arising out of a breach or default of this Agreement or the documents and instruments executed in connection with this Agreement or in connection with or contesting the validity of this Agreement or the documents and instruments executed in connection with this Agreement or with respect to contesting the lien priority of the Lessor, or with respect to contesting any of the terms, covenants, provisions, and all conditions of this Agreement, or any of the matters referred to herein or therein or in connection with any bankruptcy proceeding, Lessor shall be entitled to be reimbursed for all of its attorneys' fees, whether or not suit is filed and including, without limitation, those incurred in each and every action, suit or proceeding, including any and all appeals and all fees and costs incurred by Lessor whether in State, Federal, Bankruptcy Court, or any other judicial or administrative court or proceeding shall be paid by to Lessor by Lessee.

(o) Lessor and Lessee expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

This Security Agreement has been executed and delivered as of the date and by the parties set forth below.

Date: 9/15/2015

Cargo Transport Alliance
Anatoly Galunov, Partner

Date 09/15/2015

Miami Logistics Services Inc.

EXHIBIT
B

# OPERATING AGREEMENT # OA/04-2015

This OPERATING AGREEMENT ("Agreement") is made and entered into as of September, 15th 2015 (the "Effective Date") *between:*

**CARRIER:**        **Cargo Transport Alliance, L.L.C.**
FL State of Formation ID#: L15000019251
1525 NW 167th Street
Suite 115Miami Gardens, FL 33169

**INDEPENDENT CONTRACTOR:**    **MIAMI LOGISTICS SERVICES INC,**
FL State of Formation ID#: P15000075573
EIN: 47-5080303

## RECITALS

WHEREAS, CARGO TRANSPORT ALLIANCE LLC an authorized motor CARRIER, desires to provide interstate and intrastate transportation of freight by truck utilizing independent contractors; and

WHEREAS, INDEPENDENT CONTRACTOR owns and operates trucks to transport property from the place of receipt to the place of destination for compensation from customers, during which period of time INDEPENDENT CONTRACTOR assumes complete responsibility for the property it is transporting;

WHEREAS, INDEPENDENT CONTRACTOR desires to use the freight forwarding brokerage services, trailers and other devices and accessories of CARGO TRANSPORT ALLIANCE LLC to negotiate better compensation from Customers for the property it transports from the place of receipt to the place of destination and to transport such property more efficiently; and

NOW, THEREFORE, in consideration of the foregoing and of the mutual Promises set forth below; CARGO TRANSPORT ALLIANCE LLC and INDEPENDENT CONTRACTOR mutually covenant and agree as follows:

## DEFINITIONS

1. "Advances" shall mean any and all currency given to INDEPENDENT CONTRACTOR by CARGO TRANSPORT ALLIANCE LLC

2. "B.O.L." shall mean Bill of Lading and or other paperwork describing the Load.

3. "Carrier" shall mean CARGO TRANSPORT ALLIANCE LLC.

4. "Carrier System" shall mean the business plan and operations of CARGO TRANSPORT ALLIANCE LLC

5. "Consignee" shall mean the person or entity to which the Load is to be delivered.

6. "Customer" shall mean the person or entity that contracted with Carrier to haul the Load.

7. "Devices" shall mean any and all items leased to INDEPENDENT CONTRACTOR by CARGO TRANSPORT ALLIANCE LLC to enhance the Driver's ability to haul a Load, including but not limited to: GPS and Pre-Pass.

8. "DOT Inspection Sheet" shall mean the official form and any other documents approved by the Department of Transportation that all Drivers must complete and keep current in the Equipment by Law at all times.

9. "Driver" shall mean the driver of the Equipment that is either the owner of the Equipment and the INDEPENDENT CONTRACTOR described in this Agreement or an employee and or agent of the INDEPENDENT CONTRACTOR that is authorized by Law at all times to haul Loads via Equipment.

INITIALS *SK*                     OPERATING AGREEMENT # OA/04-2015     Page 1 of 11

10. "Documentation" shall mean written forms of vehicle insurance including but not limited to a 30-day notice and change cancellation clause, vehicle registration and fees, B.O.L., DOT Inspection Sheet, Driver drug test, Driver income taxes, Driver physical examinations, Driver random alcohol and drug tests, Fuel Receipts, Equipment Maintenance Records, highway use authorization and taxes, INDEPENDENT CONTRACTOR payroll taxes, Log Book Sheet, licenses, mileage taxes, permits, Physical Examination Certificates, state property taxes, Toll Receipts, Toll Tickets, weight taxes, and any and all other paperwork that is required of Driver by Law and or by Carrier prior to and during the providing of Services for CARGO TRANSPORT ALLIANCE LLC

11. "Equipment" shall mean a truck and trailer or any other combination of vehicles designed and used for hauling a Load.

12. "Equipment Maintenance Records" shall mean the record detail, receipts and any and all repair and or maintenance description of Equipment performed while Equipment was being sub-leased to INDEPENDENT CONTRACTOR by CARGO TRANSPORT ALLIANCE LLC

13. "Equipment Provider" shall mean the Company, which CARGO TRANSPORT ALLIANCE LLC leasing Equipment from.

14. "Fuel Receipts" shall mean the receipts for fuel confirming the actual purchase of fuel used for a particular Haul.

15. "Haul" shall mean the journey of the Load.

16. "Law" shall mean all international, federal, state, local and other laws, rules and other regulations, including but not limited to those issued by the Interstate Commerce Act and the Federal Department of Transportation.

17. "Load" shall mean the property that was contracted for by Customer with Carrier being transported by Driver in the Equipment.

18. "Log Book Sheet" shall mean the daily written form that records the changing of the timing and the status of each Load and Haul by each Driver.

19. "Maintenance Facility" shall mean an independent facility that is authorized by Carrier to perform maintenance and make repairs to Equipment required by Law.

20. "Pre-Pass" shall mean the Device that gives the Driver national weigh station bypass system information.

21. "Physical Examination Certificates" shall mean reports issued by a physician authorized by Carrier of Driver that confirm the Driver is fit mentally and physically to haul Loads via Equipment.

22. "Rate" shall mean the gross amount agreed upon by Carrier and INDEPENDENT CONTRACTOR for a particular haul of a Load.

23. "Services" shall mean the freight forwarding services to be performed by the Driver of INDEPENDENT CONTRACTOR that CARGO TRANSPORT ALLIANCE LLC negotiated, assembled and or consolidated, or provided for the assembling and consolidating of, for the hauling of the Load from the place of receipt to the place of destination for Customers.

24. "Tax Reports" shall mean the tax reports regarding the fuel consumption of the Equipment required by Law.

25. "Toll Receipts" shall mean the receipts for tolls confirming the actual purchase of tolls paid for a particular Haul.

26. "Toll Tickets" shall mean the report confirming the actual mileage incurred during a particular Haul.

## AGREEMENT

1. **NATURE OF AGREEMENT.**
This Agreement sets forth the terms under which the Parties agree to cooperate in the sale and provision of Services to Customers by CARGO TRANSPORT ALLIANCE LLC through INDEPENDENT CONTRACTOR.

2. **OBLIGATIONS.**

**2.1. CARGO TRANSPORT ALLIANCE LLC** shall be responsible for the following during the Term of this Agreement:

1) Provide its Operating Authority (MC number) and register INDEPENDENT CONTRACTOR's truck under its USDOT number.

2) Provide its freight forwarding brokerage services, trailers and other devices and accessories to transport property on its behalf from the place of receipt to the place of destination for compensation from Customers.

3) Place and maintain, at its sole discretion, Carrier's advertisements, designs, Lettering, logo, name and or slogan on the Equipment;

4) Supply permits required by Law to INDEPENDENT CONTRACTOR;

5) Activate a fuel card for INDEPENDENT CONTRACTOR for all fuel purchases during the performance of Services during the Term of this Agreement.

6) Provide its International Fuel Tax Agreement (IFTA). File IFTA tax returns form as required by Law;

**2.2. INDEPENDENT CONTRACTOR** and any Driver and/or agent of INDEPENDENT CONTRACTOR shall provide the following to CARGO TRANSPORT ALLIANCE LLC during the Term of this Agreement:

1) Provide and maintain at its sole expense the Equipment according to Appendix A, here attached and titled "INDEPENDENT CONTRACTOR's Equipment" in excellent working condition so as to ensure the safe and efficient operation.

2) Provide and maintain at its sole expense the level of insurance that is required by FMCSA;

3) Sub-lease a trailer from Carrier according to the terms in Appendix B, here attached and titled "Trailer Lease Agreement";

4) Identify that the Equipment is in compliance with the FMCSA;

5) Maintain and operate the Equipment for the duration of this Agreement according to US DOT Federal Highway Administration regulations and all other Law;

6) Use due diligence at all times to ensure and assure complete Customer Satisfaction during the Term of this Agreement by committing to the following:
   * Picking up and delivering Loads on time,
   * Behaving courteously and professionally with Consignee, Customer, Carrier and any and all others while performing Services for CARGO TRANSPORT ALLIANCE LLC.

7) Pay for, maintain and provide any and all Documentation to CARGO TRANSPORT ALLIANCE LLC prior to, during and upon termination of this Agreement as required by Law and by Carrier;

8) Participate in a drug test and in random alcohol and drug tests required by Law and Carrier;

9) Hold and provide Documentation that confirms the content of the Load;

10) Have, at its sole expense, Equipment available for inspection by Carrier quarterly;

INITIALS _SK_

11) Have, at its expense, Equipment inspected and or maintained at Maintenance Facility;

12) Comply with all Laws regarding Load size and weight restrictions;

13) Notify Carrier regarding and receive from Carrier, prior to commencing a Haul, a permit for Load size and weight where required by Law;

14) Report shortages, overages and all other exceptions of a Load to Carrier prior to signing B.O.L. Otherwise, INDEPENDENT CONTRACTOR assumes sole responsibility and liability including but not limited to that for: loss, damage, penalties, fees, and fines for any shortages, overages or other exceptions;

15) Report vehicle accidents to Carrier immediately;

16) Never leave Load unattended or unsecured;

17) Remove Carrier's advertisements, designs, lettering, logo, name and or slogan on the Equipment at the termination of this Agreement;

18) Return Devices and Equipment to Carrier in the same condition as received;

## 3. CONTRACTOR'S DRIVERS

Should CONTRACTOR employ drivers, CONTRACTOR must supply the names, cellular telephone numbers, addresses, and copies of medical cards and driver's licenses, and each employee of CONTRACTOR must execute driver qualification documents.

As required by 49 C.F.R. §§ 382.103 and 382.601, CONTRACTOR and CONTRACTOR's drivers shall comply with CARRIERS's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol-testing program, and any addendums or revisions thereto. Violation of CARRIER's Drug and Alcohol Policy, or positive tests for prohibited drugs or alcohol shall immediately disqualify CONTRACTOR's driver.

CARGO TRANSPORT ALLIANCE LLC shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law, in violation of COMPANY's minimum qualification standards, or in violation of any policies of COMPANY's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet COMPANY's minimum qualification standards.
Upon a driver's disqualification by COMPANY, CONTRACTOR shall, if CONTRACTOR so chooses furnish another competent, reliable, and qualified professional driver who meets COMPANY's minimum qualification standards or this Agreement shall terminate immediately.

## 4. PAYMENTS, SETTLEMENTS & DEDUCTIONS

a. CARGO TRANSPORT ALLIANCE LLC shall pay INDEPENDENT CONTRACTOR **88% of Load Rate.**

b. CARGO TRANSPORT ALLIANCE LLC shall settle with INDEPENDENT CONTRACTOR as to services provided under this Agreement **every Friday.**

c. INDEPENDENT CONTRACTOR shall pay CARGO TRANSPORT ALLIANCE LLC for **sub-leased Equipment** according to the schedule here attached as **Appendix B** and titled "Trailer Lease Agreement."

d. INDEPENDENT CONTRACTOR shall pay CARGO TRANSPORT ALLIANCE LLC for **Services, Devices, Equipment** according to the schedule here attached as **Appendix C** and titled "Schedule of Charges to be paid by INDEPENDENT CONTRACTOR to CARGO TRANSPORT ALLIANCE LLC "

e. CONTRACTOR will maintain a **MAINTENANCE RESERVE FUND** with CARRIER.

CONTRACTOR authorizes CARGO TRANSPORT ALLIANCE LLC to deduct the MAINTENANCE RESERVE Fund from CONTRACTOR'S Settlement, **$350.00 per each truck per Settlement Period.**

CARRIER may draw upon the MAINTENANCE RESERVE Fund for the purpose of settling amounts that CONTRACTOR owes CARRIER under this Agreement, including, but not limited to, any expense incurred by CARRIER that is CONTRACTOR'S responsibility under this Agreement. CARRIER will describe each transaction involving the MAINTENANCE RESERVE Fund in writing to CONTRACTOR.

CONTRACTOR may request an accounting of MAINTENANCE RESERVE Fund in writing at any time, and such accounting will be provided seven (7) days from CARRIER'S receipt of that request.

The MAINTENANCE RESERVE Fund shall be returned to CONTRACTOR within 30 (thirty) days upon termination of the Agreement, less applicable charge backs, as determined by CARRIER.

f. All payments by either Party under this Agreement shall be made in U.S. dollars and shall be deemed paid upon receipt.

g. Each Party shall be responsible for and pay any and all taxes in accordance with their obligations as defined in this Agreement and the Law.

## 5. COST OF OPERATIONS:

CONTRACTOR shall bear the operational expenses including but not limited to:
Fuel, fuel taxes, permits of all types, tolls, ferries, base plates and licenses, insurance costs relating to insurance coverage required to comply with this agreement, federal highway use tax on the Equipment, federal, provincial, state or city income taxes, and any self-employment or payroll taxes; and any sales, use, excise and other taxes due and owing to ownership or operation of the Equipment.
CONTRACTOR shall bear any expenses necessary to maintain the Equipment in compliance with all applicable federal and state safety laws and regulations.

## 6. FUEL CARDS.

CARGO TRANSPORT ALLIANCE LLC shall issue to CONTRACTOR, a fuel card that CONTRACTOR may use for all fuel purchases; provided, however, that CONTRACTOR shall use the fuel card only for fuel purchases made in connection with CONTRACTOR'S provision of services under this Agreement.

## 7. RELATIONSHIP.

INDEPENDENT CONTRACTOR assumes full control and responsibility for all hours worked, commissions earned, wages and or salaries paid to employees and agents, worker's compensation and unemployment insurance, licenses required by Law, taxes, fringe benefits and all other costs relating to the use of Drivers provided by INDEPENDENT CONTRACTOR pursuant to this Agreement.

## 8. REPRESENTATIONS, WARRANTIES AND COVENANTS.

a. CARGO TRANSPORT ALLIANCE LLC and INDEPENDENT CONTRACTOR each represents and warrants to, and agrees with the other that it has the right, power and authority to enter into and perform its obligations under this Agreement.

b. INDEPENDENT CONTRACTOR represents and warrants that it meets or exceeds the rules and requirements of Law regarding the performance of its obligations in this Agreement. INDEPENDENT CONTRACTOR agrees that it shall obtain, and shall thereafter maintain all necessary licenses and permits in accordance with the rules and requirements of Law, and shall not take any action in contravention of the terms and conditions of the license and permit or of the Law.

## 9. TERM

The "Term" of this Agreement shall remain in effect for a period of 48 months from Effective Date.
THIS AGREEMENT IS NON-CANCELLABLE AND IS SUBJECT TO THE TERMS AND CONDITIONS STATED HEREIN, WHICH CONTRACTOR ACKNOWLEDGES THAT CONTRACTOR HAS READ, UNDERSTANDS, AND AGREES TO.

## 10. LIMITATION OF LIABILITY.

a. IN NO EVENT SHALL CARGO TRANSPORT ALLIANCE LLC BE LIABLE TO INDEPENDENT CONTRACTOR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSS OF REVENUES, WHETHER FORESEEABLE OR NOT FOR ANY CAUSES WHATSOEVER.

b. CARGO TRANSPORT ALLIANCE LLC MAKES NO WARRANTY, EXPRESS OR IMPLIED, TO ANY OTHER PERSON CONCERNING SERVICES. INDEPENDENT CONTRACTOR SHALL NOT HAVE ANY RIGHT OF RECOVERY AGAINST ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF CARGO TRANSPORT ALLIANCE LLC OR ANY SUBSIDIARY THEREOF.

c. IN NO EVENT SHALL ANY OF THE PAYMENTS DESCRIBED IN APPENDIX B, C AND D BE CONSTRUED TO CREATE ANY ADDITIONAL LIABILITIES FOR CARGO TRANSPORT ALLIANCE LLC TOWARD INDEPENDENT CONTRACTOR OR ANY OTHER THIRD PARTY.

## 11. INDEMNIFICATION.

a. INDEPENDENT CONTRACTOR shall indemnify and hold CARGO TRANSPORT ALLIANCE LLC harmless from all liability to Customers and third persons disclaimed by CARRIER, to the extent such liability is based upon.

b. INDEPENDENT CONTRACTOR providing Services, including, without limitation, Customer's violation or alleged violation of any Law or any claims made under any warranty or representation by INDEPENDENT CONTRACTOR to Customer or any third party.

c. INDEPENDENT CONTRACTOR shall pay all expenses (including attorneys' fees) incurred by CARGO TRANSPORT ALLIANCE LLC in connection with all legal or other formal or informal proceedings concerning claims of Customers or other third parties and INDEPENDENT CONTRACTOR shall satisfy all judgments, costs, or other awards which may be incurred by or rendered against CARGO TRANSPORT ALLIANCE LLC with respect to such claims.

d. CARGO TRANSPORT ALLIANCE LLC shall have the sole right of defense in any legal or other formal or informal proceedings concerning claims of Customers or other third parties. INDEPENDENT CONTRACTOR shall pay any settlement of any such claim or legal or other formal or informal proceeding, but INDEPENDENT CONTRACTOR shall not agree to any settlement of any third party claim without first giving thirty (30) days prior written notice of the terms and conditions of such settlement to CARGO TRANSPORT ALLIANCE LLC and obtaining CARRIER'S written consent to such settlement.

## 12. SUBORDINATION.

Each Party hereby acknowledges that this Agreement does not grant to INDEPENDENT CONTRACTOR or to any Customer any right, interest or lien in any equipment, facility or other property of CARGO TRANSPORT ALLIANCE LLC and CARGO TRANSPORT ALLIANCE LLC does not in any other document expressly grant to INDEPENDENT CONTRACTOR or to any Customer any such right, interest or lien. This clause shall be self-operative and no further instrument of subordination shall be required by any security agreement, mortgage or other document reflecting such interest to make this subordination effective. In confirmation of such subordination, each Party shall execute promptly any certificate that the other Party may reasonably request.

## 13. NOTICES.

All notices and other communications from either Party to the other, except as otherwise stated in this Agreement, shall be in English writing and shall be deemed received upon actual delivery (or confirmed facsimile delivery) addressed to the other Party as follows:

**INDEPENDENT CONTRACTOR** by courier, delivery service, or by personal delivery to:
Attention:      MIAMI LOGISTICS SERVICES INC.
Address:
Telephone:      305.988.1197
E-mail:         senior.kcb@yandex.ua

**Cargo Transport Alliance** by courier, delivery service, or by personal delivery to:
Attention:      Cargo Transport Alliance LLC.,
Address:        1525 NW 167TH St., Suite 115
                Miami Gardens, FL 33169
Telephone:      954.889.3223
E-mail:         info@cta-fl.com

INITIALS _SK_                                    OPERATING AGREEMENT # OA/04-2015      Page 6 of 11

Each Party may change its contact person, number or address on written notice to the other Party.

**14. GOVERNING LAW.**
This Agreement shall be interpreted according to the Laws of the State of Florida, U.S.A. The Parties hereby agree to venue and submit to the jurisdiction of the courts of Broward County, Florida.

**15. SEVERABILITY.**
Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to Law. In the event that the transactions set forth in this Agreement are challenged before a court or regulatory body of competent jurisdiction by persons or entities which are not Parties hereto, CARGO TRANSPORT ALLIANCE LLC and INDEPENDENT CONTRACTOR agree that each will use all reasonable efforts before such court or regulatory body to support the continuing operation of this Agreement by its terms. If any provision of this Agreement is deemed to be invalid or unenforceable, the provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to permit compliance with the minimum legal requirements; provided, that if the effect of the foregoing is such that the economic relationships or benefits and burdens contemplated under this Agreement are substantially affected, the Parties shall seek to use all reasonable efforts to reconstitute this Agreement so as best possible to restore to each Party the economic position contemplated in this Agreement.

**16. COUNTERPARTS.**
This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute but one and the same instrument.

**17. ENTIRE AGREEMENT.**
This Agreement constitutes the entire agreement between the Parties and supersedes all previous understandings, commitments or representations concerning its subject matter.
This Agreement may not be amended or modified in any way, and none of its provisions may be waived, except by a prior writing signed by an authorized officer of each Party. No waiver of any provision of this Agreement shall constitute a continuing waiver of such provision or a waiver of any other provision.

**IN WITNESS WHEREOF,** each of the Parties hereto has duly executed and delivered this Agreement as of the day and year first above written.

BY: CARGO TRANSPORT ALLIANCE LLC
Name: Anatoly Galunov
Title: PARTNER                                Signature

By: MIAMI LOGISTICS SERVICES INC.

Name: SERGIY KURASHOV
Title: OWNER                                  Signature:

*Appendix A*

**EQUIPMENT DESCRIPTION:**

| | Make: | Type: | Year: | VIN #: | Plate #: | Unit#: |
|---|---|---|---|---|---|---|
| 1 | KW | TR | 2012 | 1XKFDP9X5CJ293405 | F5291R | 0009 |
| 2 | KW | TR | 2012 | 1XKFDP9X4CJ293377 | F5292R | 0010 |
| 3 | KW | TR | 2012 | 1XKFDP9X7CJ293387 | F5293R | 0011 |
| 4 | KW | TR | 2012 | 1XKFDP9X2CJ296617 | F5294R | 0012 |

**Other Equipment:**          FLEET ONE Fuel Card    No. _____
                                                        No. _____
                                                        No. _____
                                                        No. _____

                              GPS Satellite Unit    _____
                                                    _____
                                                    _____
                                                    _____

**BY: CARGO TRANSPORT ALLIANCE LLC**
Name: Anatoly Galunov
Title: PARTNER                    Signature_____

**By: MIAMI LOGISTICS SERVICES INC.**
Name: Sergiy Kurashov
Title: Owner                      Signature: _____

*Trailer Lease Agreement*

**1. Parties.**   **Lessor:**   Cargo Transport Alliance LLC,
              **Lessee:**   MIAMI LOGISTICS SERVICES INC.

**2. Lessor's Representations.** The Trailer being leased by the Lessee from the Lessor is described as specified in the Lease Agreement Summary and hereto made part of this agreement.

**3. Lessee.** Lessee agrees to pay Lessor, during the term of the Lease (as set forth in Section 4 below) a monthly lease payment as specified in the Lease Agreement Summary and is due on the 1 of the month for that month's lease.

**4. Term.** The term of this Lease shall be as specified in the Lease Agreement Summary. See attachment #1.

**5. Lessee's Responsibilities.** The Lessee shall be responsible for all repairs and maintenance of the Trailer during the lease. All repairs or replacement parts shall be of the same type and quality as those furnished by the Lessor (including without limitation tires and brakes). The Trailer must be returned clean and free of debris. Lessee shall be responsible for removing any markings, signs, decals, glues or adhesives placed on the Trailer before returning the Trailer. A thorough inspection of the trailer will be documented at the Lease inception. Remaining tire treads and brake wear will be measured and documented at the Lease inception. Any Trailer damage, tire wear or brake wear documented at the end of the Lease will be the Lessee's financial responsibility as follows.

**6. Use of Trailer.** Lessee agrees to maintain and operate the Trailer in compliance with all applicable laws, orders, rules and regulations of any governmental authority and will not permit the Trailer to be used for any illegal purposes. Lessee agrees that the trailer will not be sublet. No company other than lessee, whose name appear on both this contract and provided insurance certificate, may use lessor`s trailers.

**7. Insurance.** Lessee agrees to provide and maintain at its sole expense:

A. Comprehensive insurance to protect for comprehensive and Collision physical damage risks including but not limited to, collision, theft, fire, weather, natural disaster or any other cause, with a deductible no greater than one thousand dollars ($1,000). Lessee must provide Lessor a Certificate of Insurance with Lessor named as loss payee and additional insured for the specific Trailer leased and for the amount listed on the Lease Agreement Summary. Lessee agrees to pay Lessor for the deductible within 30 days of any claim occurrence and also agrees to pay Lessor for any deductions made by insurance company for Trailer towing and storage, unpaid premiums or any other deductions.

B. Automobile Liability insurance with a minimum combined single limit of One million dollars ($1,000,000). Lessee must provide a Lessor a Certificate of Insurance with Lessor named as loss payee and additional insured.

C. Lessee must renew any expired insurance certificates as long as trailer has not been returned to lessor. Lessee must also proved lessor a copy of any changes to lessee insurance coverage of lessors trailers this will include changes in insurance carriers. Lessee`s failure to keep adequate insurance coverage on lessor's trailers will result in lessor's actions to repossess equipment at the cost of the lessee.

**8. Lease Termination Charges.** The Lessee agrees to lease the Trailer for the term specified in Section 4 above. If the Lessee returns the Trailer and terminates the Lease prior to the specified term, the Lessee agrees to pay cancellation fees as specified in the Lease Agreement Summary.

**9. Lease Continuation.** At the expiration of the current Lease, the lease will be automatically renewed on a monthly basis. The renewal monthly lease rate will be either the same or increased. This rate is at the discretion of the lessor.

**10. Security Deposit.** A security deposit, as specified in the Lease Agreement summary, may be required for the Lease. The security deposit will be use to offset any tire and brake wear charges or Trailer damage incurred by the Lessee at the end of the Lease and/or will be used to offset any Lease termination charges or unpaid rents. If those charges exceed the security deposit amount, the Lessee will be billed and pay for the excess charges. If the security deposit exceeds these charges, a refund will be made to the Lessee at the end of the Lease.

**11. Liability/Loss.** Lessee agrees to hold harmless and indemnify Lessor from and against any liability or loss, including without limitation, any court costs and legal fees incurred in good faith by the Lessor, arising out of any cause associated with Lessee's business or use of the Trailer.

**12. Default By Lessee.**
In the event Lessee fails to make payments when due or fails to comply with any of the terms and conditions of this Lease within ten (10) days after Lessor has mailed written notice of same to Lessee, the Lessor may, at its option.

A. Lessor may declare this Lease terminated and Lessee agrees to immediately surrender peaceful possession of the Trailer to Lessor. Upon failure of the Lessee to deliver the Trailer to the Lessor, then Lessor can take possession of the Trailer without legal process; Or

B. Lessor may continue the Lease and recover damages from the Lessee for such failure to comply.

INITIALS ___                                    OPERATING AGREEMENT # OA/04-2015     Page 9 of 11

**13. Bankruptcies or Assignment for the Benefit of Creditors.** In the event of the filing of any petition for bankruptcy, receivership or assignment for the benefit of creditors, relating to the Lessee, the Lessee agrees, irrespective of whether lease payments shall then be in default, that the Lease shall be deemed terminated and to immediately surrender peaceful possession of the Trailer to the Lessor.

**14. Assignment.** Lessee may not assign this Lease and Lessee may not sublet the Trailer.

**15. Fees and Interest.** In the event it becomes necessary for Lessor to employ an attorney or collection agency to enforce collection of lease payments, lease termination fees, late fees, tire and brake wear fees or Trailer damage charges, or to enforce compliance with any of the covenants and agreements herein contained, Lessee shall be liable for reasonable attorneys' fees, costs and expenses incurred by Lessor, and in addition, shall be liable for interest at the higher of ten percent (10%) per annum or the highest rate then permitted by law on the sum determined to be due by reason of breach of this Lease, such interest to run from the date of breach of the Lease.

**16. Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State of Florida.

**17. Lessee's Responsibility for Costs, Fees and Expenses.** Lessee shall pay for and be fully responsible for the following: Any and all costs, fees, and expenses (excluding depreciation and ordinary wear and tear from proper use) incurred in connection with the use, operation, and maintenance of the Equipment, including, but not limited to, taxes (except for any taxes based on or measured by income and/or ownership of Lessor), license charges, insurance, fuel, fuel taxes, permits, tolls. Any unpaid tolls/tickets/fines and taxes that come after the license plate will be deducted from security deposit or added on next months invoice. Lessee is fully responsible for all fees related to such fines.

*Lease Agreement Summary:*

| | |
|---|---|
| *Effective Date:* | *9/15/2015* |
| *Lease Duration:* | *MINIMUM 6 MONTHS* |
| *Lease Payment Due Date:* | *1st of the Month* |
| *Cancellation Fees:* | *1 Month* |

| Trailer Type: | DRY VAN | REEFER |
|---|---|---|
| Monthly Rent: | $650.00 | $1,200.00 |
| Security Deposit: | $1,300.00 | $2,400.00 |
| Insurance Value: | $30,000.00 | $44,500.00 |
| Monthly Insurance: | $110.00 | $200.00 |
| Total Weekly Payment per Trailer: (including rent and insurance) | $190.00 | $350.00 |

*I acknowledge these lease terms and conditions and agree to lease this trailer for the duration of the above agreed to term. If the trailer is returned prior to the term of the lease, I will pay the cancellation charges indicated above. I understand that lessee is fully responsible for all maintenance and repairs of the trailer, including tires and brakes and any damage. I have read and understand the Driver's Check Out Report and agree with beginning tire and brake measurements and understand the tire wear and brake wear charges that will be incurred at the end of the lease. I have read and understand and have signed the Trailer Lease Agreement and agree to the detailed terms and conditions of the lease.*

**BY: CARGO TRANSPORT ALLIANCE LLC**
Name: Anatoly Galunov
Title: PARTNER                                 Signature

**By: MIAMI LOGISTICS SERVICES INC.**
Name: Sergiy Kurashov
Title: Owner                                   Signature:

*Appendix C*

## *"Schedule of Charges to be paid by INDEPENDENT CONTRACTOR to CARGO TRANSPORT ALLIANCE LLC "*

INDEPENDENT CONTRACTOR authorizes CARGO TRANSPORT ALLIANCE LLC to deduct expenses, for the following items from any Settlement(s) due or to come due to Contractor under the terms of this Agreement:

### *1.  FIXED EXPENCES  (on weekly basis per each Truck)*

| Description | Amount, USD (per week per truck) |
|---|---|
| Insurance premiums (Liability, Cargo and Truck PD) | $380.00 |
| Fuel and Road Taxes | $40.00 |
| Sub-Lease of Reefer Trailer (including PD insurance) | $350.00 |
| Sub-Lease of Dry Van (including PD insurance) | $190.00 |
| Maintenance Reserve | $350.00 |
| GPS tracking (AMS) | $25.00 |

### *2.  OPERATIONAL EXPENCES*

| Description | Rate/Amount, USD |
|---|---|
| "Quick Pay" (Factoring) fees | 2% flat rate of billed invoices |
| Administration fees | 12% of Load Rate |
| Fuel cost for all fuel purchases | according to Fleet One report |
| Drivers Payroll | Agreed rate |
| Pay Road (Tolls) (E-Z Pass, E-Pass, Sun-Pass) | Report |

**DEDUCTIONS FOR EQUIPMENT SUB-LEASE AGREEMENT # 6377/S.** Miami Logistics Services Inc., authorizes CARGO TRANSPORT ALLIANCE LLC to deduct Monthly Rent ($ 5,495.00)  in  accordance  with  the Equipment Sub-Lease Agreement # 6377/S from any Settlement(s) due or to come due under the terms of this Agreement.

**DEDUCTIONS FOR ADVANCES**
INDEPENDENT CONTRACTOR shall pay CARGO TRANSPORT ALLIANCE LLC for any and all advances received from Carrier by INDEPENDENT CONTRACTOR, Driver and or other agent of INDEPENDENT CONTRACTOR during the term of this Agreement.

**DEDUCTIONS FOR MAINTENANCE**
INDEPENDENT CONTRACTOR shall pay CARGO TRANSPORT ALLIANCE LLC for any and all maintenance of Truck and/or trailer paid by Carrier on behalf of Contractor.

**DEDUCTIONS FOR OTHER FEES**
INDEPENDENT CONTRACTOR shall pay to CARGO TRANSPORT ALLIANCE LLC for the following fees, including but not limited to:
   a) The cost of the motor vehicle record (MVR)
   b) The cost of pre-employment drug test
   c) The cost of each random drug test
   d) The cost of each random alcohol test
   e) The cost of each piece of overnight mail
   f) For any and all Log Book Sheets utilized.

**BY: CARGO TRANSPORT ALLIANCE LLC**
Name: Anatoly Galunov
Title: PARTNER                                    Signature

**By: MIAMI LOGISTICS SERVICES INC.**
Name: Sergiy Kurashov
Title: Owner                                         Signature:

INITIALS_____                                        OPERATING AGREEMENT # OA/04-2015     Page 11 of 11



August 14, 2015

Cargo Transport Alliance, L.L.C.
1525 NW 167th Street
Suite 115
Miami Gardens, FL 33169



RE: Lease Documents No. 6377

Dear Anatoly Galunov:

Enclosed please find the following documents for your review and signature:

1. Equipment Lease ("Lease")
2. Delivery and Acceptance Certificate
3. Personal Guarantee - Anatoly Galunov, Marina Galunova, and Maxim Cheremnykh
4. Security Agreement in Support of Lease Obligations
5. Personal Information Form

Under the terms of the approval of Dakota Financial, LLC ("Dakota" or "Lessor"), you must complete the following items as conditions to the obligation of Lessor to fund this transaction:

A. Please provide us with evidence that the Equipment subject to the Lease is covered by insurance as required by Section 10 of the Lease. Please name Dakota Financial, LLC as loss payee and additional insured.
B. You must make a security deposit in the sum of $135,000.00. Please forward a cashiers check in that amount to Dakota Financial, LLC. Please also forward a check in the amount of $450 to Dakota Financial, LLC for documentation fees. CREDIT WILL BE GIVEN AS TO ANY MONEY ALREADY PAID.
C. Please provide provide confirmation Dakota Financial has been added as lien holder. Our ELT Lien Code is 230622065.



I would like to remind you that you will be required to make 48 monthly payments of $5835 per month plus applicable tax. After making these payments, under the purchase option, you will be able to purchase the equipment for the sum of $135,000.00.

Please be advised that you are granting security interests to us in certain property that you own or in which you have rights. Lessor will be filing financing statements under the Uniform Commercial Code in connection with this transaction. The filings generally do not require your signature.

Very truly yours,

*Brian M. Barbetto*

Dakota Financial, LLC, as Lessor
Brian Barbetto, Credit Manager


Date: _____


_____

Cargo Transport Alliance, L.L.C., as Lessee
Anatoly Galunov, Manager



## EQUIPMENT LEASE AGREEMENT

### Lease #6377

**LESSOR:**  **DAKOTA FINANCIAL, LLC**

**LESSEE:**  Cargo Transport Alliance, L.L.C.

1525 NW 167th Street

Suite 115      State of Formation ID#

Miami Gardens, FL 33169      FL   L15000019251

## SUPPLIER:

MHC Truck Source Inc.

2701 Midwest Dr., Kansas City, KS 66111

816-921-8600

## EQUIPMENT DESCRIPTION:      Vin#/Serial#/ID:

Five (5) 2012 Kenworth T700s      1XKFDP9X2CJ296617, 1XKFDP9X5CJ293405

1XKFDP9X2CJ296603, 1XKFDP9X7CJ293387

and 1XKFDP9X4CJ293377

## SCHEDULE OF LEASE PAYMENTS:

**Monthly Rent:**  $5,835.00 * plus applicable tax    **Number of Rent Payments:** 48 Months

**Security Deposit:** $135,000.00

### TERMS AND CONDITIONS

### *THIS LEASE IS SUBJECT TO THE TERMS AND CONDITIONS PRINTED HEREON AND ON THE FOLLOWING PAGES, ALL OF WHICH ARE MADE A PART HEREOF. PLEASE READ CAREFULLY BEFORE SIGNING.*

1.      **LEASE.** Dakota Financial, LLC ("Lessor") leases to the above-named Lessee ("Lessee"), and Lessee hereby leases from Lessor, all items of equipment (collectively, the "Equipment" and each an "Item" of Equipment) listed above and/or in a separate schedule attached hereto and made a part hereof (each a "Schedule"). The terms "Item" and "Equipment" shall also mean and include all replacements, repairs, substitutions, additions, and accessions therefore and/or thereto. Lessor and Lessee agree that this Lease is a "Finance Lease" as defined by California Commercial Code ("Cal. Com. C.") Section 10103(a)(7). Lessee acknowledges that Lessor has not selected, manufactured or supplied any Equipment used by Lessor to Lessee and that Lessor has acquired the Equipment and has the right to possession and use of the Equipment in connection with entering into this Lease with Lessee. Lessee further acknowledges that Lessee has received a copy of any contract or Supply Contract (as defined by Cal. Com. C. §10103(a)(25)) by which the Lessor acquired the Equipment and the right of possession and use of the Equipment before signing this Lease. Lessee further acknowledges that approval of the Supply Contract from the vendor, manufacturer or other Supplier (as defined by Cal. Com. C. §10103(a)(24)) is a condition to the effectiveness of the Lease. Lessee further acknowledges that before executing this Lease, it has received an accurate statement designating the policies and warranties, and any disclaimers or warranties, indications or modifications or remedies, or liquidated damages, including those of a third party, such as the manufacturer of the Equipment, provided to Lessor by the Supplier in connection with Supplier's part of the Supply Contract by which the Lessor acquired the Equipment and its right to possession and use of the Equipment. Lessee further acknowledges that Lessee is informed of the identity of the Supplier of the Equipment to Lessor and Lessee further has selected the Supplier and directed the Lessor to acquire

Equipment Lease Agreement      Page 1 of 9      Initial: _____ Cargo Transport Alliance, L.L.C.

the Equipment to obtain the right to possession and use of the Equipment from that Supplier. Lessee further acknowledges that it is entitled under Division 10 of the Cal. Com. C. to all promises and warranties, including those of any third party, provided to Lessor by the Supplier or manufacturers of the Equipment. Lessor and Lessee further acknowledge that Lessee may communicate with Supplier of the Equipment. Lessor shall lease to Lessee and Lessee shall lease from Lessor an Item of Equipment, all of the Equipment, goods and other personal property described in the schedule now or hereafter from time to time executed by Lessor and Lessee and made a part hereof, all upon the terms and conditions hereinafter set forth or supplemented with respect to each Item of Equipment by the terms and conditions set forth in each schedule or any other written addenda or agreement executed by Lessor and Lessee. It is the intent of Lessor and Lessee that this Lease is a true lease and not a lease intended as security pursuant to Cal. Com. Code Section 1201(36). However, if for any reason this Lease is not deemed to be a true lease, which is contrary to the terms herein and the intent of Lessor and Lessee, then Lessor is granted a first priority security interest in the Equipment and the other property described in any Schedule and proceeds thereof including but not limited to (1) the proceeds from a sale or transfer of any right, title or interest of intangibles and claims and rights to recover any amounts in respect of the Equipment against the manufacturer and/or seller of the Equipment; (2) insurance proceeds, and requisition, indemnity or other payments of any kind for the Equipment.

2.      **TERM.** The "Term" of this Lease shall commence on the first day of the month in which Lessee executes and delivers to Lessor the Delivery and Acceptance Certificate in a form prescribed by Lessor that corresponds to each Schedule to this Lease (each a "Delivery and Acceptance Certificate"), and ends on the last day of the last month of the number of months stated above as the Term. If any Term is extended, the word "Term" as used herein shall be deemed to refer to each and every extended or renewal term of this Lease. All provisions of this Lease shall apply during any extended Term except as may be otherwise specifically provided in this Lease, in any applicable Schedule to this Lease, or any subsequent written agreement of Lessor and Lessee. With respect to each Schedule, if for any reason the Equipment has not been delivered, installed and accepted by Lessee within ninety (90) days after it is ordered by Lessor, or if Lessee fails to accept the Equipment and execute a Delivery and Acceptance Certificate within 14 days following delivery of the Equipment, Lessor may, at Lessor's option, deem the Term to have commenced and Lessee shall thereafter be liable for all obligations due pursuant to the terms of this Lease. Alternatively, Lessee may terminate Lessor's obligations under such Lease and Lessee shall, on demand of Lessor, pay Lessor all amounts paid or owing by Lessor in respect to the purchase of such Equipment and indemnify and hold Lessor harmless from any and all liabilities, claims, costs and expenses to the Supplier of the Equipment or any other party, arising out of or relating to the Equipment or the Lease. Upon payment of such amounts, Lessor, at Lessee's request, shall execute a quitclaim bill of sale with respect to such Equipment to Lessee on an "AS IS", "WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT ANY WARRANTIES EXPRESS OR IMPLIED BY LESSOR, AS TO ANY MATTER WHATSOEVER other than a warranty that such Equipment is free and clear of all liens and encumbrances arising from Lessor's actions. Lessee shall upon such payment be subrogated to Lessor's claims, if any, against the Supplier of such Equipment. Lessee agrees that its remedies, should it find fault with any of the Equipment, shall be and are solely against the Supplier.

3.      **RENT.** Lessee shall pay Lessor the total rent for the Term, which shall be the total amount of all rent payments stated in the "Schedule of Lease Payments" above or in any Schedule, plus such additional rents as may arise under this Lease. All monthly payments of rent shall be payable in advance, starting on the Commencement Date set forth above in this Lease and on the same day of each month thereafter, whether or not Lessor has rendered an invoice therefore, at the office of Lessor set forth herein or to such other place as Lessor may from time to time designate in writing. If Lessee fails to pay any rent or other sum to be paid by Lessor hereunder within ten (10) days after the due date hereof, Lessee shall pay Lessor (a) an amount calculated at the rate of ten cents ($.10) per one dollar ($1.00) of each such delayed payment, and shall pay within ten (10) days after the original due date, as compensation for Lessor's internal operating expenses arising as a result of such failure, (b) amounts paid by Lessor to others relevant to the collection thereof, and (c) interest on such unpaid rent or other amount, at the rate of eighteen percent (18%) per annum based on a 360 day year or at such lesser rate as may be permitted by law, computed from the date due to the date paid. If any check made to pay rent or any other sum paid by Lessee to Lessor hereunder is returned unpaid for any reason whatsoever, Lessee shall pay Lessor the additional sum of twenty-five dollars ($25.00) as Lessor's operating expenses resulting from such unpaid check.

4.      **ADVANCE RENTS.** Lessee shall make a non-refundable payment to Lessor of "Advance Rents" or "Advance Payments" as set forth in the "Schedule of Lease Payments" above or in any other Schedule. Lessor may, but shall not be obligated to, apply any such amount to cure any default of Lessee hereunder, in which event Lessee shall promptly restore any amount so applied within five (5) business days after Lessor's written demand for such amount.

5.      **SECURITY DEPOSIT.** Any security deposit paid by Lessee at the inception of or at any time during the Term shall be held by Lessor to secure payment for potential damages or excessive wear and performance of the obligations of Lessee hereunder. In the event Lessee performs each and every obligation under the terms of this Lease, such security deposit or so much thereof that has not been applied by Lessor shall be returned to Lessee. Lessee hereby grants to Lessor a first priority security interest in any security deposit and proceeds thereof. Any security deposit so taken shall be non-interest bearing, does not have to be segregated by Lessor, and may be commingled with other deposits or money of Lessor. Lessor may, but shall not be obligated to, apply any security deposit to cure any default of Lessee, in which event, Lessee shall promptly restore any amount so applied within five (5) business days after Lessor's written demand for a replacement deposit.

**6.      SELECTION OF EQUIPMENT: DISCLAIMER OF WARRANTIES.** Lessee has selected both the Equipment and the Supplier from whom Lessor covenants to purchase the Equipment at Lessee's request. **LESSEE ACKNOWLEDGES THAT LESSOR HAS NO EXPERTISE OR SPECIAL FAMILIARITY ABOUT OR WITH RESPECT TO THE EQUIPMENT. LESSEE AGREES THAT THE EQUIPMENT LEASED HEREUNDER IS LEASED "AS IS" AND IS OF A SIZE, DESIGN AND CAPACITY SELECTED BY LESSEE AND THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR LESSEE'S PURPOSES, AND THAT LESSOR HAS MADE NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE SUITABILITY OR DURABILITY OF SAID EQUIPMENT FOR THE PURPOSES AND USES OF LESSEE, NOR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT THERETO, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. If the Equipment is not properly installed, does not operate as represented or warranted by the Supplier and/or manufacturer, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the Supplier and/or manufacturer and shall, nevertheless, pay Lessor all rent payable under this Lease and shall not set up against Lessee's obligations any such claims as a defense, counterclaim, claim, cause of action, set off or otherwise.** So long as Lessee is not in breach or default of this Lease, Lessor hereby assigns to Lessee, solely for the purpose of making and prosecuting any such claim any rights, which Lessor may have against the Supplier and/or manufacturer for breach of warranty or other representation respecting any Item of Equipment. All proceeds of any warranty recovery by Lessee from the Supplier and/or manufacturer of any Item of Equipment shall first be used to repair or replace the affected Item of Equipment.

      **LESSEE ACKNOWLEDGES THAT NEITHER THE SUPPLIER NOR ANY SALESMAN, EMPLOYEE, REPRESENTATIVE OR AGENT OF THE SUPPLIER ("SUPPLIER") IS AN AGENT OR REPRESENTATIVE OF LESSOR OR VICE VERSA, AND THAT NO SUPPLIER IS AUTHORIZED TO WAIVE OR ALTER ANY TERM, PROVISION OR CONDITION OF THIS LEASE, OR MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THIS LEASE OR THE EQUIPMENT. LESSEE AGREES AND ACKNOWLEDGES THAT SUPPLIER IS LESSEE'S AGENT AND NOT LESSOR'S AGENT WITH RESPECT TO THE EQUIPMENT, THE OPERATION AND ACQUISITION OF THE EQUIPMENT, AND ANY AND ALL REPRESENTATIONS AS TO THE EQUIPMENT.** Lessee further acknowledges and agrees that Lessee, in executing this Lease, has relied solely upon the terms, provisions and conditions contained herein and any other statements, warranties, or representations, if any, by the Supplier, or any salesman, employee, representative or agent of the Supplier, have not been relied upon and shall not in any way affect Lessee's obligation to pay the rent and otherwise perform as set forth in this Lease. TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, LESSEE HEREBY WAIVES ALL OF ITS RIGHTS AND REMEDIES CONFERRED UPON A LESSEE UNDER SECTIONS 10508 THROUGH 10522 OF THE CAL. COM. C. AND LESSEE WARRANTS THAT THIS PROVISION HAS BEEN NEGOTIATED BY LESSOR AND LESSEE.

**7.      COMMERCIAL RISK.** Lessee bears all risk that the Equipment may become unusable for any reason, including without limitation, loss, theft, damage, destruction, defect, governmental regulation, prohibition, impracticability of use, obsolescence or commercial frustration. Unless otherwise provided herein, no inability to use the Equipment shall result in the termination of this Lease or relieve Lessee of any of its obligations under this Lease. In addition, Lessee is responsible for obtaining all licenses necessary to use the Equipment and under no circumstances shall Lessee bring any action against Lessor for patent, trademark, copyright, any intellectual property or software infringement and all such defenses and claims are expressly waived.

**8.      LOCATION; INSPECTION; USE.** The Equipment shall be delivered to Lessee and installed by Lessee, at Lessee's own expense, and thereafter kept at the location specified on the schedule above or attached hereto. Lessee shall not remove the Equipment from the aforementioned location without Lessor's prior written consent. Lessee shall use the Equipment strictly for business or commercial use, in a careful and proper manner and shall comply with all laws, regulations and ordinances relating to its possession, use or maintenance. Lessor shall have the right from time to time during reasonable business hours, to enter upon the Lessor's premises for the purpose of inspecting the Equipment. Lessee shall, whenever requested by Lessor, advise Lessor of the exact location of any and all Items of Equipment.

**9.      ALTERATIONS; MAINTENANCE.** Lessee shall, at Lessee's own expense, maintain the Equipment in good operating condition, repair and appearance, furnish all parts and labor required to keep the Equipment in such condition, protect same from deterioration other than normal wear and tear, and only use the Equipment in the regular course of Lessee's business and within normal capacity. For the purpose of assuring Lessor that the Equipment will be properly serviced, Lessee shall cause the Equipment to be maintained by the Supplier pursuant to the Supplier's standard preventative maintenance contract, if any. All parts furnished in connection with maintenance or repair shall immediately become part of the Equipment. All such maintenance, repair and replacement services shall be paid for and discharged by Lessee when due with the result that no Lien (as defined in Paragraph 12 below) will attach to the Equipment. Only qualified personnel of Lessee shall operate the Equipment. The Equipment shall be used only for the purposes for which it was designed. Lessee shall not make or permit any changes or alterations to the Equipment without Lessor's prior written consent, which will not be unreasonably withheld. All accessories, replacements, parts and substitutions for or which are added or attached to the Equipment shall become the property of Lessor, be included in the definition of Equipment and be subject to this Lease.

10.     **INSURANCE.** Lessee shall obtain and maintain insurance on the Equipment for all risks of loss or damage from every cause whatsoever in an amount not less than the greater of replacement value (as new) or the aggregate amount of all unpaid rents plus the Residual Value of the Equipment (as defined in Paragraph 16) as of the Commencement Date of this Lease with a deductible or co insurance acceptable to Lessor. Each "all risk" policy shall (i) provide for each insurer's waiver of its right of subrogation against Lessor and Lessee, and (ii) provide that such insurance (A) shall not be invalidated by any action of Lessee, or any breach by Lessee of any provision of any of its insurance policies, and (B) shall waive set-off, counterclaim or offset against Lessor. Lessee shall also obtain and maintain for the Term, comprehensive public liability insurance, with a severability of interest endorsement or its equivalent, covering liability for bodily injury, including death, and property damage resulting from the purchase, ownership, leasing, maintenance, use, operation, sale or return of the Equipment in an amount satisfactory to Lessor. Lessor, its successors or assigns, shall be named the additional insured and the sole named loss payee with respect to insurance for damage to or loss of the Equipment and shall be named additional insured on the public liability insurance. Each liability policy shall (a) provide that such insurance shall have cross-liability and severability of interest endorsements (which shall not increase the aggregate policy limits of Lessee's insurance). All insurance policies shall provide that Lessee's insurance shall be primary without a right of contribution of Lessor's insurance, if any. Lessee shall pay all premiums for such insurance and shall deliver to Lessor the original policy or policies of insurance, or other documentation satisfactory to Lessor evidencing the insurance required thereby, along with proof, satisfactory to Lessor, of the payment of the premium therefore; provided, however, that Lessor shall be under no duty to ascertain the existence of or to examine such insurance policy or advise Lessee in the event such insurance coverage shall not comply with the requirements hereof. Lessee hereby agrees and instructs that upon request, any insurance carrier, broker or claims adjuster shall immediately provide to Lessor a copy of any insurance policy and all amendments, modifications, and endorsements thereto. All insurance shall provide for at least thirty (30) days advance written notice to Lessor before any cancellation or material modification thereof. Lessee hereby irrevocably appoints Lessor, as Lessee's attorney in fact to make claim for, settle, receive payment of, and execute and endorse all documents, checks or drafts received in payment for loss or damage under any such insurance policy. Lessee agrees if Lessee shall fail to procure, maintain and pay for such insurance, Lessor shall have the right, but not the obligation, to obtain such insurance on behalf of and at the expense of Lessee. In the event Lessor does obtain such insurance, Lessee agrees to pay all costs thereof, with the next rent payment. Lessee shall obtain insurance from a carrier with an A-rating or better in *Best's Key Rating Guide.*

11.     **RISK OF LOSS.** Lessee shall bear the entire risk of loss, theft, destruction, damage or disrepair of the Equipment or any part thereof for any cause whatsoever. No such loss, damage, theft, destruction or disrepair of the Equipment shall relieve Lessee of the obligation to pay rent or from any other obligation under this Lease. In the event of any of the above, Lessee shall notify Lessor within 10 days of its damage, theft or destruction or disrepair, and Lessee, at Lessee's own expense and at Lessor's sole and exclusive option, shall either (a) repair the Equipment, returning same to its previous condition, and in compliance with this Lease, unless unrepairable, or (b) replace same with like Equipment of equivalent value, useful life, in good condition and acceptable to Lessor, which shall become the property of the Lessor, or (c) immediately pay Lessor all rent due and to become due under this Lease together with the Residual Value of the Equipment discounted to present value as of the date of such damage, theft, destruction or other loss (at the rate set forth in Paragraph 16(B)) or such amount equivalent to the fair market value as may be allocated by Lessor to specific Items of Equipment. All proceeds of insurance received by Lessor as a result of such loss or damage shall, where applicable, be applied toward the replacement or repair of the Equipment or the payment of the obligations of Lessee hereunder. Upon payment of all sums due from Lessee hereunder, this Lease shall be terminated with respect to such lost, stolen, or damaged Equipment so paid for and Lessee shall thereupon become entitled to such Equipment "AS IS", "WHERE-IS" and "WITH ALL FAULTS" and without any warranty, express or implied, with respect to any matter whatsoever (other than a warranty that such Equipment is free and clear of all liens and encumbrances arising from Lessor's actions).

12.     **ENCUMBRANCES AND TAXES.** Lessee shall comply with all laws and regulations relating to, and shall promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes, municipal, state and federal, which may now or hereafter be imposed upon the purchase, ownership, possession, leasing, renting, operation, control, use, maintenance, delivery, sale and/or redelivery of the Equipment and to prepare and/or file, upon request by Lessor, any schedules required by taxing authorities in connection therewith. In the event Lessee does not pay all sums specified above, Lessor has the right, but not the obligation, to pay the same. If Lessor shall so pay any of the aforementioned, then the Lessee shall remit such amount with the next installment of rent after written notice from Lessor. In addition to the foregoing, Lessee shall keep the Equipment free and clear of all liens, claims, security interests, mortgages and/or encumbrances (each a "Lien" or collectively "Liens"), and shall pay promptly when due, and shall indemnify and hold Lessor harmless from all Liens. Lessor, as owner of the Equipment, shall be entitled to any and all depreciation provided under the Internal Revenue Code of 1986, as amended from time to time, and any other state and federal income tax benefits which may now or hereafter be available to an owner of such Equipment. The Lessor and Lessee intend this Lease to be a true lease for all purposes.

**13.     REDELIVERY.** Upon the expiration or earlier cancellation or termination of this Lease, Lessee shall, at Lessee's sole cost, expense and risk promptly return the Equipment by delivering it, packed and ready for shipment, to such place or carrier as Lessor may specify in good condition as received, less reasonable wear and tear. No such return shall constitute termination of this Lease unless Lessor shall agree so in writing, and Lessor will not so agree until all of Lessee's obligations under this Lease have been fulfilled. Should Lessee not timely return the Equipment after the end of the Term, Lessee shall be liable for rent at the rate of 125% of each month's rent set forth in the Schedule of Lease Payments until such time as the Equipment is returned to Lessor. This remedy is in addition to any and all of Lessee's remedies set forth in Paragraph 16. The acceptance of said rent by Lessor shall not waive Lessor's right to have the Equipment promptly returned to Lessor pursuant to the provisions hereof, nor shall the acceptance of said rent be deemed to be an extension of the existing Term. When any Equipment is returned to Lessor, it shall (i) be in the condition and repair required under Paragraph 9 of this Lease, (ii) be free of all evidence of advertising or insignia placed on it by Lessee, (iii) be free of all Liens except Liens created by Lessor, and (iv) meet all legal and regulatory conditions necessary for the Lessor to sell or lease it to a third party. Lessee shall pay to Lessor on demand, as additional rent hereunder, the cost of any repairs necessary to then place the Equipment in the condition required pursuant to Paragraph 9 of this Lease. The Equipment will be deinstalled and, if applicable, recertified for maintenance by the manufacturer's technicians or manufacturer-approved technicians at Lessee's expense. Returned Equipment will be accompanied by all manuals, service and repair records and descriptive brochures. Lessee shall be responsible for software licensing or related fees upon resale of the Equipment. Lessee will provide, at no expense to Lessor, 120 days of free storage at the current location of the Equipment. The Equipment will be stored in accordance with the manufacturer's recommendations regarding storage. If an equipment auction is necessary, Lessor will be permitted to auction the Equipment in place at Lessee's premises.

**14.     INDEMNIFICATION.** Lessee assumes liability for, and does hereby indemnify and hold harmless Lessor, its agents, employees, officers, directors, successors and assigns from and against any and all liabilities (including, but not limited to, any and all claims, actions, causes of action, costs, and expenses, including reasonable attorneys' fees, of every kind and nature, including without limitation, for property damage, wrongful death or personal injury and for trademark, patent or copyright infringement) arising out of or relating to the purchase, sale, use, condition (including latent and other defects whether or not discoverable by Lessee or Lessor), operation, ownership, selection, delivery, sale, leasing or return of any Item or Equipment, regardless of where, how and by whom operated, any failure on the part of Lessee to perform or comply with any conditions of this Lease or any loss to the extent permitted by law by Lessor of the benefit of any accelerated depreciation or other tax benefits to the extent that Lessor has any claim for any accelerated depreciation or other tax benefits with respect to any particular Lease or schedule, or the right to claim the same, with respect to the Equipment. Without limiting the foregoing, this indemnification shall extend to claims made by any person, including Lessee, its agents and employees, and shall apply whether such liabilities, claims, etc. are based on negligence (passive or active) of Lessor or another, breach of warranty, strict liability, products liability or otherwise. The indemnities and assumptions of liabilities and obligations provided for in this Paragraph and Lessee's indemnities elsewhere in this Lease shall continue in full force and effect notwithstanding the expiration or other termination of this Lease. For the purpose of any indemnification, Lessee is an independent contractor and cannot make any binding representation or contract on behalf of Lessor.

**15.     DEFAULT.** Any of the following events or conditions shall constitute an "Event of Default" hereunder: (a) If Lessee shall default in the payment when due of any obligation or other indebtedness (i) under this Lease or any other document, instrument or agreement executed and/or delivered in connection with this Lease or (ii) under any other agreement for borrowed money between Lessee and Lessor arising independently of this Lease; (b) if Lessee fails to pay any other monies or charges on the due date, or fails to observe any other term or condition of this Lease when due, including any failure to obtain, maintain and evidence insurance coverage required under this Lease; (c) if Lessee ceases doing business as a going concern; (d) if Lessee becomes insolvent or makes an assignment for the benefit of creditors; (e) if a petition is filed by or against Lessee under the Federal Bankruptcy Code; (f) if Lessee applies for or consents to the appointment of a receiver, trustee, conservator, or liquidator of Lessee or such receiver, trustee, conservator, or liquidator is appointed without the application or consent of Lessee; (g) if any statement, representation or warranty heretofore or hereafter furnished by Lessee shall be untrue or unperformed in any material respect; (h) if a creditor of Lessee or any other person or entity attaches or levies execution against Lessee and the attachment or levy is not released within 48 hours; (i) if Lessee makes a bulk transfer of its furniture, fixtures, furnishings, or other equipment or inventory; (j) if Lessee breaches any of the terms of any lease or other credit agreements with Lessor or any other person or entity, or defaults thereunder or if the condition of Lessee's affairs shall so change as to, in Lessor's opinion, increase the credit risk involved in this Lease; (k) if individual Lessee or any guarantor of Lessee dies or any event described above occurs with respect to any guarantor; (l) if the Lessee is a corporation and 50% or more of the then issued and outstanding voting capital stock of Lessee shall be acquired by any person, entity or group who are not such owner on the date of execution of this Lease; (m) any event of default occurs under any agreement, document or instrument now or hereafter existing and relating to this Lease; (n) if Lessee is a limited liability company or partnership and 50% or more of the members' interests or partnership interests change; or (o) Lessee manifests any conduct that would result in a repudiation of the Lease.

**16.      REMEDIES OF LESSOR.** Upon the occurrence of any Event of Default and at any time thereafter Lessor may without demand or notice to Lessee and without terminating or otherwise affecting Lessee's obligations hereunder exercise one or more of the following remedies, as Lessor in its sole discretion shall elect: (a) declare the entire balance of rent for the remaining Term to be immediately due and payable and recover such rent and all other rent and sums due hereunder, such payments to be discounted to present value as set forth below in this Paragraph 16; (b) require Lessee to assemble the Equipment and make it available to Lessor at a place designated by Lessor as provided in Paragraph 13 above; (c) take and hold possession of the Equipment and/or render the Equipment unusable, and for this purpose enter and remove the Equipment from any premises where the same may be located without liability to Lessee for any damage caused thereby; (d) immediately take possession of and sell or lease the Equipment or any part thereof at public or private sale or other disposition (and Lessor may be purchaser at such public sale) for cash, on credit or otherwise, without representations or warranties, and upon such other terms as shall be acceptable to Lessor, and for such purposes of sale or lease, Lessor may use Lessee's name, voice, signature, photograph or likeness, in any manner and for any purpose, including, but not limited to, advertising or selling, or soliciting the purchase of, any or all of the Equipment or other related goods or services; (e) enter, use and occupy the premises of Lessee for the purpose of taking, holding, reconditioning, displaying, selling, auctioning or leasing the Equipment, without cost to Lessor or liability to Lessee; (f) proceed by appropriate action either at law or in equity to enforce  performance by Lessee of the covenants of this Lease or to recover damages for the breach of such covenants; or (g) exercise any and all rights accruing to a lessor under any applicable law upon a default by a lessee.  If notice is required by law, any written notice to Lessee of any such sale or lease, given not less than ten (10) days prior to the date thereof, shall constitute reasonable notice to Lessee unless otherwise allowed by law.  Any sale or lease of the Equipment by Lessor after default shall be free and clear of any rights or interest of Lessee. Without limiting any of the foregoing remedies, Lessor may immediately recover the following from Lessee to the extent permitted by law: (A) all unpaid rents, late charges and other sums due as of the date of default; (B) all unpaid rents to become due from the date of default through the last day of the Term discounted to present value at the federal discount rate announced at The Federal Reserve Bank in San Francisco then in effect; (C) any and all costs or expenses paid or incurred by Lessor in connection with the repossession, holding, repair, reconditioning and subsequent sale, lease or other disposition of the Equipment, including but not limited to, attorneys' fees and costs, whether or not litigation is commenced; (D) the Residual Value of any Item of Equipment which Lessee fails to return to Lessor as provided above or which Lessee converts or destroys, or which Lessor does not or is unable to repossess; (E) all other costs or expenses paid or incurred by Lessor at any time in connection with the execution, delivery, administration, amendment and enforcement or exercise of any of the Lessor's rights and remedies under this Lease and all taxes (and interest and penalties relating thereto) imposed by any governmental agency (other than taxes measured on the net income of Lessor); (F) to the extent such benefits are available to Lessor, in connection with any particular Lease or schedule, any actual or anticipated loss of federal or state tax benefits to Lessor (as determined by Lessor) resulting from Lessee's default or Lessor's repossession or disposition of the Equipment; and (G) any and all other damages, including incidental damages pursuant to Cal. Com. C. §10530, proximately caused by Lessee's default. Unless otherwise agreed in writing, "Residual Value" is defined in this Lease as the value of the Equipment at the end of the Term which shall be the fair market value of the Equipment as valued on a "replacement value" and/or "in place and operational basis", as Lessor shall determine, and which shall in no event be less than 20% of its original cost funded by Lessor for and related to such Equipment.

All rights and remedies of Lessor under this Lease are in addition to all rights and remedies contained in any other agreement, instrument or document available to Lessor at law or in equity. All such rights and remedies are cumulative and not exclusive and may be exercised successively, concurrently and repeatedly. No default by Lessee or action by Lessor, including repossession, sale or re-leasing of Equipment, shall result in or constitute a cancellation or termination of this Lease unless Lessor so notifies Lessee in writing, and no cancellation or termination hereof shall release or impair any of Lessee's obligations hereunder. No exercise of any right or remedy shall constitute an election of remedies and preclude exercise of any other right or remedy. If any legal action or other proceeding is brought to enforce the terms of this Lease, or to protect or enforce the ownership of the Equipment or the priority of the Lessor with respect to the Equipment or with respect to any collateral of Lessor, whether in state, federal or bankruptcy court (including, but not limited to, such actions as relief from the automatic stay, to obtain administrative expense claims, with respect to avoidance actions, and with respect to Lessor's treatment in a plan) or in any administrative or other proceeding of any kind, or with respect to any alleged dispute, breach, default, misrepresentation, or otherwise in connection with any provisions of this Lease, Lessor shall be entitled to recover its reasonable attorneys fees, including costs of in-house counsel, whether litigation has or has not been commenced, and all other reasonable costs incurred in that action or proceeding, in addition to any other remedies, reasonable costs and reasonable expenses to which Lessor may be entitled.  In addition, Lessor shall be entitled to all collection costs of any kind arising out of the enforcement or administration of this Lease.  Lessor and Lessee agree that any amount payable by Lessee pursuant to subsection (a) of this Paragraph 16 represents liquidated damages for the loss of Lessor's bargain and not a penalty.  If there be more than one Lessee party to this Lease, the liability of each shall be joint and several and any release of or forbearance with respect to one Lessee shall not release any other Lessee.  Lessor shall be entitled to specific performance of any and all of its rights under this Lease whether or not an adequate remedy at law exists.

Equipment Lease Agreement          Page 6 of 9                    Initial: _____ Cargo Transport Alliance, L.L.C.

**17.     ASSIGNMENT BY LESSEE.** WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR WHICH LESSOR MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION, LESSEE SHALL NOT VOLUNTARILY OR INVOLUNTARILY (a) SELL, ASSIGN, TRANSFER, PLEDGE, GRANT A SECURITY IN INTEREST IN, HYPOTHECATE OR OTHERWISE DISPOSE OF THIS LEASE, THE EQUIPMENT, ANY ITEM OF EQUIPMENT, OR ANY INTEREST IN THE LEASE OR THE EQUIPMENT; (b) SUBLET OR LEND ANY ITEM OF EQUIPMENT, ANY PART THEREOF, OR LESSEE'S INTEREST IN THIS LEASE; OR (c) PERMIT ANY ITEM OF EQUIPMENT OR ANY PART THEREOF TO BE USED BY ANYONE OTHER THAN LESSEE OR LESSEE'S EMPLOYEES.

**18.     ASSIGNMENT BY LESSOR.** Lessor may, at any time, with or without notice to Lessee, mortgage, grant a security interest in, or otherwise transfer, sell or assign all or any right, title or interest in this Lease or any Equipment or any rent or other amounts due or to become due hereunder. Lessee agrees with Lessor and any such assigns (including any assignee to which such rights have been assigned by a prior assignee) that, upon receipt by Lessee from Lessor or such assignee of notice in writing of any such assignment, Lessee will make all further payments due or to become due hereunder directly to such assignee at the address specified in such notice of assignment and will recognize such assignee as the person or entity entitled to exercise all other rights of Lessor hereunder. Lessee further agrees with Lessor and any such assignee that in any action brought by such assignee against Lessee to enforce Lessor's rights hereunder, Lessee will not assert against such assignee, and expressly waives as against an assignee, any breach or default on the part of Lessor hereunder and any and all other defenses, claims, counterclaims or causes of action which Lessee may have against Lessor, Supplier or any other person or entity either hereunder or otherwise. Lessee shall file no complaints, counterclaims, third party complaints, or cross-complaints for any reason or purpose against assignee except for those actions arising out of assignee's willful misconduct. Unless otherwise agreed in writing, no such assignee shall be obligated to perform any obligation, term or condition required to be performed by Lessor hereunder arising or relating to the period before the assignment to such assignee.

**19.     PURCHASE OPTION.** Provided that the Lease has not been terminated or cancelled and that no default or Event of Default has occurred and is continuing, on the last day of the Term, Lessee shall have the option to purchase the Equipment for a price equal to the following "Purchase Option Price": $135000. Lessor and Lessee acknowledge and agree that such price represents the estimated fair market value of the Equipment as of the date of the Lease. If Lessee wishes to purchase the Equipment on the last day of the Term, it shall deliver to Lessor written notice of its intent to purchase the Equipment (such purchase to be on an "AS-IS", "WHERE-IS" AND "WITH ALL FAULTS" BASIS, without any warranty whatsoever except that Lessor has not created any lien, claim or encumbrance on or in respect of the Equipment) not less than one hundred and twenty (120) days (but not more than one hundred eighty (180) days) prior to the last day of the Term. Upon receipt of the Purchase Option Price, Lessor shall deliver to Lessee a bill of sale transferring title to the Equipment from Lessor to Lessee without representation or warranty on an "AS IS", "WHERE IS," "WITH ALL FAULTS" basis other than a warranty that since the date of this Lease, Lessor has not assigned, sold or transferred in whole or in part its title to the Equipment except in accordance with this Lease, and that such title is free and clear of all Liens created by, through or under Lessor (other than this Lease). If Lessee fails to deliver the Purchase Option Price to Lessor on the last day of the Term, Lessee shall be deemed to have waived its right to exercise this purchase option and shall return the Equipment to the Lessor in accordance with this Lease. Upon full and indefeasible payment by Lessee to Lessor of the Purchase Option Price and all amounts due under the Lease, Lessor will, on Lessee's request, provide such termination statements and other documents as Lessee may reasonably request to evidence the termination of the Lease and the rights of Lessor in respect of the Equipment.

**20.     OWNERSHIP; PERSONAL PROPERTY.** The Equipment is, and shall at all times be and remain the sole and exclusive property of Lessor. The Equipment is, and at all times shall remain, personal property notwithstanding that the Equipment or any Item thereof may now be, or hereafter become, in any manner affixed or attached to, or imbedded in, or permanently resting upon real property or any improvement thereof or attached in any manner to what is permanent. Prior to or at any time during the Term hereof with respect to an Item of Equipment, Lessee will obtain and deliver to Lessor waivers of interest or Liens in recordable form, satisfactory to Lessor, from all persons claiming an interest in the real property on which such Item is installed or located including all appropriate landlord and mortgagee waivers. Plates, labels or other markings stating that the Equipment is owned by Lessor shall be affixed to or placed on the Equipment by Lessor or, at Lessor's request or if required by law, by Lessee at Lessee's expense, and Lessee shall keep the same in a prominent position thereon.

**21.     NET LEASE; NO OFFSET. THIS IS A NET LEASE, AND ALL RENT AND ALL OTHER SUMS PAYABLE BY LESSEE HEREUNDER SHALL BE PAID UNCONDITIONALLY WHEN DUE, WITHOUT ABATEMENT, DEDUCTION, COUNTERCLAIM OR SETOFF OF ANY NATURE, INCLUDING, WITHOUT LIMITATION, ANY DEFENSE, COUNTERCLAIM OR SETOFF ARISING OUT OF ANY PRESENT OR FUTURE CLAIM LESSEE MAY HAVE AGAINST LESSOR, OR ANY ASSIGNEE OF LESSOR, OR THE VENDOR, MANUFACTURER OR OTHER SUPPLIER OF THE EQUIPMENT, OR ANY OTHER PARTY AND ALSO INCLUDING, BUT NOT LIMITED TO, ANY CLAIM, COUNTERCLAIM OR DEFENSE ARISING OUT OF COMMERCIAL FRUSTRATION, IMPRACTICABILITY, FEASIBILITY OR IMPOSSIBILITY. In no event, except as otherwise expressly provided herein, shall this Lease expire, cancel or terminate or shall any of the Lessee's obligations be affected by reason of any**

defect in or damage to or loss or destruction of all or any part of the Equipment, from any cause whatsoever, or any interference with Lessee's use of the Equipment by any person or entity (other than Lessor, its successors or assigns or anyone acting through Lessor) or for any other cause whatsoever.

22.    **MISCELLANEOUS.**  Lessee shall provide Lessor with a copy of Lessee's annual financial statement, including balance sheet and profit and loss statement within ninety (90) days after the close of Lessee's fiscal year, in addition to any other information normally provided by Lessee to the public and/or such other financial data or information relative to this Lease and the Equipment as Lessor may from time to time reasonably request. This Lease shall be binding upon Lessor and Lessee, their successors, legal representatives and assigns and is a valid and subsisting legal instrument, and no provision which may be deemed unenforceable shall in any way invalidate any other provision or provisions, all of which shall remain in full force and effect. All Paragraph headings are inserted for reference purposes only and shall not affect the interpretation or meaning of this Lease. This Lease constitutes the entire contract and agreement between Lessor and Lessee hereto, and no representation, oral or written, shall constitute an amendment or modification hereto unless signed in writing by an authorized officer of Lessor. Any and all prior representations, oral or written, are merged herein. This Lease and the other Lease Documents may be executed or authenticated in counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same document. No oral agreements by Lessor and Lessee shall ever be enforceable. Time is of the essence with respect to this Lease and each and all of its provisions. NONE OF THE PROVISIONS OF THIS LEASE MAY BE AMENDED, MODIFIED OR WAIVED EXCEPT IN A WRITING SIGNED BY LESSOR AND LESSEE.

Initials_____

23.    **NOTICES.**  Any written notice or demand under this Lease may be given to a party by mailing it to the party at the party's address set forth herein, or at such address as the party may provide in writing from time to time. Unless otherwise set forth in writing, any and all notices to Lessor and to Lessee pursuant to the terms of this Lease are deemed to be conclusively received and given by mailing such notice to the addresses set forth in page 1 of this Lease. Such notice shall be conclusively deemed to have been received three (3) days from the date of mailing, charges prepaid, if mailed by first class mail, or one (1) day if sent by Federal Express charges prepaid, or such other similar overnight courier service; or if personally delivered, charges prepaid, on the day it is personally delivered and received by Lessor and/or Lessee at the address indicated above.

24.    **GOVERNING LAW; VENUE; JURY TRIAL WAIVER.**  Lessee acknowledges that the last act necessary to the formation of this Lease is the acceptance and execution of this Lease by Lessor at Lessor's principal place of business, which is in Los Angeles, California. The exclusive jurisdiction and venue of any claim or controversy arising out of this Lease shall be in federal or state court in Los Angeles, California, unless Lessor, at its sole option, chooses to commence litigation in another state because the Equipment or any Item of Equipment is located in that state. However, under no circumstances will litigation filed against Lessor be filed by way of complaint, counterclaim, cross-complaint or cross-action in any court other than in Los Angeles County, California. The choice of law under which this Lease shall be interpreted is California law. LESSEE HEREBY KNOWINGLY AND VOLUNTARILY WAIVES TRIAL BY JURY AND THE RIGHT TO INTERPOSE ANY NON-COMPULSORY COUNTERCLAIM OR OFFSET OF ANY NATURE OR DESCRIPTION IN ANY LITIGATION BETWEEN LESSEE AND LESSOR OR ITS ASSIGNEES, WITH RESPECT TO THIS LEASE, AND THE EQUIPMENT OR THE REPOSSESSION THEREOF. Lessee further agrees that it shall have no right to institute or maintain and shall not institute any action or proceeding, whether judicial, administrative or arbitral in nature, against Lessor unless Lessee: (a) notifies Lessor in writing of the alleged breach, default or other act which the Lessee contends caused Lessee damage no more than 60 days after occurrence of the alleged breach, default, or other act, and (b) institutes such action or proceeding before the first anniversary of the date of the alleged breach, default or other act which the Lessee contends caused Lessee damage.

25.    **FURTHER ASSURANCES; POWER OF ATTORNEY.**  Lessor and Lessee each hereby agrees to execute, deliver and file or record at Lessee's expense such further instruments, certificates and other documents, including, without limitation, financing statements under the Uniform Commercial Code ("UCC"), and to do such further acts and things as may reasonably be requested by each other in order to assure to each other that the rights conferred or intended to be conferred by this Lease or to protect Lessor's right, title and interest in the Equipment are properly protected. Notwithstanding the foregoing, Lessor is granted a power of attorney by Lessee to insert, at any time, in any equipment order or invoice, schedule, UCC financing statement, amendment or assignment, or in any other appropriate document as is necessary to register, perfect, or evidence Lessor's ownership interest or security interest in the Lease, the Equipment, or any interest of Lessor hereunder, any information, signature, serial number, description, date or amount to be inserted in such documents and to endorse any checks or payments made payable to Lessee on behalf of Lessee to apply to the obligations due under this Lease. Lessee specifically gives Lessor a power of attorney to act as its attorney in fact with any State's Department of Motor Vehicles or Secretary of State or County recorder to take any such action as is necessary or contemplated to protect Lessor's rights as set forth in this Lease. No officer, employee, or agent of Lessor shall have the power to waive any of the terms or provisions hereof or to incur additional obligations on behalf of Lessor unless such waiver or additional obligations are in writing signed by a duly authorized officer of Lessor. Lessor is further authorized to file any UCC or other documentation with respect to its rights, title or interest in this Lease, related documents, instruments and agreements, Equipment and other property covered hereby and thereby.

26.      **WAIVER.** No delay or omission on the part of Lessor in exercising any right hereunder shall operate as a waiver of any such right or of any other right hereunder, and a waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.

27.      **LESSOR'S PAYMENT.** In case of failure of Lessee to procure or maintain proper insurance or pay such fees, assessments, duties, charges and taxes or to keep any Item of Equipment free and clear of all Liens or in good repair, condition and working order, all as herein before provided, Lessor shall have the right, but not the obligation, without notice to or demand upon Lessee, and without releasing Lessee from any obligation herein before specified, to effect and pay for such insurance or to pay such fee assessments, duties, charges and taxes or to keep such Equipment in good repair, condition and working order, as the case may be, and to pay, purchase, contest or compromise any Lien which in the sole judgment of Lessor appears to affect such Equipment, and in exercising any such right, to incur any reasonable liability and expend whatever reasonable amounts in its absolute discretion it may deem necessary therefore.  All sums so incurred or expended by Lessor shall immediately become due and payable by Lessee upon payment by Lessor and shall thereafter bear interest at the rate of 18% per annum, but not greater than the highest rate permitted by any applicable law.  It is not the intent of Lessor to violate or evade any usury laws and to the extent that any payment in this Lease or in any schedule is deemed to be usurious, such usurious payments shall be applied to costs, fees, and interest and lease balance and yield thereon which shall be the greatest amount allowable by law in such manner or order as Lessor shall designate.

28.      **LESSEE'S REPRESENTATIONS.** THE UNDERSIGNED LESSEE(S) ATTEST THAT THEY HAVE READ ALL DOCUMENTS WHICH ARE PART OF THIS LEASE, RELATED DOCUMENTS, INSTRUMENTS AND AGREEMENTS AND ARE FULLY AWARE OF ALL THE TERMS AND CONDITIONS CONTAINED HEREIN AND THEREIN.  LESSEE ALSO REPRESENTS THAT THERE IS NO ACTION OR PROCEEDING PENDING OR, INSOFAR AS LESSEE KNOWS, THREATENED AGAINST LESSEE BEFORE ANY COURT OR ADMINISTRATIVE AGENCY WHICH MIGHT HAVE A MATERIALLY ADVERSE EFFECT ON THE BUSINESS, CONDITION OR OPERATIONS OF LESSEE.  THE UNDERSIGNED FURTHER GUARANTEE THAT ALL REQUIRED CORPORATION, PARTNERSHIP OR LIMITED LIABILITY COMPANY ACTION HAS BEEN TAKEN AND THAT ALL DOCUMENTATION HAS BEEN AUTHORIZED TO BE EXECUTED BY THE SIGNATORIES BELOW.

## *THIS LEASE IS NON-CANCELLABLE AND IS SUBJECT TO THE TERMS AND CONDITIONS STATED HEREIN, WHICH LESSEE ACKNOWLEDGES THAT LESSEE HAS READ, UNDERSTANDS, AND AGREES TO.*

This Lease shall not be binding upon
Lessor or become effective until and
unless Lessor accepts the same in writing
in the State of California.

Date 8/14/2015                                           Date _____

_____        _____
DAKOTA FINANCIAL, LLC                           Cargo Transport Alliance, L.L.C.
By: Michael Green, Managing Partner          Anatoly Galunov, Manager



## DELIVERY AND ACCEPTANCE CERTIFICATE

Lessee: Cargo Transport Alliance, L.L.C.

RE: Equipment Lease Agreement No.: 6377

To: Dakota Financial, LLC ("Lessor")

All of the Items of Equipment referred to in the above-referenced Lease No. 6377 dated as of August 14, 2015, between Lessor and Lessee, have been delivered to assembled and installed for, and accepted by, the undersigned and are in good working order and condition according to the supplier's, vendor's, or manufacturer's specifications. All installation or other work necessary prior to the use of such Equipment has been completed. The Equipment has been examined and tested, and is in all respects satisfactory and complies with all terms of the Lease.

The undersigned acknowledges that based on the execution of this Delivery and Acceptance Certificate, the term of the Lease will commence. The Lease is noncancellable and the undersigned acknowledges and agrees that if the Equipment fails to perform as expected or represented by vendor, manufacturer, supplier, or anyone else, the undersigned will continue to comply with all of the terms of the Lease and make all payments to Lessor in accordance with the Lease. In addition, the undersigned will look solely to the supplier, vendor or manufacturer of each Item of the Equipment for all training, if any, promises, performance and warranties and any damages by virtue of the failure of the Equipment to perform as represented.

The undersigned acknowledges that Lessor is neither the manufacturer, distributor, supplier nor vendor of any of the Equipment nor an agent of any of them, and has no control, knowledge or familiarity with the condition, capacity, or functioning of the equipment and is a finance lessor as defined in Commercial Code, Section 10103(a)(7).

**NOTICE TO THE LESSEE: Do not sign this Delivery and Acceptance Certificate until the Equipment has been delivered, assembled, installed and accepted by you as satisfactory in all respects. Payment to the supplier, vendor, manufacturer or any other person or entity will not be made until this Delivery and Acceptance Certificate is properly signed and returned to Lessor.**

Date _____

_____
Cargo Transport Alliance, L.L.C.
Anatoly Galunov, Manager



## Guaranty

**Lessor: Dakota Financial, LLC**

**Lessee: Cargo Transport Alliance, L.L.C.**

## Lease No. 6377

Dakota Financial, LLC (the "Lessor") and Cargo Transport Alliance, L.L.C. (the "Lessee") have entered into an Equipment Lease Agreement, Lease No. 6377 (the "Lease"), dated August 14, 2015.

The undersigned (collectively or individually, as the context requires, "Guarantor") has a financial interest in Lessee and recognizes that Lessor would be unwilling to enter into the Lease with Lessee without this Guaranty (the "Guaranty"). If more than one Guarantor signs this Guaranty, then each Guarantor shall be obligated hereunder on a joint and several basis. Each Guarantor hereby absolutely and unconditionally guarantees the due and punctual payment and performance by Lessee of all Obligations (as defined below) before or after any Event of Default by Lessee (as defined in the Lease). Guarantor promises to pay all Obligations under the terms of the Lease. Guarantor hereby absolutely and unconditionally covenants and agrees that it is independently liable for the Obligations and Lessor or its assignees may proceed directly against Guarantor without proceeding against Lessee, any collateral or any leased Equipment.

As used herein, the term "Obligations" means: (a) any and all liabilities, obligations and duties of every kind and character of Lessee to Lessor or any assignee of Lessor arising pursuant to or related to the Lease, or any agreement, document, instrument, certificate or agreement related to the Lease whether now or hereafter existing or arising, including this Guaranty (collectively, with the Lease, the "Lease Documents"), regardless of whether such present or future liabilities, obligations or duties be direct or indirect, primary or secondary, joint, several, or joint and several, fixed or contingent including further, without limitation, the duty to pay rent, indemnities and other sums to Lessor under the Lease Documents; (b) any and all indebtedness, obligations, liabilities, covenants, duties, guaranties, agreements separate and independent of the Lease whether now due or hereafter entered into or owing by Guarantor to Lessor or any assignee of Lessor and whether direct or indirect, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Guarantor may be liable jointly with others or individually; (c) any and all renewals, extensions, modifications and increases of such liabilities, obligations and duties, or any part thereof, described in items (a) and (b) of this paragraph; (d) all costs, expenses and fees, including, but not limited to, court costs and attorneys' fees, arising in connection with the collection of any or all amounts, such liabilities, obligations and duties of Lessee to Lessor and any assignee of Lessor described in items (a) (b) and (c) of this paragraph, including costs, expenses and fees arising in connection with the enforcement of this Guaranty.

This Guaranty is a continuing one and shall terminate only upon full payment and performance of all Obligations, including, without limitation, the payment in full of all rents and all other sums due under the Lease Documents.

Either before or after revocation hereof, Guarantor authorizes Lessor at its sole discretion, with or without notice, and without affecting Guarantor's continuing liability hereunder, from time to time to (a) change the time or manner of payment of the Lease by modification, renewal, extension, acceleration or otherwise, (b) amend or change any other provision of the Lease including the rental amount thereof, (c) accept partial payment on the Lease, (d) accept new or additional instruments, agreements or documents relative to the Lease, (e) release, substitute or add one or more endorsers, cosigners or guarantors for the Lease, (f) enter into forbearances with Lessee even though the result of such forbearance is to increase the cost, fees and/or expenses attributable to the Lease, (g) amend or modify the terms of any guaranty executed by a co guarantor, including the maximum liability thereunder, (h) obtain collateral for the payment of the Lease and/or any guaranty thereof, (i) waive, release, exchange, substitute, or modify, in

whole or in part, existing, after-acquired or later acquired property, Equipment, or collateral securing obligations under the Lease or any guaranty therefor on such terms as Lessor at its sole discretion shall determine, (j) subordinate payment of all or any part of the Lease to other creditors of Lessee or other persons or entities on such terms as Lessor deems appropriate, (k) apply any sums received from Lessee, any other guarantor, endorser or cosigner or from the sale or collection of collateral or its proceeds to any obligation of Lessee whatsoever in any order and regardless of whether or not such obligation guaranteed hereby, is secured by collateral, or is due and payable, (l) without limiting the foregoing, apply any sums received from Guarantor or from the sale of collateral granted by Guarantor to any, all, or any portion of any of Lessee's obligations in any order regardless of whether or not the obligations are secured by collateral or are due and payable, and (m) exercise any right or remedy Lessor may have with respect to the Lease or any collateral securing the Lease, this Guaranty or any other guaranty, including, without limitation, bidding and purchasing at any sale of any such collateral, and compromising, collecting or otherwise liquidating any collateral or the Lease.

Guarantor waives any rights to require Lessor to: proceed against Lessee, proceed against or exhaust any security held from Lessee, or pursue any other remedy in Lessor's power whatsoever.

Guarantor acknowledges that Guarantor may have certain rights under applicable law, which, if not waived by Guarantor, might provide Guarantor with defenses against Guarantor's liability under this Guaranty. Among those rights are certain rights of subrogation, reimbursement, indemnification and contribution, and rights provided in sections 2787 to 2855, inclusive, of the California Civil Code. Guarantor waives all of Guarantor's rights of subrogation, reimbursement, indemnification, and contribution, and any other rights and defenses that are or may become available to Guarantor by reason of any or all of California Civil Code sections 2787 to 2855, inclusive, including, without limitation, Guarantor's rights:

(a)     To require Lessor to disclose any information with respect to the Lease, Lessee, or any other guarantor, co-signer or endorser, or with respect to any collateral; or to require Lessor to notify Guarantor of (a) any payment made under or in connection with any Lease Document, (b) any sale or other disposition of security for the Lease, (c) acceptance of this Guaranty, (d) any amendment or extension of any Lease Document or of any other agreement, instrument or document pertaining to all or any part of the Obligations, (e) the execution and delivery by Lessee and Lessor of the Lease or of Lessee's execution and delivery of other documents in connection therewith, (f) the occurrence of any breach by Lessee or default by Lessee under the Lease or any other Lease Document, (g) Lessor's transfer or disposition of the Obligations, or any part thereof, (h) protest, proof of non-payment or default by Lessee, (i) any other action at any time taken or omitted by Lessor, and generally, all demands and notices of every kind in connection with this Guaranty or any document or agreements evidencing, securing or relating to any of the Obligations, except as otherwise specifically provided herein, (j) any default of Event of Default under the Lease, or (k) disposition of any collateral security granted by Lessee or Guarantor.

(b)     That Guarantor's obligation under this Guaranty must be commensurate with that of Lessee;

(c)     To be discharged based upon the absence of any liability of Lessee, at any time, by virtue of operation of law, or otherwise, or due to any other disability or defense of Lessee or any other guarantor, endorser or co-signer;

(d)     To be discharged if any of the terms, conditions or provisions of the Lease are altered in any respect;

(e)     To be discharged upon acceptance by Lessor of anything in partial satisfaction of the Lease, and/or if Lessor designates the portion of the Lease to be satisfied;

(f)     To be discharged upon any modification of the Lease or the release by Lessor of Lessee or any other guarantor, endorser or co-signer;

(g)     To require Lessor to proceed against Lessee, or any other guarantor, endorser, co-signer, or other person, or to pursue or refrain from pursuing any other remedy in Lessor's power;

(h)     To receive the benefit of or participate in any and all security for payment of the Obligations and/or performance of the Lease;

(i)     To have any security for the Lease first applied to satisfy or discharge the Lease;

(j)     To be discharged based upon any failure by Lessor to perfect or continue perfection of any lien or use due diligence to collect all or any part of any Lease, or if recovery against Lessee becomes barred by any statute of limitations, or if Lessee is not liable for any deficiency after Lessor realizes upon any collateral; and

(k)     To be discharged due to the release or discharge of any collateral for the Lease or Guaranty, or relating to the validity, value or enforceability of any collateral.

Guarantor also waives all rights and defenses that Guarantor may have because the Lessee's obligations under the Lease are secured by real property. This means, among other things: (1) Lessor may collect from Guarantor without first foreclosing on any real or personal property collateral pledged or assigned by Lessee; (2) If Lessor forecloses on any real property collateral pledged by the Lessee: (A) The amount of the Lease obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, (B) Lessor may collect from Guarantor even if Lessor, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Lessee and has destroyed Guarantor's right of subrogation and reimbursement against the principal by operation of Section 580d of the California Code of Civil Procedure or otherwise. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Lessee's debt is secured by real property. The unconditional waiver of rights and defenses by Guarantor include, but are not limited to, any rights or defenses directly or indirectly based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

Any and all indebtedness of Lessor now or hereafter owed to Guarantor and all claims of Guarantor against Lessor, whenever arising, are hereby subordinated to the Obligations and assigned to Lessor as additional collateral. If Lessor so requests, any note or other instrument evidencing such indebtedness and all claims of Guarantor against Lessee shall be delivered to Lessor, and such indebtedness and all claims of Guarantor against Lessee shall be collected, enforced and received by Guarantor as trustee for Lessee and be paid over to Lessor on account of the Obligations but without reducing or affecting in any manner the liability of Guarantor hereunder. Should Guarantor fail to collect proceeds of debt owed to it by Lessee and pay the proceeds to Lessor, Lessor, as Guarantor's attorney in fact may do such acts and sign such documents in Guarantor's name as Lessor considers necessary, at its discretion, to effect such collection, and Guarantor hereby irrevocably appoints Lessor as Guarantor's attorney in fact for such purposes. If Lessee is a corporation, partnership, or limited liability company, Guarantor will not withdraw or accept, without Lessor's prior written consent, any return of any capital invested or equity interest in Lessee.

To the maximum extent permitted by law, Guarantor specifically waives the benefit of the statute of limitations affecting its liability hereunder or the enforcement hereof, or the collection of any Obligations, including, without limiting the foregoing, any and all special statutes of limitations arising out of California Code of Civil Procedure sections 580a or 726(b). Any partial payment by Lessee, which operates to toll any statute of limitations as to Lessee, shall likewise toll the statute of limitations as to Guarantor. Guarantor agrees to pay to Lessor, on demand, reasonable attorneys' fees and all other costs and expenses which may be incurred by Lessor in the collection or attempted collection from Lessee with respect to the Lease or with respect to this Guaranty and/or in the interpretation, enforcement or attempted enforcement by Lessor of this Guaranty or any collateral therefor, including, but not limited to, proceedings in any bankruptcy or other insolvency case or other proceedings which have anything whatsoever to do with the Lease or this Guaranty, or both, in any manner, whether or not legal proceedings or suit are instituted, together with interest thereon and including, without limitation, all attorneys' fees and related costs of enforcement of any and all judgments and awards and upon any appeal relating thereto.

GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INSTITUTED BY Lessor OR GUARANTOR WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS GUARANTY, THE LEASE, ANY COLLATERAL THEREFOR OR ANY MATTER ARISING THEREFROM OR RELATING HERETO OR THERETO.

Guarantor agrees that the Guaranty is entered into in Los Angeles County, California and hereby irrevocably submits and consents to the jurisdiction of any federal or state court of competent jurisdiction within California in connection with any action or proceeding arising out of or relating to this Guaranty. In any such litigation, Guarantor consents to service of process by any means authorized by California or federal law or as otherwise agreed in writing between Lessor and Guarantor.

All rights, remedies, powers and benefits granted to Lessor under this Guaranty, the Lease, any oral or other written agreement or applicable law whether expressly granted or implied in law or otherwise, are cumulative and not exclusive, and are enforceable alternatively, successively, or concurrently on any one or more occasions at Lessor's discretion.

Lessor shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any security interest

granted to Lessor hereunder or Lessor's rights, powers and/or remedies hereunder (including any right of setoff) unless such waiver shall be in writing and signed by an authorized officer of Lessor.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Lessor of any default, right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such default, right, power and/or remedy which Lessor would otherwise have on any future occasion whether similar in kind or otherwise.  Any failure by Lessor to file or enforce a claim against any estate (whether in administration, bankruptcy, probate or other proceeding) of Lessee or of any others, shall not affect Guarantor's liability hereunder.

Neither this Guaranty nor any related agreement, document or instrument nor any provision hereof or thereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lessor expressly referring to this Guaranty and to the provisions so amended, modified or discharged.

This is a continuing guaranty of the Lease.  Revocation of this Guaranty, if permitted by applicable law, shall be effective only upon the close of the next business day after written notice thereof is received by an officer of Lessor by certified or registered mail, return receipt requested at 11755 Wilshire Blvd. Suite 1670, Los Angeles, CA 90025, or at any other office of Lessor designated in a written notice mailed by Lessor to Guarantor at its address set forth below.  Any such revocation shall be effective only as to the revoking party and shall not affect that party's obligations with respect to the Lease or Guaranty existing before the revocation became effective or as to any renewals, extensions or modifications of any obligations, whether such renewal, extension or modification is made prior to or after revocation, including those evidenced by a new or additional instrument or agreement or which change the rental amount under the Lease, or for post revocation interest and other costs and collection expenses accruing or incurred by Lessor with respect thereto.  Notwithstanding any revocation hereof, this Guaranty shall not be terminated until Lessor has received payment in full of all the Obligations, which are guaranteed hereby.

The provisions of this Guaranty shall be construed and interpreted and all rights and obligations hereunder determined in accordance with the laws of the State of California.

This Guaranty constitutes the entire agreement between the parties with respect to the subject matter of this Guaranty, and any and all previous or contemporaneous correspondence, statements, or agreements by or between the parties hereto with respect to the subject matter of this Guaranty (but not previous or other guarantees given to Lessor by Guarantor) are superseded hereby.  This Guaranty may be modified only by a written instrument signed by the parties hereto.

Date_____

"Guarantor"

_____

Anatoly Galunov

Address:

1082 SE 5th Court
Dania, FL 33004

Fax:



### Security Agreement in Support of Lease Obligations

**SECURITY AGREEMENT**, dated as of 8/14/2015 (as amended, supplemented or restated from time to time, this "**Security Agreement**"), between Dakota Financial, LLC (and its designees, successor and assigns, "**Lessor**") and Cargo Transport Alliance, L.L.C. (and his permitted heirs, successors and assigns, "**Lessee**").

### RECITALS:

Lessee and Lessor have entered into that certain Equipment Lease Agreement dated as of 8/14/2015 (as amended, supplemented or restated from time to time "**Lease Documents**"). As part of the transaction, Lessee grants to Lessor a first priority security interest in certain collateral to secure its obligations under the Lease Documents. The Lease Documents and the other documents, instruments, certificates and agreements related to the Lease Documents are hereafter referred to as the "**Lease Documents**". This Agreement and the Lease Documents, as amended, modified, supplemented or restated from time to time, and any Guaranty for the Lease Documents are collectively referred to as the "**Transaction Documents**".

This Security Agreement is secured by the Collateral (as hereinafter defined) and all other personal property, described in Annex A attached hereto from time (collectively, the "**Property**").

In consideration of the promises and agreements herein, Lessor and Lessee ("the parties") agree as follows:

1. **Grant of Security Interest**. Lessee grants to Lessor a security interest in the Property and to all now or hereafter existing proceeds, products, and books and records relating to or arising out of or from the Property including, but not limited to (i) property, accounts, general intangibles, contract rights, inventory, equipment, chattel paper, electronic chattel paper, tangible chattel paper, software, cash, money, warehouse receipts, bills of lading, goods, purchase orders, deposit accounts, payment intangibles, investment property, stock, documents, letter of credit rights, commercial tort claims, promissory notes, and all other tangible or intangible property not specifically described herein (ii) all leases and subleases of the Property and the personal property described herein, (iii) all chattel paper and general intangibles related to the Property and the personal property described herein, including all product warranties relating to the Property, (iv) all security deposits and other cash collateral accounts related to the Property and the personal property described herein, (v) all books, records, writings and software related to or evidencing the personal property and Property described herein; (vi) all replacements, substitutions and accessions related to the Property and the personal property described herein; and (vii) all proceeds of all of the foregoing, including, but not limited to, all amounts payable under any insurance policy relating to the Property and the personal property described herein. All of the Property, personal property described herein in subparts (i)-(vii) herein are collectively referred to collectively as "**Collateral**."

2. **What Obligations the Collateral Secures**. Each item of Collateral shall secure all present and future Obligations of Lessee under the Lease Documents or pursuant to any other obligation of Lessee to Lessor including, but not limited to the Lease. As used herein, the term "**Obligations**" means: (a) any and all liabilities, obligations and duties of every kind and character of Lessee to Lessor or any assignee of Lessor arising pursuant to or related to the Lease Documents, whether now or hereafter existing or arising, including this Security Agreement, regardless of whether such present or future liabilities, obligations or duties be direct or indirect, primary or secondary, joint, several, or joint and several, fixed or contingent including further, without limitation, the duty to pay rent, indemnities and other sums to Lessor under the Lease Documents; (b) any and all indebtedness, obligations, liabilities, covenants, duties, guaranties, or contracts now due or hereinafter owing by Lessee to Lessor or any assignee of Lessor whether direct or indirect, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined and whether Lessee may be liable jointly with others or individually; (c) any and all renewals, extensions, modifications and increases of such liabilities, obligations and duties, or any part thereof, described in items (a) and (b) of this paragraph; (d) all costs, expenses and fees, including, but not limited to, court costs and attorneys' fees, arising in connection with the collection of any or all amounts, such liabilities, obligations and duties of Lessee to Lessor described in items (a), (b) and (c) of this paragraph, including costs, expenses and fees arising in connection with the enforcement of this Security Agreement; (d) all amounts advanced or incurred by Lessor on account of Lessee under this Agreement or for the maintenance or preservation of the Collateral;



3.      **Assignment of Insurance Policy and Proceeds.**  Notwithstanding the grant of a security interest in the Property and in the Collateral, Lessee assigns to Lessor all of its right, title and interest in and to any proceeds arising out of the insurance policy covering the Property and Collateral for all purposes. In addition, Lessor shall be covered under the insurance policy or any subsequent insurance policy as a co-insured and the sole loss payee. Lessee shall not cause any insurance policy to be canceled without 30 days notice to Lessor and if the insurance policy is not replaced and such replacement is not approved by Lessor, then this Security Agreement shall be declared in default.

4.      **Lessee's Covenants, Warranties and Representations.**  Lessee covenants, warrants and represents:

(a)      that except for the security interest granted by this Agreement, the Collateral is free from and will be kept free from all levies, liens, claims, security interests, mortgages and/or other encumbrances (individually or collectively, as the context requires, sometimes herein called a "**Lien**") or filings under the Uniform Commercial Code or other law, rule or regulation in connection therewith or herewith; and

(b)      that Lessee (i) has full authority to enter into the Transaction Documents or any other contracts, agreements, leases, notes, conditional sale contracts, or other documents now or at any time hereafter ("Future Transaction Documents") to which it is, or may become, a party and, in so doing, (ii) is not violating its organizational documents, any law or regulation or agreement with third parties, (iii) has taken all such action as may be necessary or appropriate to make the Transaction Documents or Future Transaction Documents from time to time executed and/or delivered in connection herewith binding upon it, and (iv) has executed Transaction Documents that are valid, binding and enforceable against it.

5. **Lessee's Agreements.**  Lessee agrees:

(a)      to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral, the Transaction Documents related thereto, and any Future Transaction Documents and the Obligations herein shall survive the termination of the Transaction Documents or any Future Transaction Documents;

(b)      that if a certificate of title be required or permitted by law, Lessee shall obtain such certificate with respect to the Collateral, showing the Lien of Lessor thereon and in any event do everything necessary or expedient to preserve or perfect the security interest of Lessor;

(c)      that the security interest granted by Lessee to Lessor shall continue effective irrespective of any retaking or redelivery of any Collateral and irrespective of the payment of the amount described in any Transaction Document or any Future Transaction Documents so long as there are any Obligations of any kind owed by to Lessor; provided, however, that upon any assignment of this Security Agreement, the Assignee shall thereafter be deemed for the purpose of this Paragraph to be the Lessor under this Security Agreement as and to the extent the of the rights, remedies, privileges and Collateral assigned hereunder;

(d)      upon the request of Lessor, if any of the Collateral consists of software, to inform Lessor of the name of the licensor of such software and to provide Lessor with a copy of the license agreement or other documents relating to the software of rights thereto or therein and a collateral assignment of such Collateral;

(e)      that Lessee will (A) report any loss or destruction of Property within five (5) business days and (B) provide notice of any material adverse change in the business or condition, financial or otherwise, of the Lessee or any guarantor of, or other obligor with respect to, the Obligations.

6.      **Representations and Warranties.**  Lessee hereby represents and warrants to Lessor the following:

(a)      Lessee has good and marketable title to all Collateral, free of all claims, liens, mortgages, pledges, security interests, encumbrances or charges of any kind (except in favor of or otherwise known by Lessor) ;

(b)      all information, including, but not limited to, financial statements, or other reports, schedules, or documents delivered or to be delivered to Lessor by Lessee is and will be correct and true as of the date given and will not omit to state a fact necessary in order to make the statements contained herein or therein not misleading;

(c)      Lessee has taken all action necessary to obtain the approval of all appropriate persons to grant the security interest in the Collateral as stated herein and to execute the terms of this Agreement and the person executing this Agreement, warrants and represents that all such appropriate action has been taken and that he is authorized to execute this Agreement on behalf of the Lessee.



7.    **General Covenants of Lessee.**  Unless otherwise excepted by this Agreement or by written amendment executed by Lessor, Lessee agrees:

(a) to perform or cause to be performed all Obligations secured hereby when due;

(b) to indemnify Lessor against any loss, claims, demands and liabilities caused by or arising from the Collateral;

(c) not to change its name, business structure or identity, principal place of business or chief executive office, the location of Collateral or the place where Lessee keeps its records concerning the Collateral without the prior written consent of Lessor, or add any new fictitious name; and prior to any such change to which Lender so consents, Lessee agrees to execute and deliver or cause to be delivered to Lessor any additional documents, instruments and agreements, including, without limitation, financing statements, waivers and subordinations, as Lessor may request;

(d) to keep its/their business properties and the Collateral  in good repair;

(e) to furnish Lessor with such information and reports concerning Lessee and the Collateral, as Lessor may request, including complete and accurate records regarding Lessee's business and all Collateral;

(f) to permit Lessor and its designees at any time during normal business hours on 24 hours notice to inspect the Collateral; to have free access and right of inspection to any papers, instruments and records pertaining thereto; and make photocopies, at Lessee's expense, from Lessee's books, records and writings pertaining to the Collateral;

(g) Other than such proceedings presently pending, to promptly notify Lessor in writing of the details of any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or that would result in any material adverse change in Lessee's business, properties, assets, goodwill or condition, financial or otherwise;

(h) upon an Event of Default to pay all costs and expenses, including attorneys' fees incurred by Lessor and relating to the perfection, preservation, realization, enforcement and exercise of Lessor's rights, remedies and powers hereunder;

(i) to insure the Collateral for at least the amount due to Lessor under any of the Obligations due to Lessor. Lessor shall be furnished with a copy of any and all such policies and any certificates evidencing the foregoing from the insurers and will instruct its carriers, brokers and claims adjusters to immediately and without delay to send such policies to Dakota. Lessor is granted a power of attorney to act as attorney in fact to obtain copies of all insurance information and documents from such carriers, brokers and claims adjusters. Lessee further covenants and agrees that until Lessor has been paid in full on all of the Obligations, that Lessee will immediately notify Lessor of any losses arising out of the damage or destruction of the Collateral, that it will not receive any insurance proceeds from the loss or destruction of the Collateral, that any and all such insurance proceeds from any insurance claims will be paid directly by the insurer or adjuster to Lessor, that it will instruct any insurance carriers, brokers and claims adjusters to pay Lessor and only Lessor, and if any insurance proceeds come into possession of the Lessee, that they will be held in trust for the benefit of Lessor and paid to Lessor within 5 days of receipt. In the event that Lessor receives insurance proceeds, Lessor, in its sole and absolute discretion, may apply the insurance proceeds to the amount due Lessor on any of the Obligations or use the proceeds to repair or replace any damaged Collateral.

8.    **Specific Covenants of Lessee.**  Unless otherwise excepted by this Agreement or by written amendment executed by Lessor, Lessee agrees:

(a) without the prior written consent of Lessor, not to sell, assign or transfer the Collateral;

(b) to pay before they become delinquent all charges, liens, taxes, assessments and insurance premiums charged against the Collateral, and upon the failure of Lessee to do so, Lessor may, at its option, pay any such charge, the amount of which shall be added to the Obligations and bear interest at the rate provided in any Transaction Documents or Future Transaction Documents or other agreement or contract evidencing the underlying obligation;

(c) to preserve and protect all Collateral and at all times maintain the Collateral in good condition and repair, not causing or permitting any waste or unusual or unreasonable depreciation;

(d) to register, use, operate and control the Collateral in accordance with all relevant statutes, laws, ordinances and regulations; and

(e) to execute such documents, including, without limitation, fixture filings, landlord waivers, mortgagee waivers, assignments, and endorsements of certificates of title, and do such things as Lessor may reasonably request for the purpose of perfecting, preserving and enforcing its security interest in the Collateral and to consummate all of the transactions contemplated by this Agreement or any other agreement between Lessee and Lessor.

9.    **Powers of Lessor, Authorizations, and Power of Attorney.**  Lessee hereby authorize Lessor and its designees at any time and whether or not a default exists:



(a)  to perform any obligation of Lessee's hereunder in Lessee's name or otherwise and to make such payments and perform such acts as Lessor may deem necessary to preserve and insure the Collateral or its value of Lessor's security interest, including, without limitation, filing any financing statement and any action which Lessee shall have agreed to take pursuant to the terms of this Agreement;

(b)  to assign its rights in this Agreement in full or in part; and

(c)  grants Lessor a Power of Attorney for the purpose of endorsing all checks and any sums payable from insurance companies or anyone else to Lessee when Lessor deems it necessary to do so in its sole discretion and to endorse or execute any documents or instruments necessary with insurance companies to obtain the proceeds from any insurance resulting from the loss of the Collateral and file any UCC-1 Financing Statements perfecting Lessor's lien on the Collateral or to state any ownership interest it may have in Collateral. Lessee also grants to Lessor a power of attorney to act as attorney in fact with any State's Department of Motor Vehicles to file any such documents on its own behalf or on behalf of the Lessee as is reasonably necessary to perfect its lien or state its ownership interest in any such collateral or property or to change the title, or to correct incorrect property descriptions or anything else that Lessor deems to be necessary. The Power of Attorney given to Lessor is for the purpose of allowing Lessor to take any and all action reasonably necessary to protect its interests in any Collateral and to be paid for damage, destruction or obtaining proceeds from any insurance company or other person or entity with respect to the Collateral.

10.     **Events of Default; Acceleration.  The following constitute "Events of Default" under this Security Agreement**:

(a)  any of Lessee's Obligations to Lessor under any of the Transaction Documents to which it is a party is not paid promptly when due;

(b)  any default or Event of Default shall have occurred under any of the Lease Documents, including any failure on the part of Lessee to pay all rental and all other sums when due to Lessor;

(c)  Lessee breaches any warranty, representation or covenant or other provision in any of the Transaction Documents or with respect to any Future Transaction Documents, or any other documents evidencing any Obligations by Lessee to Lessor or other transaction between Lessee and Lessor;

(d)     any default or  Event of Default  shall occur under any Guaranty executed by a guarantor;

(e)     any default or Event of Default on any Future Transaction Documents by a guarantor;

(f)      any default occurs by allowing any insurance policy protecting Collateral or required to be maintained by Lessee or a guarantor to lapse and is not replaced. In addition, Lessor must be assigned and/or granted a security interest in the new insurance policy and be a co-insured and sole loss payee so that at no time there is a gap in coverage on the Collateral for any reason or purpose;

(g)     any material adverse change in the financial condition of Lessee;

(h)     if Lessee makes an assignment for the benefit of creditors, makes or sends a notice of bulk transfer, or any petition is filed under the Federal Bankruptcy Code, or if there is an appointment of a receiver or trustee for any of Lessee's assets; and

(i)      Lessee or any guarantor dies or fails to maintain its corporate, partnership of limited liability company existence in good standing or the usual business of any Lessee or guarantor is terminated, suspended or dissolved.

**If Lessee shall be in default or if an Event of Default hereunder occurs under the Lease, the Obligations shall, if Lessor shall so elect, become immediately due and payable without any notice or demand and Lessee specifically waives any such notice or demand.**

11.     **Lessors Remedies After Default.** Upon the occurrence of any Event of Default that has not been cured in accordance with any agreement with Lessor and at any time thereafter, in addition to all other rights and remedies of Lessor granted by any other agreement with Lessee or by any statute or rule of law, or otherwise, Lessor may at its discretion and without notice to or consent by Lessee

(a)     accelerate payment of all Obligations, demand immediate payment thereof from Lessee and any guarantor to Lessor and terminate any agreement for the granting of further credit and, at Lessor's discretion, obtain the appointment of a receiver to enforce Lessor's rights hereunder;

(b)     enter upon any premises on or in which the Collateral may be located and take possession thereof to complete the processing, repairing and reconditioning of the Collateral, to store the Collateral, to effect the sale, foreclosure or other disposition thereof or for any other purpose, all without compensation to Lessee, and Lessor may remove any and all of the



Collateral from said premises for the same purposes. Lessee shall, at the request of Lessor, assemble or deliver all or any part of the Collateral at such place or places as Lessor designates in its request. In the event Lessor institutes an action to recover any Collateral, whether by prejudgment remedy or otherwise, Lessee waives the posting of any bond that might otherwise be required. In addition, Lessee agrees that Lessor may auction the Collateral from any location where it is located without paying any storage or rental costs and Lessee specifically consents to Lessor entering on to any premises for that purpose.

(c)      collect, foreclose, receive, appropriate, set off and realize upon any and all Collateral, or sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral at such prices or terms as Lessor may deem reasonable for cash, upon credit or for future delivery, with Lessor having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right of equity or redemption of Lessee, which right of equity or redemption is hereby expressly waived and released by Lessee.   Ten (10) days' prior notice by Lessor to Lessee designating the time and place of any public auction of Collateral or the time after which any private sale or other disposition of Collateral may take place shall be deemed to be reasonable notice thereof, and Lessee waives any other notice;

(d)      repair or recondition any Collateral to the extent Lessor deems necessary and any sum expended by Lessor for processing or repair shall be added to the Obligations secured by this Agreement;

(e)      apply the cash proceeds of Collateral actually received by Lessor from any sale, lease, foreclosure or other disposition of the Collateral to the payment of (i) all costs and expenses of every kind or nature incurred or paid by Lessor in connection therewith, including, without limitation, reasonable attorneys' fees, and (ii) all and any of the other Obligations, in whole or in part, and in such order as Lessor may elect, whether then due or not due.  The costs and expenses incurred or paid by Lessor with respect to any sale, lease, foreclosure or other disposition of the Collateral may further include, without limitation: (i) expenses of retaking, holding, reconditioning, assembling, preparing for sale or lease, advertising, storing, repairing, completing, selling, leasing, foreclosing or otherwise disposing of the Collateral; (ii) premiums on bonds and undertakings; (iii) sales, use and other taxes; (iv) fees and expenses of custodians, warehousemen, brokers, appraisers, auctioneers, sheriffs and others; (v) legal expenses and attorneys' fees; and (vi) all other expenses that may be incurred or paid by Lessor in attempting to collect the Obligations and to foreclose upon the Collateral. Lessee shall be liable to Lessor for the payment on demand of all such costs and expenses.  Lessee shall be liable for any deficiency with interest at the rate set forth in any written loan document, note, agreement or other writing evidencing the Obligations;

(f)      exercise all of the rights and remedies of a secured party under the California Commercial Code in any jurisdiction where enforcement is sought, whether in California or elsewhere; and

Lessor shall have the right at its sole discretion to determine which rights and remedies and in which order any of the same are to be exercised, and Lessor may at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Obligations.  Lessor may, at any time or times, proceed directly against Lessee, any guarantor, person or entity to enforce payment of the Obligations and shall not be required to take any action of any kind to preserve, collect or protect Lessor's rights in the Collateral. Lessee shall remain liable for any deficiency after sale, lease or other disposition of the Collateral or any part thereof. All rights, remedies, powers and benefits granted to Lessor by Lessee, or by applicable law, are cumulative and not exclusive and enforceable alternatively, successively, or concurrently on any one or more occasion.

12.      **Miscellaneous.**

(a) Lessor may correct any errors herein in this Agreement and fill in such blanks as serial numbers, date of first payment and the like herein or in any other Transaction Documents or Future Transaction Documents. Lessee authorizes Lessor to file all financing statements for Lessee with respect to the Collateral as Lessor may deem necessary or desirable.

(b) All notices provided for herein shall be in writing and shall be deemed to have been given when delivered personally, when telecopied, or if deposited in the United States mail, when received addressed to Lessee at the address set forth for Lessee under its signature page hereon and for the Lessor as follows (or other address provided in writing by the respective parties to the other from time to time):



If to Lessor:

    Dakota Financial, LLC
    11755 Wilshire Blvd. Suite 1670
    Los Angeles, CA 90025
    Telephone: 310-696-3030
    Fax: 310-696-3035
    Attention: Managing Partner

(c) This Agreement shall be governed by and subject to the laws of the State of California (without regard to conflicts of laws principles).

(d) LESSEE HEREBY IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT OR ANY OF ITS ASSETS WITH RESPECT TO THIS SECURITY AGREEMENT MAY BE BROUGHT IN ANY JURISDICTION WHERE LESSEE OR ANY OF ITS ASSETS MAY BE FOUND, or in any court of the State of California or any federal court of the United States of America located in Los Angeles, California, United States of America, or both, or any other jurisdiction in the State of California where any assignee of the Lessor is located, as Lessor or any assignee of the Lessor may elect, and by execution and delivery of this Security Agreement, Lessee hereby irrevocably submits to and accepts with regard to any such action or proceeding, for itself and in respect of its assets, generally and unconditionally, the jurisdiction of the aforesaid courts.          (e) Except as otherwise provided herein, Lessee waives and agrees not to assert or take advantage of the defense of any statute of limitations in any action hereunder or for the collection of any Obligations or the performance of any obligation secured hereby;

(f)          Lessee waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Obligations or of any action or non action on the part of Lessee, Lessor, any guarantor, endorser, or any other person whosoever, in connection with any obligation or evidence of indebtedness held by Lessor as collateral or in connection with any indebtedness secured hereby.

(g)          No delay or omission on the part of Lessor or its assignee in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement. No waiver by Lessor of any default shall operate as a waiver of any other default of at the same default on a future occasion. Lessor's acceptance of any partial or delinquent payment from Lessee or any other person or entity shall not waive any Obligation or modify this Agreement.

(h)          Neither this Agreement nor any provision hereof shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lessor expressly referring to this Agreement and to the provision so amended, modified or discharged. This Agreement, together with any other agreement signed in connection with it representing or securing the underlying Obligations, constitute the entire understanding and agreement between the parties.

(i)          If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be ineffective only to the extent of such invalidity or unenforceability, without invalidating the remainder of such provision or any remaining provisions of this Agreement. Paragraph headings used in this Agreement are for the convenience of the parties and shall not be used to interpret the meaning of any provision.

(j)          All references to the term "Lessor" wherever used herein shall be deemed to mean and include its parent, affiliates, subsidiaries, agents, correspondents, representatives, bailees, and each of their successors and assigns. Further, any assignee of Lessor shall have all of the rights and powers of Lessor under the terms of this Agreement.

(k)          Under no circumstances shall Lessor be deemed to have assumed any responsibility for or obligation or duty of any nature or kind with respect to any Collateral, or any matter or proceeding arising out of or relating thereto, but the same shall be at the sole risk of Lessee at all times. Lessee agrees to indemnify and hold Lessor harmless from and with respect to any and all losses, claims, demands or liabilities of every kind caused by the Property or Collateral subject to this Agreement and upon request by Lessee defend Lessor from any all such claims, losses. demands or liabilities.

(l)          This Agreement shall be for the benefit of Lessor, its successors and assigns, and shall bind the heirs, executors, and successors in interest of Lessee.

(m)          All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.



(n)      In the event that Lessor employs attorneys to remedy, prevent, or obtain relief from a breach or default of this Agreement or the documents and instruments executed in connection with this Agreement arising out of a breach or default of this Agreement or the documents and instruments executed in connection with this Agreement or in connection with or contesting the validity of this Agreement or the documents and instruments executed in connection with this Agreement or with respect to contesting the lien priority of the Lessor, or with respect to contesting any of the terms, covenants, provisions, and all conditions of this Agreement, or any of the matters referred to herein or therein or in connection with any bankruptcy proceeding, Lessor shall be entitled to be reimbursed for all of its attorneys' fees, whether or not suit is filed and including, without limitation, those incurred in each and every action, suit or proceeding, including any and all appeals and all fees and costs incurred by Lessor whether in State, Federal, Bankruptcy Court, or any other judicial or administrative court or proceeding shall be paid by to Lessor by Lessee.

(o)      Lessor and Lessee expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

**This Security Agreement has been executed and delivered as of the date and by the parties set forth below.**

Date 8/14/2015                                    Date _____

_____              _____

DAKOTA FINANCIAL, LLC                         Cargo Transport Alliance, L.L.C.
By: Michael Green, Managing Partner            Anatoly Galunov, Manager

                                              Signatory represents that the following information is true and correct:

                                              Address: 1525 NW 167th Street
                                                       Suite 115
                                                       Miami Gardens, FL 33169

                                              Fax:

                                              State of Formation ID#
                                              FL L15000019251



ANNEX A

LIST OF COLLATERAL FOR THIS SECURITY AGREEMENT

1992 Trailmaster Trailer                    Vin#/Serial#/ID: 1PTFB1TRGN9010466

## Resolution to Lease of Cargo Transport Alliance, L.L.C.

I hereby certify that as the presently serving Managing Member of Cargo Transport Alliance, L.L.C., a(n) FL LLC (the "LLC"). I further certify that as such, I am the person at the LLC who is authorized to execute this Certification and that the following is a true and correct copy of certain Resolutions duly adopted at a Meeting of the Members of the LLC convened and held in accordance with law and with the Operating Agreement of the LLC and that such Resolutions are now in full force and effect unaltered, and without modification or amendment, and has not been repealed:

WHEREAS, this LLC is contemplating the lease of certain equipment, more fully described on attached Equipment Schedule and hereinafter referred to as "Equipment" with DAKOTA FINANCIAL, LLC ("DAKOTA");

WHEREAS, there has also been presented to this meeting the Equipment Lease Agreement, Lease No. 6377, dated August 14, 2015, Equipment Schedule and Attachments intended to be executed in connection with the foregoing transaction (all hereinafter referred to as "Agreement");

NOW THEREFORE, be it

RESOLVED: That this LLC shall enter into the Agreement and all other documents provided for therein with DAKOTA or required by DAKOTA as a condition to entering into the Agreement, including, but not limited to any Security Agreements requested by DAKOTA pledging other real or personal property as additional collateral, pursuant to the terms and conditions set forth in the Agreement or in any other document or instrument executed in connection with entering into the Agreement and in which DAKOTA relied in making its credit decision to lease the Equipment to the LLC;

RESOLVED FURTHER: That in connection with the Agreement the appropriate Members of this LLC may execute on behalf of the LLC, the Agreement and all such other documentation as is necessary to accomplish said transaction;

RESOLVED FURTHER: That the appropriate Members of this LLC may deliver such additional documentation to DAKOTA in connection with the transaction, as they shall deem appropriate;

RESOLVED FURTHER: That the Agreement, together with all other documentation required for the transaction, including, but not limited to, those items detailed in these Resolutions, may be executed and delivered on behalf of the LLC by the Managing Member or Members without the necessity of any corporate or other seal required by DAKOTA and the execution of this Agreement shall be conclusive evidence of this LLC's approval of any such documents so executed by the Managing Member or Members;

RESOLVED FURTHER: That the said Managing Member or Members of the LLC are authorized to take such other action, from time to time, on behalf of the LLC, as he or she deems necessary, advisable or proper in order to accomplish the execution of the foregoing Agreement or otherwise required by the Agreement, and further to carry out and perform the obligations of the LLC under said Agreement and under all of the other documentation otherwise required;

RESOLVED FURTHER: That the Managing Member or Members may certify to any person, firm, LLC having an interest therein, as to the adoption of and as to the text of the due adoption of the foregoing Resolutions, and the incumbency of any person, in any of the offices specified in any such Resolutions; and such, person, firm, or LLC may rely upon the matters so certified until notice of the alteration, amendment, repeal or modification of such Resolution or Resolutions, or of the termination of such incumbency, shall have been actually received by such person, firm or LLC.

IN WITNESS THEREOF, I have subscribed my name on this _____ day of _____, 20 _____ .


By:_____

       Name:
       Title:


By:_____

       Name:
       Title:



## Personal Information Form

Individual Name: Anatoly Galunov

Home address: _____

_____

_____

Social Security No: _____

Date of Birth: _____

Drivers License No. _____

Home Phone _____

Business Number _____

Fax Number _____

Mobile No. _____

Email Address _____

Please attach a copy of your driver's license.

In the event we can not reach you, please provide the information regarding your relatives ( parents, etc.) not living with you:

Name_____

Address_____

Phone Number_____

Dakota Financial, LLC
11755 Wilshire Blvd.
Suite 1670
Los Angeles, CA 90025

 DAKOTA FINANCIAL

# POWER OF ATTORNEY

Motor Vehicle Titling, Licensing and Registration

<u>Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.</u> ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above.  The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description:  2012 Kenworth T700 , Vin #: 1XKFDP9X2CJ296617**

**<u>Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.</u>**
*Print Company or Individual Name*

**By:** _____  **Date:** _____
*Signature*

State of _____

County of _____

On _____ day before me, _____,

*Notary Printed Name and Title*

Personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed this instrument.  **I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.** WITNESS my hand and official seal._____

## POWER OF ATTORNEY

Dakota Financial, LLC
11755 Wilshire Blvd.
Suite 1670
Los Angeles, CA 90025

 DAKOTA FINANCIAL

Motor Vehicle Titling, Licensing and Registration

<u>Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.</u> ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above.  The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description:_ 1992 Trailmaster Trailer  , Vin #: 1PTFB1TRGN9010466**

**<u>Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.</u>**
*Print Company or Individual Name*

**By:** _____   **Date:** _____
*Signature*

State of _____
County of _____
On _____ day before me, _____,
*Notary Printed Name and Title*
Personally appeared_____, who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed this instrument.  **I certify under PENALTY OF PERJURY under the laws**
**of the State of _____ that the foregoing paragraph is true and correct.**
WITNESS my hand and official seal._____

Dakota Financial, LLC
11755 Wilshire Blvd.
Suite 1670
Los Angeles, CA 90025



# POWER OF ATTORNEY

Motor Vehicle Titling, Licensing and Registration

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.** ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above. The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description:** **2012 Kenworth T700 , Vin #: 1XKFDP9X5CJ293405**

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.**
*Print Company or Individual Name*

**By:** _____   **Date:** _____
*Signature*

State of _____
County of _____
On _____ day before me, _____,
<span style="text-align:center">*Notary Printed Name and Title*</span>
Personally appeared_____, who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed this instrument. **I certify under PENALTY OF PERJURY under the laws
of the State of _____ that the foregoing paragraph is true and correct.**
WITNESS my hand and official seal._____

**Dakota Financial, LLC**
**11755 Wilshire Blvd.**
**Suite 1670**
**Los Angeles, CA 90025**

# POWER OF ATTORNEY



Motor Vehicle Titling, Licensing and Registration

Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C. ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above. The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description:** 2012 Kenworth T700 , Vin #: 1XKFDP9X2CJ296603

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.**
*Print Company or Individual Name*

**By:** _____   **Date:** _____
*Signature*

State of _____

County of _____

On _____ day before me, _____ ,
_____*Notary Printed Name and Title*

Personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed this instrument. **I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.** WITNESS my hand and official seal._____

**Dakota Financial, LLC**
11755 Wilshire Blvd.
Suite 1670
Los Angeles, CA 90025



# POWER OF ATTORNEY

Motor Vehicle Titling, Licensing and Registration

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.** ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above. The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description: 2012 Kenworth T700 , Vin #: 1XKFDP9X7CJ293387**

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.**
*Print Company or Individual Name*

**By:** _____  **Date:** _____
*Signature*

State of _____

County of _____

On _____ day before me, _____,
                                                        *Notary Printed Name and Title*

Personally appeared_____, who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed this instrument. **I certify under PENALTY OF PERJURY under the laws
of the State of _____ that the foregoing paragraph is true and correct.**
WITNESS my hand and official seal._____

Dakota Financial, LLC
11755 Wilshire Blvd.
Suite 1670
Los Angeles, CA 90025



# POWER OF ATTORNEY

Motor Vehicle Titling, Licensing and Registration

<u>Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.</u> ("Principal") does hereby authorize and irrevocably appoint Dakota Financial, LLC ("Agent"), or any officer, employee (Chris Park, Brian Barbetto, Michael Fernandez, Heith Harris, Adrian Gallo) or designee of agent, as the true lawful attorney-in-fact and agent of Principal for the sole purpose of executing in the name of and for Principal (i) any assignment of a certificate of title or certificate of ownership for the purpose of transferring and/or releasing any or all of Principal's interest in and to all commercial and non-commercial vehicles, (ii) to sign all papers and documents relating to the application for or renewal of licensing and/or registration; and (iii) any other document relating to the application of titles, vehicle title lien applications, lien releases, vehicles licenses, transfers, registrations, or license and registration renewals with respect to all commercial and non-commercial vehicles, and otherwise to perform any act on behalf of the principal relating to the matters set forth above. The authority herein shall include such incidental acts as are reasonable to carry out and perform the specific authorities granted herein.

My attorney-in-fact agrees to accept this appointment subject to its terms, and agrees to act and perform in said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems advisable.

Principal agrees to hold harmless Dakota Financial, LLC and any of its employees from any responsibility for the issuance or renewal of any title, license or registration to any commercial or non-commercial vehicle at the direction to the Agent.

**Vehicle Description:  2012 Kenworth T700 , Vin #: 1XKFDP9X4CJ293377**

**Anatoly Galunov, Manager, Cargo Transport Alliance, L.L.C.**
*Print Company or Individual Name*

**By:** _____ **Date:** _____
*Signature*

State of _____
County of _____
On _____ day before me, _____,
                                                          *Notary Printed Name and Title*
Personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed this instrument. **I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.** WITNESS my hand and official seal._____



## Pre-Authorized Debit Form

Lessee: Cargo Transport Alliance, L.L.C.

I, _____, hereby authorize Dakota Financial, LLC to automatically debit my bank account listed below to make payment(s) for the monthly equipment lease obligation(s) detailed in the Equipment Lease Agreement, Lease #6377 dated August 14, 2015, plus applicable fees and taxes.

Bank Name:                    _____

Account #:                     _____

Routing / ABA #:_____

Amount to be deducted:     _____

_____
Printed Name


_____
Signature


Place a voided check here



## Request for Certificate of Insurance

August 14, 2015

RE: Cargo Transport Alliance, L.L.C.

Agent: _____

Contact: _____

Phone: _____

To Whom It May Concern:

Cargo Transport Alliance, L.L.C. has entered into an Equipment Lease Agreement with Dakota Financial, LLC. Consequently, Cargo Transport Alliance, L.L.C. must show evidence of insurance on the leased equipment listed on the attached **Schedule 1**.  The policy should include auto liability, physical damage, and non-trucking liability.

Please name Dakota Financial, LLC as the additional insured and sole loss payee on the policies covering this equipment and fax the certificate to us at 310-696-3035.  Please use this for our address and other contact information:

Dakota Financial, LLC
11755 Wilshire Blvd. Suite 1670, Los Angeles, CA 90025
Ph: 310-696-3030
Fax: 310-696-3035

If you have any questions, feel free to give me a call at 310-696-3030.

Yours truly,

*Brian M. Barbetto*

Brian Barbetto, Credit Manager
Dakota Financial, LLC

I, Anatoly Galunov, authorize my insurance policy to be modified as described above.

_____

Cargo Transport Alliance, L.L.C.
Anatoly Galunov, Manager



## Schedule 1

| Equipment Description | Market Value / Equipment Cost | Serial Number |
| --- | --- | --- |
| 2012 Kenworth T700 | $62,030.00 | 1XKFDP9X2CJ296617 |
| 2012 Kenworth T700 | $62,030.00 | 1XKFDP9X5CJ293405 |
| 2012 Kenworth T700 | $62,030.00 | 1XKFDP9X2CJ296603 |
| 2012 Kenworth T700 | $62,030.00 | 1XKFDP9X7CJ293387 |
| 2012 Kenworth T700 | $62,030.00 | 1XKFDP9X4CJ293377 |
| 1992 Trailmaster Trailer | $15,000.00 | 1PTFB1TRGN9010466 |



# g1 GHERMANLEGAL PLLC
www.ghermanlaw.com

ATTORNEY AT LAW

The Ingraham Building
Eighth Floor
25 Southeast Second Avenue
Miami, FL 33131-1603

*p* (305) 459-1551
*f* (305) 459-1551

**EXHIBIT**
1

September 14, 2016

Via FedEx 777223935495
GALUNOV, ANATOLY
GALUNOVA, MARINA
1082 SE 5TH CT.
DANIA, FL 33004

Via FedEx 777223888956
CARGO TRANSPORT ALLIANCE, L.L.C.
C/O ANATOLY GALUNOV
1525 NW 167TH STREET SUITE 115
MIAMI GARDENS, FL 33169

Re: *Sergiy Kurashov vs. Anatoly Galunov, Marina Galunova, Cargo Transport Alliance, L.L.C*

Dear Mr. & Mrs. Galunov:

This correspondence is addressed to you individually as well as to Cargo Transport Alliance, LLC ("CTA") (and referred collectively, as "you"). My office represents Mr. Sergiy Kurashov and Miami Logistics Services, Inc ("MLS").

On Mr. Kurashov's behalf this letter demands the return of the unsecured loan of $168,238.50 within 20 days of your receipt of this demand. Attached you will find copies of the two receipts totaling $130,000.00 together with an invoice for an outstanding $38,238.50 the receipt of money for which you had acknowledged on several occasions.

I will get directly to the point: in 2015 you wanted to add four trucks to CTA's fleet and needed money you did not have to obtain a favorable financing from Dakota Financial, LLC ("Dakota"). To induce Mr. Kurashov to cause international wire of funds to CTA, in your 7/27/2015 correspondence you represented to Mr. Kurashov as follows:

С вами у нас будут 2 вида взаимоотношений:
1. Договор Лизинга (договор аренды с последующим выкупом 4-х таков). В рамках этого договора будет обозначен ваш первоначальный взнос на покупку и условия финансирования и выкупа.
2. Договор на эксплуатацию траков (вы в роли владельца траков передаете их нам на эксплуатацию).

Contrary to your misrepresentation, Mr. Kurashov was never an owner of the trucks.

To further camouflage the true purpose of your intent of extracting monies under false pretenses from Mr. Kurashov, in your letter of 8/14/2015, you represented to him that "You are allowed for early termination at any time after the first twelve months without any penalty and up to a 20% discount off the remaining balance due. Thus, you are NOT locked into a long-term deal." Yet, when you received the $168,238.50 and when Mr. Kurashov demanded his monies back, you flat out refused. Furthermore, in the

*Kurashov vs. Cargo Transport Alliance, L.L.C et al*
*Page 2 of 4*

8/14/2015 letter you intentionally omitted to disclose to Mr. Kurashov that CTA is not the owner of the subject trucks either. Nevertheless, by representing that "CTA will recognize this money as your buyout" you misleadingly implied CTA's ownership. Additionally, by inducing my client to enter into the lease-purchase transactions for four trucks without an independent dealer's license was fraudulent, and was also a violation of Chapter 320 of the Florida Statutes.

If you will not settle this demand within the indicated timeline, on Mr. Kurashov's behalf we will promptly file an initial suit for conversion and unjust enrichment. Should you cross-claim against MLS, then MLS will counterclaim for rescission of all agreements based on fraud, which is an attorney-fee carrying cause of action, and as predicate will also allege civil actions for violation of the Florida Communications Fraud Act, Federal Wire Fraud Act, Organized Fraud, and Conspiracy to Commit Fraud against CTA, Anatoly Galunov, and Marina Galunova. The basis for such allegations will be that the four 2012 Kenworth T700 trucks [unit ## 9–12] subject matter of the "Operating Agreement # OA/04-2015" and of the "Equipment Sub-lease Agreement" to Lease #6377/S do not belong to CTA, and never belonged to CTA, and that CTA never had a right to sublease the trucks to MLS.[1]

It will be further shown that on 9/15/2015, when you, on CTA's behalf, had fraudulently induced Mr. Kurashov to sign the "Operating Agreement" and "Equipment Sublease Agreement" on behalf of MLS, you had already executed a UCC-1 statement in Dakota's favor and also intentionally concealed that fact from Mr. Kurashov. Paragraph 19 of the "Equipment Sub-lease Agreement" provides for purchase option, which, again, shows your *per se* violation of the Florida requirement for having an independent dealer's license, and neither Anatoly Galunov, nor Marina Galunova, nor CTA have such a license.

Further, my clients are adamant, and the discovery from your financing company will promptly show, that Dakota Financial LLC had no idea of your sublease to MLS, and as such your actions were in further violation of the Florida law. Section 817.5621 of the Florida Statutes, governing "Unlawful subleasing of a motor vehicle" prohibits schemes such as yours, and makes Anatoly Galunov and Marina Galunova subject to punishment for commission of a "felony of the third degree." *See* Fla. Stat. § 817.5621. Additionally, since Dakota Financial LLC is a California company, and considering that one of your agreements with Mr. Kurashov invokes California law, pursuant to section 570 of the California Penal Code "An act of unlawful subleasing of a motor vehicle, as defined in Section 571, shall be punishable by imprisonment in the state prison or in the

---

[1] While knowing that Mr. Kurashov does not possess even rudimentary English skills, your scheme went as far as to shamelessly make him sign a "Personal Guarantee", and a "Delivery and Acceptance Certificate" sight unseen. These documents are void *ab initio* for the same reason of illegality as explained above.

Additionally, should you purport that you acted as an agent for Dakota Financial, LLC, then we will sue Dakota Financial LLC as the principal on this deal.

county jail for not more than one year, or by a fine of not more than ten thousand dollars ($10,000), or by both that fine and imprisonment."

Florida law further provides that notwithstanding any other remedy or relief to which a person is entitled, anyone suffering damage as a result of a violation of this provision may bring an action to recover or obtain actual damages; equitable relief, including, but not limited to, an injunction or restitution of money and property; punitive damages; reasonable attorney's fees and costs; and any other relief the court deems proper. *See* Fla. Stat. § 817.5621(3). My clients will be fully availing themselves of the benefits of this provision.

Indeed, both agreements are void *ab initio* due to their illegality, and you would be precluded from enforcing them against MLS and/or against Mr. Kurashov. In Florida, public policy mandates that "no action may be maintained on an 'illegal' agreement." *See Castro v. Sangles*, 637 So.2d 989, 990 (Fla. 3d DCA 1994); *D&L Harrod, Inc. v. U.S. Precast Corp.*, 322 So.2d 630, 631 (Fla. 3d DCA 1975) ("There is no legal remedy for that which is illegal itself"); *see also Katz v. Woltin*, 765 So.2d 279 (Fla. 4th DCA 2000) (agreement to sell stock in restaurant to salon operator was unenforceable because liquor statutes do not allow operators to have a felony conviction).

From the standpoint of your attempt to enforce these agreements, Mr. Kurashov's intent will not even matter. "In general, Florida courts are under no obligation to discern the intent of the parties from language contained within an illegal contract." *One Harbor Financial Ltd. Co. v. Hynes Properties, LLC*, 884 So.2d 1039 (Fla. 5th DCA 2004). Notwithstanding the aforementioned, CTA's performance of the "Operating Agreement # OA/04-2015" and of "Equipment Sub-lease Agreement" is laced with fraud as well. Our expert reviewed CTA's FY2016 "Statements of Owner Operator Account" and has concluded that based on the fuel consumption, the national reefer rate, on your own projected rate in the 7/27/2015 e-mail, and on the data from the statements you submitted to Mr. Kurashov, CTA misrepresented the profits from, and fraudulently allocated losses to, trucks 9 – 12 thereby depriving my clients from the benefits of their supposed bargain. Please note a technical point, that since Julia was involved in compiling the statements, and in Mrs. Galunova's absence Julia was transmitting them to my clients, her participation as a defendant is not excluded at this point.

Indeed, the list of potential claims and defenses outlined in this letter is by no means exhaustive, and this letter reserves the right to assert additional claims and defenses as the necessity arises. Considering that your actions placed Mr. Kurashov into a financial hardship of such degree that he had to leave this country, a country in which he came also based on your false and shameless enticements of a steady income "pessimistically at $4,480.00" per month, my clients give you a very generous 20-day period to right your wrongs, and return the funds. Moreover, while not obligated under the law, my client is amenable even to consider Ms. Galunova's current health condition, and give you a reasonable payment plan to return the $168,238.50 with interest at the Florida statutory prejudgment rate of 4.75% from 8/26/2015, in exchange for a general release. This letter precedes filing of a lawsuit and presents you with one chance to settle the dispute before a lawsuit is filed and before the attorney's fees and court costs begin to accrue. Your insurance, if any, most likely will not tender either a defense or coverage in

*Kurashov vs. Cargo Transport Alliance, L.L.C et al*
*Page 4 of 4*

this suit; therefore, proceed wisely, since debts obtained by fraud are not dischargeable in bankruptcy, should that thought cross your mind.

      I encourage you or the attorney that would be representing Cargo Transport Alliance, LLC, Anatoly Galunov, and Marina Galunova, to contact me about the subject matter discussed in this letter. Please direct all communications on this matter to my office, and should you reach out directly to Mr. Kurashov, we will treat this as harassment. Please be governed accordingly.

Sincerely,

Sergiu Gherman, Esq.

**RECEIPT** DATE 08/26/2015 No. 446301

RECEIVED FROM _Sergey Kurashov_  $ 70,000

_seventy thousand only ————_ DOLLARS

FOR RENT / FOR _Down Payment for Financing Trucks_

| ACCOUNT | | CASH |
| PAYMENT | | CHECK |
| BAL. DUE | | MONEY ORDER / CREDIT CARD |

FROM _Goldwyn Info CTA Citi a/c_

BY _Cargo Transport Alliance LLC_

---

**RECEIPT** DATE 08/31/2015 No. 446302

RECEIVED FROM _Sergey Kurashov_  $ 60,000

_Sixty thousand only ————_ DOLLARS

FOR RENT / FOR _Down Payment for Financing Trucks_

| ACCOUNT | | CASH |
| PAYMENT | | CHECK |
| BAL. DUE | | MONEY ORDER / CREDIT CARD |

FROM _Goldwyn Inc CTA Citi a/c_

BY _Cargo Transport Alliance LLC_

Cargo transport Allence, LLC
1525 NW 167th Street Ste 115
Miami Gardens
Florida 33169

# I N V O I C E

Sergey Kurashov

| | |
|---|---|
| **Invoice #** | 0000001 |
| **Invoice Date** | 09/03/2015 |
| **Due Date** | 09/03/2015 |

| Item | Description | Unit Price | Quantity | Amount |
|------|-------------|-----------|----------|--------|
| | Down Payment for Financing Trucks | 31500.00 | 4.00 | 126,000.00 |
| | Processing fee | 450.00 | 1.00 | 450.00 |
| | Truck registration, plate numbers | 1750.00 | 4.00 | 7,000.00 |
| | Insurance down payment | 4464.25 | 4.00 | 17,857.00 |
| | GPS (ELD, Delivery fee, Installation) | 250.00 | 4.00 | 1,000.00 |
| | Refrigerators fir trucks | 130.00 | 4.00 | 520.00 |
| | ElectroInventor | 350.00 | 4.00 | 1,400.00 |
| | Trailer rent (Reefer) Sec dep and first month | 2400.00 | 2.00 | 4,800.00 |
| | Trailer rent (Dry Van) Sec dep and first month | 1300.00 | 2.00 | 2,600.00 |
| | Oregon Permit and bond | 350.00 | 4.00 | 1,400.00 |
| | Truck delivery: (air tickets) | 268.85 | 4.00 | 1,075.40 |
| | Truck Inspection: | 588.10 | 1.00 | 588.10 |
| | Trucking positioning: | | | |
| | - Fuel expenses | 1810.00 | 1.00 | 1,810.00 |
| | - Driver compensation | 1738.00 | 1.00 | 1,738.00 |

| | | |
|---|---|---|
| **Subtotal** | | 168,238.50 |
| **Total** | | 168,238.50 |
| **Amount Paid** | | 130,000.00 |
| **Balance Due** | | $38,238.50 |



August 14, 2015

Dear Sergey,
Here is your approval based on the revised request and the terms in which we are willing to proceed.

1. Lessee: Sergey Kurashov
2. Equipment: Four 2012 Kenworth T700 trucks
3. Amount: $280,000 (plus sales taxes if applicable) less ($45%) $126,000 down payment/security deposit = $154,000 financed
4. Term: 48 months.
5. Payment: $5,770 (First payment not due until 30 days after funding occurs). *
6. Down Payment: $126,000 due at lease signing.
7. Purchase option: Security deposit $20,000 may be applied. This is NOT an additional cost. CTA will recognize this money as your buyout.
8. Processing fee: $450 to cover title searches, quik-trac inspections on the collateral equipment, preparation of and emailing the documents.
9. Insurance: Dakota Financial, LLC to be named loss payee and additional insured on your policy covering the four leased trucks.
10. Personal Guaranties: Sergey Kurashov

*Note: You are allowed for early termination at any time after the first twelve months without any penalty and up to a 20% discount off the remaining balance due. Thus, you are NOT locked into a long-term deal.

Before we can proceed we need emailed to us the following items:

1. Copy of a regular Check made payable to Cargo Transport Alliance LLC in the amount of $450 representing our processing fee. We don't need the hard copy check just a photocopy emailed to Olga.
2. $20,000 shall be remitted to Lessor at the account provided below upon signing this Approval.

| | |
|---|---|
| Beneficiary's Bank: | CITI BANK |
| Beneficiary Name: | Cargo Transport Alliance LLC. |
| Account No.: | 3290325343 |
| ABA Routing #: | 067004764 |

3. Please sign below your acceptance of our approved terms and email ceo@cta-fl.com.
   Please get back to me as soon as possible. We can move quickly with everyone's cooperation.

Thanks,
Anatoly.

I HAVE READ AND UNDERSTOOD THE TERMS OF THIS APPROVAL

_____

Sergey Kurashov

**Cargo Transport Alliance LLC**
1525 NW 167th St, Office #115 / Miami Gardens, FL 33169



**From: Anatoly Galunov** anatoly.galunov@gmail.com
**Subject:** Re: См. вложенный файл
**Date:** July 27, 2015 at 2:25 PM
**To:** Владимирович Сергей senior.kcb@yandex.ua

Сергей, добрый день!
Отвечаю на ваши вопросы.
**1) Передача денег: есть два варианта.**
   1. Передать наличные, как вы предлагаете. Физически получить деньги здесь не является проблемой (в том числе и в другом городе). Значительно большей проблемой является легализация этой суммы. Американские Власти очень отрицательно относятся к наличным (особенно в крупных размерах). У меня есть хороший приятель (мощный юрист, работал в международной комиссии по противодействию отмывания денег). Он мне рассказал очень много интересных примеров и историй. Не буду все это рассказывать, скажу только одно: настоятельно не рекомендую связываться с наличными. (это может негативно сказаться и на вашем иммиграционном деле и на принятии решения по финансированию бизнеса). Поверьте, уж больно не любят они больших наличных денег, с непонятным происхождением, особенно от "русских".
   2. Я могу вам предложить абсолютно легальный и "красивый" способ (которым, собственно, я сам воспользовался). Я вам дам счет моей компании в Латвии (европейский банк). Вы переводите деньги на этот счет (если у вас деньги уже наличные, то за перевод наличных в безнал вы еще можете заработать плюс 2-3%, что мелочь. но приятно.) Основанием для перевода денег будет являться договор на приобретение 4-х Траков (все, как и есть на самом деле). А уже оттуда деньги будут переведены в америку. Способ проверенный, легальный и безопасный, полностью контролируемый мной лично.

**2)** Приобретение Траков и оформление страховок без вашего присутствия абсолютно возможны. Более того, ваше присутствие и не нужно. Мы с вами подпишем все договора по электронной почте. Оригиналы отправим курьерской почтой DHL. Поскольку речь идет не о прямой покупке (за 100%), а о финансировании, то и "Тайтлы" на Траки будут вам переданы только после оплаты последнего платежа по лизингу (т.е. через 48 месяцев). Сейчас траки будут оформляться на имя Финансовой компании и передаваться на эксплуатацию в вашу транспортную компанию.
С вами и нас будут 2 вида взаимоотношений:
   1. Договор Лизинга (договор аренды с последующим выкупом 4-х таков). В рамках этого договора будет обозначен ваш первоначальный взнос на покупку и условия финансирования и выкупа.
   2. Договор на эксплуатацию траков (вы в роли владельца траков передаете их нам на эксплуатацию). Наше вознаграждение будет составлять 12% от объема продаж.

**3)** Официальное трудоустройство в данный момент невозможно.  Для официального трудоустройства в любую Американскую компанию вам необходимо иметь Разрешение на работу в этой стране. Вы сможете обратиться за данным разрешением только после получения соответствующего статуса (в вашем случае, после одобрения и принятия властями вашего иммиграционного дела и предоставления вам статуса Политического беженца).

Теперь давайте посмотрим, что можно ожидать от эксплуатации Траков.

**Доходная часть:**
1. "Соло" водитель может делать на Траке 3-3,5 тысячи миль в неделю. График работы: 3 недели в пути/ 1 неделя дома. Итого в месяц 10-11 тысяч миль на трак в месяц. (назовем это "Пессимистичный прогноз" = 10,000 миль в месяц на трак)
2. "Команда" может делать 5-6 тысяч миль в неделю. Также 3 недели в месяц. Итого в месяц на трак: 15-18 тысяч миль (Обозначим, как "оптимистичный прогноз" = 15,000 миль в месяц на трак)
3. На данный момент наш средний рейт на Риферах составляет 1,87 - 1,93 $ за милю. (будем считать по 1,90 $/Mil)

Итак, расчетный грязный доход в месяц:
   Пессимистичный (10,000 миль): $ 19,000 х 4 = $ 76,000
   Оптимистичный (15,000 миль): $ 28,500 х 4 = $114,000

**Расходная часть:**
1. Лизинговый платеж          $ 6,600 (За все 4 трака в месяц)
2. Страховка                  $ 5,600 (все 3 вида на все 4 трака в месяц)
3. Техническое обслуживание   $ 8,000 (колеса, тормоза, масло и мелкие поломки на все 4 трака)
Итого постоянных расходов:    $ 20,200

Операционные расходы:
|                          | Пессимистичный           | Оптимистичный            |
|--------------------------|--------------------------|--------------------------|
| 1. Топливо               | $ 4,600 х 4 = $ 18,400   | $ 6,800 х 4 = $ 27,200   |
| 2. Водители              | $ 4,800 х 4 = $ 19,200   | $ 8,250 х 4 = $ 33,000   |
| 3. Административные (12%) | $ 9,120                  | $ 13,680                 |
| 4. Аренда трейлеров      | $ 1,200 х 4 = $ 4,800    | $ 1,200 х 4 = $ 4,800    |
| Итого:                   | $ 51,520                 | $ 78,680                 |

|                      | Пессимистичный  | Оптимистичный  |
|----------------------|-----------------|----------------|
| Финансовый результат:| $ 4,480         | $ 15,120       |

Средний ожидаемый:  $ 8,000 - $10,000 в месяц.
(при учете вложенных инвестиций в размере $100,000 - $120,000 и Пессимистичном сценарии ($4,500 в месяц): доходность проекта в районе 50% годовых (в первые 4 года)  + через 4 года в собственности 4 трака, на общую остаточную стоимость $180,00 - $192,000).

С уважением, Анатолий.



Отправитель: **Anatoly Galunov** anatoly.galunov@gmail.com
Тема: **Re: Привет с Украины.**
Дата: **27 июля 2015 г., 0:40**
Получатель: **Владимирович Сергей** senior.sch@yandex.ua

Сергей, добрый день!
Как обещал, хочу описать более подробно предстоящий процесс.
1. Поиск подходящих траков. Перед нами стоит задача поиска таков, выпуска 2010-2012 годов, с пробегом 350-400 тысяч миль. Необходимо покупать все траки у одного покупателя (возможность получить скидку и послепродажную гарантию). У нас уже сложились деловые отношения с такой компанией (это один из лидеров в США по продаже, эксплуатации и обслуживанию). можете посмотреть их сайт https://www.pbic.com. Я разговаривал с ними на прошлой неделе. у них в Канзас Сити сейчас есть хорошие траки с небольшим пробегом (они скупили целый флот около 30 таков у одной крупной траковой компании) и мы можем выбрать 4 трака с одинаковыми параметрами с низким пробегом. Здесь нужно понимать, что рынок достаточно динамичный. То, что у них есть сейчас, через неделю может быть продано. (особенно с такими параметрами, как нужно нам). Как правило, первыми раскупают траки с наименьшим пробегом. в этом нет ничего удивительного. Как обычно поступают в такой ситуации? Мы выбираем конкретные машины, обговариваем цену и отправляем Вам на утверждение. Если всех все устраивает, нужно будет сразу заплатить депозит, чтобы эти траки убрали с продажи и зарезервировали для нас. (обычно по 5,000$ за трак). Для того, чтобы найти подходящие траки, нам нужно несколько дней. Поэтому, я хотел вам посоветовать, чтобы первые 20,000 были готовы на следующей неделе. Будем называть это "Первый транш". Конечно же, депозит будет оформлен документально. Сначала вы получите официальное письменное предложение, где будут указаны ВИН номера траков и их предлагаемая цена и условия. Вы подписываете это предложение и после этого вам выставляется счет на депозит, который будет зачтен в сумму покупки этих траков.

2. После того, как депозит оплачен и траки зарезервированы, мы начинаем работу над финансированием. Копия вышеуказанного Предложения (с ВИН номерами, ценой и координатами Продавца) направляются в Финансовую организацию для рассмотрения условий финансирования сделки. Этот процесс может занять от одной до двух недель. В случае, если кредитный комитет одобряет сделку, нам будет направлено письменное предложение по сумме, срокам и условиям финансирования, которое будет действовать 30 дней. Если условия финансирования нас устраивают, мы подписываем (принимаем) это предложение и даем "добро" на совершение сделки. Вам выставляется счет на сумму первоначального платежа(с учетом уже оплаченного депозита), который необходимо оплатить для совершения сделки. Это может быть 40-50% от суммы сделки, но с учетом наших взаимоотношений, мы постараемся договориться на 30%.
Это будет "Второй транш". (будет еще и третий транш, и пятый…., но об этом чуть позже). Дальше финансисты сами связываются с Продавцом и оформляют сделку. Это занимает еще около двух недель. (вот уже месяц прошел…)

3. Теперь давайте посчитаем, на что мы можем расчитывать?
Средняя цена траков, которые нам нужны - 60-75,000 $. (дешевле - значит старше и с большим пробегом, настоятельно НЕ рекомендую. Имейте в виду: мы покупаем Траки на условиях "AS IS" (как есть), это означает, что как только вы купили трак, все дальнейшие расходы на поддержание лежат на вас. На старые траки уже нет возможности поставить их на гарантию, они чаще ломаются, требуют больших затрат (затраты как правило незапланированные и в самый неподходящий момент). Но самое неприятное, что когда трак встал: а) он не зарабатывает денег, б) мы вынуждены отменять запланированные рейсы, с) мы теряем репутацию в глазах партнеров, d) если это скоропортящийся груз - мы несем колоссальные убытки/штрафы е) водители, как правило начинают разбегаться (никто не будет ждать, когда починят трак) а платить водителю за простой - очень накладно. Для справки, ремонтируют траки в Америке очень неспеша, но при этом лизинговые платежи никто не отменит (их платить нужно в не зависимости от состояния трака). Ну, это так, лирическое отступление.
Короче, рекомендую брать не выше 450,000 миль, чтобы на них можно было купить гарантию на минимум 200,000 миль/2года или 375,000 миль/3 года. В таком случае вы застрахованы, по крайней мере от неожиданных затрат.

Возвращаемся к цифрам. если взять для расчета минимальную цену трака (сделаем все возможное, чтобы так и было) пусть это будет 60 тысяч, тогда мы выходим на сумму сделки в 240,000$.
Пусть сумма первоначального платежа - 30%. (соответственно 72,000$) (т.е. первый транш - 20,000 и второй - 52,000)

4. До завершения сделки купли-продажи необходимо оформить страховку на траки. Существует 3 обязательных вида страхования: 1). сам трак на полную стоимость(сумму сделки). сейчас рейт 5,3% (еще не каждая страховая компания возмется). Итого на 4 трака = 12,720 $. 2). Страховка груза, перевозимого траком (примерно 1,850 на трак на год = 7,400$ и 3). Ответственность в пользу третьих лиц на сумму не менее 1 млн. $. Это самая дорогая страховка. Для начинающих компаний рейт может составлять до 25 тысяч за трак в год. Мы будем расчитывать на 11,700 $ за трак. итого на 4 трака = 46,800$.
Итак, полная стоимость страховки на 4 трак будет составлять: 12,720 + 7,400 + 46,800 = 66,920 $. Эту сумму мы тоже профинансируем. Я думаю, договоримся на 25% первоначального платежа плюс 9 ежемесячных платежей.
Тогда нужно будет оплатить только 16,730$ за страховку. (это "Третий Транш")

5. Теперь траки надо зарегистрировать и получить номера. (в зависимости от трака и Штата регистрации - от 1,700$ до 2,500$). Предлагаю регистрировать на нашу компанию (во Флориде) будет 1750$ за трак. Итого 4 трак = 7,000$. Это "четвертый транш".

6. Теперь нужно найти трейлеры. (покупать, как я понимаю вы не собираетесь) (для справки: новый трейлер стоит около 75 тыс. долларов, 2011-2012 годов - 44 - 53,000$). Я рекомендую - рефрижераторы. (проще найти водителей. Есть водители, которые сформируют команды. На флэт-бэд очень сложно найти правильного водителя). Сейчас с холодильниками в аренду очень туго (разгар сезона), но все-же постараемся найти. я арендую трейлер за 1200$ в месяц. (1 месяц депозит плюс первый месяц предоплата итого по 2400 на трак). Допустим, что вам мы найдем такие же условия. Тогда 4 трака = 9,600$ (Это "Пятый Транш")

7. Итого по деньгам:



EXHIBIT
E

1 транш 20.000 (депозит за резервирование)
2 транш 52.000 (первоначальный платеж при покупке)
3 транш 16.730 (первоначальный взнос на страховку)
4 транш 7.000 (регистрация)
5 транш 9.600 (аренда трейлеров)
Итого: 105.330 $ (примерно выходим на озвученную вами цифру)

Справедливости ради должен напомнить, что мы не посчитали стоимость дополнительной гарантии (от 4,950 до 9,650 за трак). Я приложу максимум усилий, чтобы включить эту сумму в стоимость трака при покупке в качестве дополнительной скидки). Также нужно иметь в виду, что будут небольшие расходы на оборудование каждого трака холодильником, микроволновкой, трансформатором питания, грузовыми замками, инструментами и разной мелочевкой, типа наклеек на кабину с номерами ДОТ (обязательное требование властей), установка  GPS, электронных транспордеров (для платных дорог) получение платных разрешений на проезд некоторых штатов и т.д. Возможно будет необходимо "переобуть" траки (многие крупные компании используют суперсинглы, нам это не надо) Но, это мы все выясним после того, как отправим наших технарей на физическую инспекцию таков и трейлеров.Ну и, конечно не забывайте про командировочные расходы на инспекцию, и на то, чтобы забрать траки и трейлеры от продавцов и подготовить к рейсу.

Теперь поясню, почему я об этом написал.
Как видите, процесс не быстрый. Если не будет задержек по финансированию - займет около 1,5 - 2 месяцев. Если начнем со следующей недели - есть все шансы начать работу к середине сентября. Считаю это очень важным. Если начнем работать в сентябре - тогда попадем в "хороший" сезон (всплеск деловой активности после лета и приближающиеся Новогодние праздники (всегда связаны с перемещением большого количества товаров). В декабре начнется спад. Плюс - зима (погода). Понимаете, да? Если мы начнем весть этот процесс после вашего приезда в Сентябре, то мы как раз будем "входить" в работу в самый низкий сезон в Декабре, что крайне нежелательно (в первую очередь для вас).

Сергей, у меня сейчас пол-первого ночи. Я пойду спать. Вы внимательно прочитайте, все, что я вам написал, а я вам завтра напишу вторую часть (более приятную) про то, что вам следует ожидать от эксплуатации ваших 4-х траков. Постараюсь написать также доходчиво и реалистично.
Привет семье. С уважением, Анатолий.

P.S. извиняюсь за ошибки, опечатки и стилистику. :)

On Jul 24, 2015, at 23:17, Блошмирский Сергей <serge.kab@yandex.ru> wrote:

Анатолий спасибо! Отвечаю с задержкой т.к. Ваше письмо уже пришло глубокой ночью у нас.Хороших выходных.

Сергей, добрый день!Я уже провел предварительные переговоры и с финансовой компанией, и с поставщиками траков и со страховой компанией. В целом все подтвердилось.
Мы также начали работу по набору дополнительных водителей. Для того, чтобы вы ориентировались, и вам подробно опишу, как будет выглядеть весь процесс и к чему вам быть готовым, (к определенному приходу)
По поводу аренды/покупки дома/квартиры я вам рекомендую для начала посмотреть вот эти два сайта. Там есть и аренда и продажа.
http://www.zillow.com/miami-fl/
http://www.homes.com/#search
С уважением, Анатолий.

Best regards,
Anatoly Galunov
ceo@cto-fl.com
www.cto-fl.com

1A955943-0CBC-4D44-8EBB-3D8D703A1977@bbl1.atele.comcast.net

Golden Glades Office Park
Office 115, 1525 NW 167/th St.
Miami Gardens, FL 33169
Tel: 954 889 3223
Fax: 305 735 7427

Best regards,
Anatoly Galunov
+992 44 600 29 29
anatoly.galunov7@gmail.com
ceo@eastoil.tj
www.eastoil.tj

24 июля 2015 г., в 2:14, Владимирову Сергей <verloff\co4yctcdo.usc> написал(а):

------- Пересылаемое сообщение -------

Ув.Анатолий здравствуйте!Свидетельствую свое почтение и хочу проинформировать ,что у меня все идет по намеченному плану ,как запись сделать.

У нас билеты на 6.09.2015 года.Хочу подтвердить наше соглашение,я прошу вас оказывать помощь, к. поврежика ,то будет автомонтаж,по при про что для меня это и жизненно-важно. Я очень надеюсь на благосклонное отношение ко мне Ситиз-банка и поэтому зайте поручение искать, мне все же как я говорил 6 единица техники в эту периметра о которых мы обсуждали.

Наша Родина опять в предреволюционном состоянии боюсь, что бы не развалось это все ушла.

Порекомендуйте район в котором по нашему лучше пока снять квартиру, а потом и купить.

Передавайте привет Вашей семье до скорой встречи. С ув.Курилов С.Н.



**Отправитель:** **Anatoly Galunov** anatoly.galunov@gmail.com
**Тема:** Re: См. вложенный файл
**Дата:** 28 июля 2015 г., 18:05
**Получатель:** Владимирович Сергей senior.kcb@yandex.ua



Я вам сейчас направлю коротенький "Договор о намерениях" (в течении часа) (Я сейчас на встрече).

On Jul 28, 2015, at 16:33, Владимирович Сергей <senior.kcb@yandex.ua> wrote:

Я готов. У меня в Майами уже есть деньги в Сити-банке, поэтому солиддаем. Прошу отдать предпочтение мне. С уже нашедей Курапов

Сергей, добрый день!

Я совершенно не настаиваю на переводе денег через Прибалтику, это всего лишь предложение. Если у нас уже есть подтверждение по Майами – делайте через Майами.

Единственно, что я хочу понимать – это сроки, в которые вы готовы начать финансирование проекта, чтобы мы, в свою очередь, начали поиск, и выстроили поиск и приобрели и сбор дополнительных водителей.

Наша страховая компания LLOYDS of London весьма консервативна и очень настороженно относится к быстрому росту компании. Она нам настоятельно рекомендует не добавлять более 2-х такси в месяц.

У меня есть 2 идеальных такси проекта и вам в компанию. Если мы начинаем проект с вами, тогда я отдам им и буду договариваться со страховой компанией о добавлении наших 4-х такси в течении августа и сентября.

С уважением, Анатолий.

On Jul 28, 2015, at 15:15, Владимирович Сергей <senior.kcb@yandex.ua> wrote:

Анатолий привет клубНадо время получить и изучить финансовое обеспамывающий наше нахождение т.к. деньги наши деньги берут особенно в налогах т.дни попадем, и выпускают их сложно и долго... А перевести денег по Майами мы уже подтверждены согдам. Я сид воду меня. Что касается сотрудника документом давать согдам. Что думаю Еще чувствую готовить, и переводим наличные в безналичные через вести и буду в Америке. Такова сегодня ситуация в налесь гранд.Дома "заковчивал" сбрасывать валюту и мне удалось, на этой цене участвую реализовать дом и пр.

Жду от Вас инструкции по документам.С ув Курапов

Сергей, добрый день!

Отвечаю на ваши вопросы.

1). Пересылка денег есть два варианта.
1. Пересылка наличными, как вы предлагаете. Физически получать деньги здесь не является проблемой (в том числе и в другом городе). Значительно большей проблемой является легализация этой суммы. Американские власти очень отрицательно относятся к наличке (особенно в крупных размерах). У меня есть хороший приятель (ведущий юрист, работал в межгаражной ассоциации по противодействию отмыванию денег). Он мне рассказал очень много интересных примеров и историй. Не буду все это пересказывать, скажу по паре одной: настоятельно не рекомендую связываться с наличными. (это может негативно сказаться и на нашем иммиграционном деле и на принятии решения по финансированию бизнеса). Поверьте, уже больше не любят они большие наличные денег, с неприятным предложением, особенно от "русских".

2. Я могу вам предложить абсолютно легальный и "красивый" способ (который, собственно, я сам воспользовался). Я вам даю счет моей компании и Логин (персональная база). Вы переводите денег на этот счет (если у вас деньги уже наличными то вы первоначально в деньги на счет можете заработать плюс 2-3%, что мелочь, но приятно). Основанием для перевода денег будет между договор на приобретение 4-х Трюков (все, как и есть на самом деле). А уже оттуда деньги будут перечислены в покупку. Способ проверенный, легальный и не пошли лял, полностью контролируемый мой мной лично.

2). Приобретение Трюков и оформление страховки без вашего присутствия абсолютно возможно. Более того, ваше присутствие и не нужно. Мы с вами получаем все договора по электронной почте. Оригиналы отправим курьерской почтой DHL. Поскольку речь идет не в единый выкупи (за 100$), а о финансировании, то и "Тайтлы" на Трюки будут вам переданы только после оплаты последнего платежа по лизингу (т.к. через 48 месяцев). Сейчас граки будут оформляться на имя Финансовой компании и передаваться по эксплуатацию в вашу транспортную компанию.

С вами у нас будет 2 вида взаимоотношений:
1. Договор Лизинга (договор аренды с последующим выкупом 4-х такси). В рамках этого договора будет обязанны ваш первоначальный взнос на покупку и условия финансирования и выкупа.
2. Договор на эксплуатацию граков (вы в роли компании гракам передаете их вам по эксплуатации). Наше вознаграждение будет составлять 12% от объема продаж.

3). Оформление трудоустройства в данный момент невозможно. Для официального трудоустройства в любую Американскую компанию вам необходимо иметь Разрешение на работу в этой стране. Вы сможете обратиться за данным разрешением только после получения соответствующего статуса (в вашем случае, после оформления и принятия властями вашего иммиграционного дела и предоставления вам статуса Политического беженца).

Теперь, давайте посмотрим, что можно ожидать от эксплуатации Трюков.

Доходная часть.
1. "Соло" водитель может делать на Трюке 3-3,5 тысячи миль в неделю. График работы: 3 недели в пути/1 неделю дома. И того в месяц 10-11 тысяч миль на грок в месяц. (получаем для "Исключительный пробег" – 10 000 миль в месяц на грак)

2. "Команда" может делать 5-6 тысяч миль в неделю. Также 3 недели в месяц. Итого в месяц на трак 15-18 тысяч миль. (Обозначим как "оптимистичный прогноз" = 15,000 миль в месяц на трак)

3. На данный момент наш средний рейт на Риферах составляет 1,87 - 1,93 $ за милю. (Будем считать по 1,90 $//ай).

Итак, расчётная годовой доход в месяц:
Пессимистичный (10,000 миль): $ 19,000 х 4 = $ 76,000
Оптимистичный (15,000 миль): $ 28,500 х 4 = $ 114,000

Расходная часть:
1. Лизинговый платеж $ 6,600 (за все 4 трака в месяц)
2. Страховка $ 5,600 (все 3 вида на все 4 трака в месяц)
3. Техническое обслуживание $ 8,000 (колеса, тормоза, масло и мелкие поломки на все 4 трака)
Итого постоянных расходов: $ 20,200

Оперативные расходы:
Пессимистичный Оптимистичный
1. Топливо $ 4,600 х 4 = $ 18,400 $ 6,800 х 4 = $ 27,200
2. Водители $ 4,800 х 4 = $ 12,200 $ 8,250 х 4 = $ 33,000
3. Административные (12%) $ 9,120 $ 13,680
4. Аренда трейлеров $ 1,200 х 4 = $ 4,800 $ 1,200 х 4 = $ 4,800
Итого: $ 51,500 $ 78,680

Пессимистичный Оптимистичный
Финансовый результат: $ 4,480 $ 15,120

Средний ожидаемый: $ 8,000 - $10,000 в месяц.
(при учете вложенных инвестиций в размере $100,000 - $120,000 в Пессимистичном сценарии ($4,500 в месяц): доходность проекта в районе 50% годовых (а первые 4 го д) + через 3 года в собственности 4 трака на общую остаточную стоимость $130,00 - 1192,000).

С уважением, Анатолий.



Отправитель: **CTA CEO** ceo@cta-fl.com 📎
Тема: Re: Соглашение о намерениях
Дата: 29 июля 2015 г., 23:39
Получатель: Владимирович Сергей senior.sch@yandex.ua

Сергей, добрый день!
Подписанное письмо получил, спасибо.

Сегодня мы начали активный поиск траков. Ситуация следующая:

Напомню, что мы обозначили в нашем LOI ценовой диапазон в 55-70 тысяч за трак и 2011-2012 годы выпуска. В предварительных расчетах мы ориентировались на 60 тысяч за трак (без доп. гарантии).
Флот Питербилтов (о которых мы говорили на прошлой неделе активно раскупается) 350-450 тыс миль уже не осталось, есть диапазон 550-700 тыс миль (что не очень-то хочется).
Есть огромное количество машин 2012-13 годов с небольшим пробегом, но цена начинается от 77 - 80 тысяч. (я такие варианты не рассматривал, по ценовом параметру)

Что есть в наличии: (что заслуживает внимания и от дорогого к более дешевому):

1. Есть **KENWORTH T700, 2012 года**, двигатель Детройт 455 лс, коробка автомат, алюминиевые колеса с пробегом  418,ххх + тыс миль, с ВСУ, отличное состояние (из одного флота).
**Цена $ 69,950** (без гарантии).  Дополнительная гарантия (на все, включая ДПФ, трансмиссию и двигатель) на 1 год/120,000 миль = $4,450,  2 года/200,000 миль - $6,950,  3 года/370,000 миль - $9,250.
Сразу скажу - цена уже с учетом скидки и очень хорошая для такой машины.(Для сравнения, в апреле я искал KW T700 для одного человека - самое дешевое, что нашли было: 2012 T700 327XXX miles - $77950.00)

"до последней капли" мы еще не торговались. (я сначала хочу посоветоваться с вами - за что биться?), но с  учетом уже сложившихся отношений и того, что мы у них уже купили 5 машин и будем покупать еще 4 машины, я рассчитываю на скидку 1,5-2 тысячи на каждую машину. Не гарантирую, но попробую "сломать" на включение годовой гарантии (4,450) в указанную цену и договориться, чтобы на второй год мы купили гарантию в конце следующего года. (так мы дополнительно сэкономим деньги сейчас, при покупке). Если биться за чистую скидку на саму машину - больше, чем 1,5 тысячи не дадут, а вот с гарантией можно поиграть, таким образом мы можем получить дополнительную скидку на четырех траках $17,800.



 

Сразу комментарий:

KW T700 - машина шикарная, очень надежная. Из плюсов - гигантское количество сервисных центров по все Америке (на каждом трак-стопе) Его ремонтируют и в самих Кенворсах и на любом Фрэйтлайнере и Интернешнале.

Огромный плюс - предустановленная ВСУ. Это будет вам экономить 50-60 долларов в день(особенно зимой), что есть $1,500-$1,800 долларов в месяц и, соответственно 18-20 тысяч в год на каждый трак!

Для справки, если самостоятельно устанавливать ВСУ на трак, это будет стоить 20-25,000)

Американские водители очень любят Американские машины (легче найти водителей) и под Американцев нужно брать автомат (многие не только не любят стик, но и просто не умеют на нем ездить (убивают сцепление).

Недостаток - чуть дороговато в нашей ситуации, немного выбивается за расчетный бюджет, но того стоит!

2. Есть **KENWORTH T660, 2011 года**, двигатель Детройт 455 лс, коробка автомат с пробегом 527,ххх тыс миль, с ВСУ, отличное состояние. **Цена $ 61,500** (без гарантии).





Комментарии: машина хорошая (у нас во флоте есть один Т660).Из минусов: пробег 527ххх (уже многовато) и он всего один (другие с пробегом за 600) (есть также 2012 год, но там уже цена 74500)

3. Есть еще один флот Freightliner, Cascadia. 2010 год. Пробег 446ххх миль... ВСУ, автомат, (с одного флота).
**Цена $ 58,500** (без гарантии).
Комментарии: Фрейтлайнеры любят "русские" водители. (У Нас во флоте 2 фрейтлайнера Каскадия, правда 2016 года, но и цена у них в салоне 167,000 каждый). Плюсы: машина надежная, приемлемый пробег (450ххх+)гигантское количество сервисных центров по всей Америке (на каждом трак-стопе). Из минусов: 2010 год. (хорошего водителя сложно затащить на старый трак (каждый хочет 2016 год).









Отправитель: **Anatoly Galunov** anatoly.galunov@gmail.com
Тема: Re: комментарии
Дата: 30 июля 2015 г., 8:57
Получатель: Владимирович Сергей senior.kcb@yandex.ua

Сергей, добрый день!
Ваша позиция понятна.
Что касается перевода: вы можете сделать это онлайн. Зайдите на ваш счет в Ситибанк и в разделе "Payments and Transfers" выберете "Citibank global transfers -US/abroad" и дальше - "transfer to a Citibank client". Система попросит сначала добавить нового получателя ( в данном случае - это Cargo Transport Alliance ).
Идите в "Add recipient account" введите запрашиваемые данные и сохраните. В последующем, вы сможете делать перевод нажатием " одной кнопки" (приготовьте ваш американский телефон, который вы указали в банке при открытии счета. Система вам отправит смс с кодом на этот телефон)
Этот вид перевода денег совершенно бесплатный.
Вы также можете выбрать "wire transfer" , но это стоит от 17 до 25 $ за перевод.

С уважением, Анатолий.
Отправлено с iPad

30 июля 2015 г., в 4:25, Владимирович Сергей <senior.kcb@yandex.ua> написал(а):

Толя,Добрый день! В приобретении машин я всегда отдавал предпочтение меньшему пробегу,если он проверяем и не скручен и техническому состоянию.А если принять Ваши критерии до 10-15 тыс. долларов не должна менять приобретать хороший трак.Поэтому рассматривайте возможность увеличения стоимостей,где будем надеяться на увеличение результативности.Ну а этот online г-700 красавец .Конечно дополнить прошу по всем где возможно.
У меня уже много забот по подготовке контрольного дела.Жду ответа по вопросе как зачислить 20тыс со счета от компании.С уважением на связи



**Отправитель:** **Anatoly Galunov** anatoly.galunov@gmail.com
**Тема:** Re:
**Дата:** 11 августа 2015 г., 18:31
**Получатель:** Владимирович Сергей senior.kcb@yandex.ua

Сергей, добрый день!

Хочу поделиться информацией. Всю предыдущую неделю мы активно "боремся" с финансистами. Два основных параметра: первое - поднять сумму сделки до 300 тысяч (чтобы мы могли купить 4 трака) и второе - снизить процент первоначального взноса. (даун пэймент)

Изначально мы получили одобрение на 175.000$ и 50% даун. На сегодняшний день мы имеем либо 180.000 и 42% дауна плюс дополнительный залог (один из наших трейлеров или таков), либо 280.000 и 50% (такие условия от двух лэндеров, но мы все еще "бодаемся") В процессе формирования предложения еще один лэндер (ожидаем ответа в течении 1-2 дней).

Держу на "холде" 6 водителей (очень опытные ребята, готовы уволиться и перейти к нам) взяли на работу еще одного диспетчера (работал на брокерскую компанию), теперь работает на нас. Через него мы получили "доступ" к ранее недоступным для нас крупным брокерам (соответственно - к более дорогим контрактам).

С завтрашнего дня начинаем внедрять новую систему электронных лог-буков (обязательное требование властей, вступает в силу с сентября 2015) Внедрили новую электронную операционную систему по контролю и учету флота/загрузки и операционной деятельности. Внедрили новую систему контроля качества и соответствия требованиям и стандартам регулирующих органов США.

В общем, все по плану. Работаем, развиваемся, растем.

Буду держать в курсе.

С уважением, Анатолий.

> On Aug 4, 2015, at 14:10, Владимирович Сергей <senior.kcb@yandex.ua> wrote:
>
> То я посмотрите bill которы Вы мне выслали тим счетов не было. Попробуем снова. На связи.
>
>> Сергей, приветствую. Деньги не поступили. По меня смущал ваш комментарий, что на перечисли с только на boa без счета. Так ж нечен же по трейлер. В нашем письме о намерениях есть все реквизиты и номер счета в том числе, посмотрите, пожалуйста ниже.
>> На всякий случай еще раз.
>>
>> Beneficiary's Bank: CITI BANK
>>
>> Beneficiary
>> Name: Corgo Transport
>> Alliance LLC.
>>
>> Account
>> No.: 3290325342
>>
>> ABA
>> Routing #: 047004764
>> По Минивен работаем, все, что нравится на пробугу (в районе 400 тыс. миль) не пройдёт по тест (75 тысяч и менее). С финансистами тоже работаем. Если этот то появится отель, здоровее, конечно все оформируем своими деньгами, не беспокойтесь.
>> С уважением, Анатолий.
>>
>>> On Aug 4, 2015, at 12:38, Владимирович Сергей <senior.kcb@yandex.ua> wrote:
>>>
>>> Анатолий, здравствуйте. Я так понимаю что деньги не зашли, раз от Вас нет весточки. На что не могу сказать, зная, Анатолий если у Вас что то появится стоящее найдите возможность, забронировать, со своих оборотных, а потмену сразу как, только. Или не спешите, подберите варианты по моего приезда. Для меня конечно есть плюсе когда деньги переменовать без счета, а только до начинаю компании. И не смогла что свалится стольк забот реализовывая свои намерения. Пока все по плану. До связи. С ув Куранов.
>>>
>>>> Сергей, добрый день,
>>>> Счет я провела и отправила, утром (по выходным он не обновляет состояние счета). Вот так уд живут люди. Жаль не перевели :)
>>>> С финансистами работаем. Появился найти наилучшие условия. Пока есть предварительное одобрение на 175.000$ (т.е. примерно на 3 трака) и даун пеймент 50%. Есть еще как минимум 2-3 других варианта. Работаем.
>>>> Буду держать в курсе.
>>>> С уважением, Анатолий.
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On Aug 2, 2015, at 12:37 AM, Владимирович Сергей <senior.kcb@yandex.ua> wrote:
>>>>>
>>>>> Анатолий, добрый! Проверьте счета эл перевела была перечислил 1000 доа.Вы уверены что мы с женой сделали все там почитали программа все правильно? Вместе с тем если не получилось, то числа 17-18 августа я буду просить Вас принять 200 тыс через "эплотнибую" и которыя вы нашите закрыть, нужные затраты.
>>>>> В остальном готовимся к выезду. Анатолий погуляйте взорчении которые показаны, дополню документами в решении.
>>>>> Хорошего выходных. До связи.

Ничего страшного. Разбираемся.
Удачи!

Отправлено с iPad

31 июля 2015 г., в 0:38, В написарили Сергей <senior.kcb@yandex.ua> написал(а):

Анатолий, друг! Вчера пробовал переместить оплаты. Пока не получается,причину разбираю. Это первый раз для меня.Но у моему есть какие это ограничения. Звонил на справочные телефона консультировался (там говорит на русском оказался.),Попробую завтра сможет ли там будет загружено,До завтра. ул.украина



Отправитель: **Владимирович Сергей** seniorkcb@yandex.ua
Тема: Re: Нужен совет
Дата: **13 августа 2015 г., 0:41**
Получатель: Anatoly Galunov anatoly.galunov@comcast.net

Анатолий добрый день! мне и 125 тыс  Т. К я предполагаю что с ними нам будит комфорт ней. Но предложение конкурентов все же дождитесь интересно. это моё мнение но я полагаясь больше на вас Т. К.  Не вижу людей к сожалению пока. Мы занялись здоровьем здесь помелочим перед выездом
хотим уже выезжать но пока держат некоторые бумаги по эмиграционному делу. Благодарю за участие в нашей ситуации. На связи. Родным привет. С ув. Курашов
13.08.2015, 03:03, "Anatoly Galunov" <anatoly.galunov@comcast.net>:

Сергей, добрый день!

Нужен совет.

Сегодня получил одобрение на 300,000 и 45% даун. Это наши финансисты, мы с ними уже работаем. [Для справки в Америке существует несколько видов кредитования. Conventional - традиционное, основанное на Кредитной истории и при наличии Социал Секьюрити номера - этот вид нам сейчас недоступен. Второй вид - аллоговое кредитование [с чем мы сейчас работаем] основанное на залоговом имуществе, первоначальном взносе [обычно 50%] или на их комбинации.
Поскольку мы подняли запрашиваемую сумму со 175,000 до 300,000 - риски увеличены и они не могут пойти на существенное понижение первоначального взноса [все, что мы добились - 45%]
Я могу попробовать заложить под этот заим свой Трак и трейлер, что вероятно даст нам возможность снижения дауна-дамента до 40%. [скорее всего - это максимум, на что можно рассчитывать].
По вторму финансисту - они обещали нам лучшие условия, но мы с ними не работали, и скорее всего они не пойдут на большую сумму с первого раза в придачах купил. 1 или 2 трака [возможно предложат комбинацию из двух финансовых организаций 1-2 трака с одними и 1-2 трака с другими]. Только что с ними говорил, ждут ответа от обоих с "как их нечки парил".

Теперь по тракам. Мы перебрали все возможные варианты. Для примера Volvo 2013 [очень хорошая] - 96,650$, Freighliner 2012 - 75-82,000$ ну и так далее. [более 40 траков по теме шпатия]. Цена всегда очень высокая, [сильно если в никого не "скидывает" траки во время сезона]. Сделав "круг почета" мы вернулись к МНС [ а]мы у них уже накупали траки и довольны качеством, б]состояние таков действительно отличное, с] цена справедливая].
Мы зарегистрировали 4 трака [2012 KW T700] по 69,950$ включая гарантию.

Теперь, собственно мои вопрос:
По даун, мы имеем одобрение на сделку не дороже 300,000 с дауном 45%. Это значит, что если мы берем 4 T700 у МНС, то сумма сделки 279,800$ и даун - 125,910$
Если мы закладываем наш трак и трейлер, то возможно реально даун до 40% = 111,900$

Что скажете?

Поскольку мы почти 2 недели вели "ожесточенные" торги и с продавцом траков, и с финансистами и наконец получили от них положительное одобрение, теперь они на иголках не меня давить и требуют окончательного решения.

Личный комментарий:

- С кем финансироваться?
В любом случае, сегодня-завтра я могу потянуть-время и подождать второго финансиста. Мои прогноз скорее всего условия будут очень, б хоже как у уже имеющихся. Скорее всего они предложат пойти на по 1-сделки [на 2 трака] и "выравнять" их на большую сумму и низкии заим будет сложно и долго, и даже если мы получим то, что имеем сейчас [или очень похожее на это]. Поскольку мы с ними не работали, не уверен, на сколько четко они в растрорванее в самом процессе. Сильно принципиальной разница в условиях дать не приходится, так что может быть есть смысл согласиться на то, что мы имеем сейчас [Как говорят: от добра, добра не ищут].

- Даун Помент.
С одной стороны, высокий даун является напрягающим фактором в начале [т.е, сейчас], но зато, тем самым мы снижаем нагрузку на последующие ежемесячные выплаты [для примера, я плачу за каждый фрайтлайнер по 4,350 в месяц, а у нас [при условии 45% дауна] месячный платеж будет составлять в районе 1,600-1,800$] Т.е. мы будем больше денег получать на руки ежемесячно [с операционной деятельности], и получать больше морального удовольствия от деятельности [не будет со давящего впечатления, что мы работаем только на выплату за траки].

- У кого покупать Траки?
Здесь, практично тоже самое: самый короткий путь - это накомый путь. МНС - компания с именем, уважаемая, порядки и мы с ними уже провели 2 сделки.

Вывод: Все готово для завершения сделки. Лично я говорю "за".

В любом случае, жду от вас решения.

С уважением, Антоний.



Отправитель: **Владимирович Сергей** seniorkcb@yandex.ua
Тема: Re:Консультация
Дата: 24 августа 2015 г., 12:37
Получатель: Anatoly Galunov anatoly.galunov@comcast.net

Анатолий привет! С праздником Украинской независимости при которой понадобилось 24 года чтобы понять от кого мы зависимы.Как увидите деньги дайте сразу мне знать.Мы пока не празднуем в надежде на благополучное будущееПривет близкимДо встречи

Сергей, добрый день!Смотрите. Паспорт вам не нужен для перевода денег.

Деньги заходят от компании "Х" с пометкой "заходят по договору купли-продажи 4-х траков #637775 между Курановым и СЛА". Я в понедельник с утра отнесу в Банк копию нашего договора и предупрежу, что мы ждем поступления денег по данному договору от компании "Х". Вопросов не будет. Мы дополнительно поднимем письмо от вас на имя СЛА, о том, что депозит за покупку траков по договору #637775 вступит от компании "Х". Это ваши внутренние взаимоотношения.

Переводить на ваш личный счет я не рекомендую.

- во-первых потому, что возникает много вопросов у обоих банков (и там и здесь) какого назначение платежей? Деньги могут просто заморозить (хорошо, если не арестовать). У меня лично СИТИБанк заморозил чек на 26,000 и я ждал потом несколько дней, чтобы дать объяснения и вернуть деньги (это с моим хорошим английским и опытом). Подозрительный платеж свыше 25,000 автоматически попадает под расследование в ФБР. Если хотите пообщаться в английском с офицером ФБР - не вопрос. :)
- во-вторых, у вас нет возможности осуществить платеж с вашего счета из нал. Деньги просто застрянут у вас на счете и мы потеряем сделку. Поверьте, мы предлагаем вам самый простой, самый быстрый и самый правильный вариант.
С Волковым я еще раз переговорил. Звоните ему. Он живет все завтра в Одессе.
Реквизиты для перевода денег ему отправлю.
С уважением, Анатолий.

On Aug 20, 2015, at 15:54, Владимирович Сергей <seniorkcb@yandex.ua> wrote:

То ли У меня там есть счет в Сити-банке в Майями.Волков может мне перечислить с офицера "крупную" и обои в Одессе и я буду сам выгадать сделать электронный платеж по Вашем договорам на мое имя.Как вариант, который пришел я в голову,чтобы договориться, я так и любой схеме, лишь бы все было правильно.

Сергей, добрый день!

Не знаю, что я скажу. Я по прежнему (пока) продолжаю продвижение нашего с вами проекта на "полных оборотах". В данный момент, к примеру, подключены контрагенты с двумя новыми водителями (только машинах еще документы, в соответствии с требования Минтранса находятся минут 40-50). Через час встретимся с еще одним кораблевым из Далечегора (в точки с увеличением количества траков) от с цраковой компании уже получил подтверждение и счет на оплату. Есть, проект договора на аренду траков (между прочим, очень тяжело найти хорошие трейлеры по приемлемой цене). Но нужно понимать, что все эти предложения имеют ограниченный период действия.

Финансисты и продавцы знают и ищут по всякому разъездам. Только что разговаривал с одним из владельцев траков, он денег постоянно, нам 3 слова права с понедельника в проект как дать ответ до конца недели. В противном случае он будет искать другую компанию, я к нему что-то рассказываю? Нужно определиться.

Не знаю, должен ли я вам советовать? Скажу про себя. Я умею (даже люблю) работать в режиме "многозадачности", но для этого нужно точно понимать "последовательность событий". В такой ситуации не люблю пассивного ожидания, поскольку есть риск не дождаться одного и потерять другое. Если вижу, что дело начинает "буксовать" беру инициативу в свои руки.

В нашем случае с вопросами. Если почитаете? "...он, ты знаешь, я должен переговорить с моими людьми..." "для меня это "главал". Похоже, что ребята берутся за дело, но не понимают с какого конца начать братьея. Если кими наполники "атьея отрабатывают" - значит у вас нет то позиции проверенная схема. (если есть, рабочая схема, которая проверена и надежна работает, значит значит отрабатывать? В такогея в куча говорится следующие? на переговоры письмо в Киеве/Одессе такому то человеку (вот что? имя и телефон) и получаешь там-то и так-то от нашего человека (вот его имя и телефон) Цена вопроса - столько-то, сроки такого-то. Точка! Отсутствие уверенности - фактор раска.

Следующий момент. Как здесь объяснить происхождение наличных в таких размерах? Если из кто-то там из-за границы - где таможенная декларация? Если это доходы на территории США - где налоговая декларация? 10-20, ну 50 можно как-то решить, и то, нужно ... время. С большой суммой - долыше и сложнее. В этой строго подобные действия "прайве отрицаются" и крайне не приветствуются. (я знаю о том уже говорил). Мои принцип, если можно сделать "правильно" - нужно делать прям оно. Вернее, предлагаемая мной - абсолютно легальна, безошибоки, проверена и гарантирован. И главное - не нужно ничего ждать. Сегодня-завтра переведете заплаты с понедельника, мы покупаем траки.

Я бы вам привелы не предложил с комментарию к кому то пишу: "решаем вопросы". Это не сто "бизнес" делают такого рода операции. Это делается исключительно по личной просьбе и в "штучном" экземпляре. Это известный Украинский бизнесмен, владелец крупного бизнеса. Мой хороший друг, партнер и сосед по Майами (бассейно зной). Он сам переводил свои средства таким образом под покупку бизнеса и независимости в США. Телефон в Украине: +380 (73) 314-16-99. Валерий Волков.

Решать вам. Можете зевать, ждать подготовлю, можете воспользоваться моим предложением. Мне нужно ваше решение до завтра.

Спасибо, Анатолий.

On Aug 20, 2015, at 08:26, Владимиров Сергей <senior.kcb@yondex.ua> wrote:

Анатолий день!Прошу еще 4 часа ,у меня мои "залоговые" подвисли на день. Что то прорабатывают, хотя уверенность у меня уже начала гаснуть.Сразу напишу,по связи

Хорошо.

Sent from my iPhone

On Aug 12, 2015, at 10:54 AM, Владимиров Сергей <senior.kcb@yondex.ua> wrote:

То ля я не исключаю такой возможности т.к. мои "залоговые" после встречи молчат пока,Условия устранены (13).Хочу дождаться ответа и следую.

У меня есть надежный/проверенный канал. (Пояснительно ранние и продолжаем пользоваться сейчас). Вы передаете мне у себя дома, здесь все заходит на баланс счет под наш с вами контракт. Все куплюпло и правильно со всех точек зрения. (Стоит около 1 %).
Дайте знать, если захотите воспользоваться.

Sent from my iPhone

On Aug 12, 2015, at 1:07 AM, Владимиров Сергей <senior.kcb@yondex.ua> wrote:

Анато лия. Я в той же мере и не думаю о каком то подставе.Просто перевод суммы денег от "залоговых" с которыми я сегодня в очередной раз встречаюсь в окончательно выводу сценарий.К единому удару я и нужно что точно буду знать эту.Эти 250000 точно будут переданы ит .Что касается переплатится в итог а виду 20,000.Вопрос прекращения нам в белом Вани уже как то остановил под сцена? Ох сделки по это не будут отказаться мои точные фио. SERGIY KURASHOV как в паспорте.Как только получу конкретику сразу напишу или позвоню.Пока

Сергей, приветствую!
Смотрите, я хочу, чтобы мы оба четко понимали ситуацию.

Дело в том, что скоро, уже все готово для совершения сделки налично. Мы сделал по всем пунктам на "низком старте". (график, финансирование, страховка залог и ответственность, банк вещ... ал, согласование контракта в страховой компании, задача трейлера и т.д.)

Процесс везде запущен и согласован. Все ждут только вашей "отмашки". Речь не идет о 20,000$ (первая транш/депозит за права, чтобы снять нас с продажи и зафиксировать для нас). Речь идет об основной сумме сделки (126,000$) для покупки прав. Как я уже говорила, безусловно я могу перекрыть 20,000 своими деньгами, (чтобы моменты были с началом), но в этом смысле нет смысла. Поскольку, если нам нужно 2-3 дня для совершения сделки, то мы можем начинать, эту дату и не "пробить" платеж. Но если я сейчас кому либо ит за траты, подтверждая тем самым что сделка совершена, но вы вдруг без объяснения причин отмените сделку, то эти деньги мне уже не вернутся.

Для ясности понимаю: Если мы вместе идут под фразой: "переплатить транш двнеами", тогда выше прописаки он иту в 126,000. по у меня такой возможности нет.
В предыдущем письме на когой ориентировка и на 200,000 на 1?-18 августа, вы на эти сроки и вышел "готовность" сделки.

Еще раз, убедительно прошу, постараться сказать максимально точный прогноз, когда вы сможете передать (или переписать) необходимую сумму для совершения сделки?

Другими словами:
Я могу вполне в срыва в течении этой недели ( на вахлы к издушной). Если вдруг по какой то причине, вы не сможете передать/переписать деньги в определ не не переписать, а прометить деньги собой (7 сентября), то конечно же часом эжеть часто от будет. Тогда нужно сделку отменить.

Сергей, пожалуйста не воспринимайте это письмо, как некое "давление" и пи шантаж, типа "или сейчас или никогда!" Совершенно нет! Ничего смертельного не произойдет. Уйдут эти траты - появятся другие. Не пойду тся нас эти подетали - будем искать других. Покрасить продавец, покрывать фини...ист. подрожать, что больше не будут нам доверять и т.п. (Да. все глохло, но никто не умер!) Вакнегааете, что мне необходимо от вас сейчас - это честный ответ! мы делаем эту сделку сейчас или нет?

Спасибо, Анатолий.

On Aug 12, 2015, at 07:04, Владимиров Сергей <senior.kcb@yondex.ua> wrote:

Тебе пришел будет!Только что пришел с банком.Ничего не меняется кучи ограничения по перечислению денег с Украины.На Вестерны ни сколько не работают.Как я и говорил и дальнейшие числа я буду переводить 200 к Мэйми. Прилетаем 7.09 в неделю буфом а "Хилтоне" до снятия квартиры.Поэтому если есть возможность, перекиньтесь своими деньгами, сделайте это что бы не терять ритм.

Зачем продавал деньгараж.гаражей пр. мелочи.Конечно, как то все получилось, немного с опережением и панов и могли бы залететь и на следующей неделею уже билеты и тд.забронировано с 6.09. Как то так.С ув Кураков

Сергей, добрый день!
Данные машины эксплуатировались в ИронАрт - очень известная компания. Машины, которые приходят от них всегда в очень хорошем состоянии. У нас все готово, остались, только сделать пару платежей. Сориентируйте меня по вашим мыслям, планам, срокам.
Спасибо, Анатолий.

Отправлено с iPod

14 авг. 2015 г., в 0:52, Владимирович Сергей <senior.kcb@yandex.ua> написал(а):

анатолии д день! Работаем с они на Украине это аббревиатура министерства и измышления сотрудный.получу защиту оставался добросовестным и учась машина в исполню их мало и.защиту .ог спасс Кураков



Отправитель: **Владимирович Сергей** <senior.kcb@yandex.ua>
Тема: Re:(Без темы)
Дата: 31 августа 2015 г., 3:14
Получатель: COMCAST anatoly.galuicov@comcast.net

Анатолий д.утро!Все логично и понятно ,порядок цифр понятен.Финансирование с  моей карточки ,если есть такая возможность [по описаной схеме в адвокатском письме] или при возможности возьмите со своих оборотных, а я уже сам 7.09.15  Вам отдам наличными [ этот вариант для меня предпочтительней ,да и Вам я думаю проще  и законнее].Уже до скорой встречи.Информируйте .Жду писем.С ув Курашов

Сергей, приветствую. В приложение нашей переписки по поводу предстоящих расходов ( на следующей недели).
1. Страховка. (самое дорогостоящее).
Страхование ответственности: 12,300$ x 4 = 49,200$
Страхование груза: 1,850 x 4= 7,400$
Страхование самих траков (5,3% от стоимости). 280,000$ x 5,3% = 14,840$
Итого: 71,440$ полная стоимость страховки за год. (будем финансировать)
Необходимо оплатить: 17,860$ Первоначальный взнос [25%]
2. Регистрация траков( точную сумму узнаем после подачи заявки. Приблизительно: 1,800$ - 2,000$ за трак.
Итого; необходимо оплатить; 7,500 - 8,000$
3. Установка спутниковых электронных устройств (ELD). Каждый юнит стоит 200$ + 20$ доставка + 30$ установка и настройка. Итого 250$ за каждый.
Необходимо: 1,000$
4. Отправка водителей за траками и трейлерами.
2 водителя в Атланту [Джорджия], 2 водителя в Канзас Сити [Миссури].
Авиабилеты 4 x 150$=600$, такси из аэропорта до диллерской 100$ x 2 = 200$
Перегонка траков до Ньюнана/Чикаго:
Топливо 300-350$ на каждый трак = 1,400$
Оплата водителям: 300$ x 4 трака = 1,200$
Итого: 3,400$
5. Траки необходимо оборудовать:
Преобразователь напряжения: 260$
Холодильник : 110$
Микроволновка: 60$
замки/стрежатели груза, 200$ комплект
Итого: 630$ x 4 = 2,520$

Всего: 32,780$

Отправлено с iPad

> 30 авг. 2015 г., в 12:41, Владимирович Сергей <senior.kcb@yandex.ua> написал(а):
>
> Анатолий приветствую!Это логично , Как же Вы регистрируете трак без меня и моих документов.?Это возможно? Или Вы это делаете на компанию ? На связи .С ув Сергей
>
>> Сергей, добрый  день!
>> Письма я получил, Вы правы, более  точную сумму я смогу дать в понедельник и дальше, по мере поступления затрат, Мы уже на завершающем этапе. Я планирую уже через неделю запустить траки в работу.
>> Еще раз, для вашего понимания: 126,000 – это только первоначальный взнос [45%] от стоимости траков. Он включает стоимость, регистрации, страхования, дополнительного оборудования, приобретения на аренду трейлеров, а также стоимости выкабавтов для водителей и стоимости доставки(перегона) траков и трейлеров. ( я вам опесывал этот процесс в первых письмах). По сравнению с первоначальным расчетам, у нас увеличилась только сумма первоначального депозита [в связи с небольшим увеличением цен на сами траки и вместо планируемых 30-35% нам необходимо финансировать при 45% доля]. Регистрация и страховка буду на том же уровне( возрастут незначительно) поскольку тоже завесят от стоимости оборудования.
>> С уважением, Анатолий.
>>
>> Отправлено с iPad
>>
>>> 30 авг. 2015 г., в 1:15, Владимирович Сергей <senior.kcb@yandex.ua> написал(а):
>>>
>>> Анатолий Д.Утро!Мои последние письма получены Вами? Я понимаю что Вы ответы на вопросы уже дадите в понедельник так, нужно посчитать и сделать консультации по списанию денег с карточки ? Поэтверди те .Дозвонится я вчера почему то не смогла в навбере Вас нет.С Ув курашов
>>>
>>>> Толя!Сформируйте сумму с учетом остатка если он есть и Вам сейчас перешлю письмо адвоката где нам предлагает списать деньги с карточки.Можете ли Вы так взять деньги ? Я вам дам зайше свои американские карточки.
>>>> Если адвокату я правильно по "126," предостгравила же , затраты на страховку и регистрацию?И на этот со все все пони ? Ко

во время регистрации машин и трейлеров без моего присутствия.
Другими словами применяя эту арифметику уже под реальную сделку, что бы я сориентировался по своим возможностям.
С ув Сергей

Сергей, приветствую!
У нас все получается. Мы успели закрыть сделку в пятницу. (сделка полностью проплачена). На следующей неделе будем оформлять, заfloat и заниматься регистрацией. (регистрацию не дают без страховки). Нужны будут деньги на регистрацию и на страховку. В понедельник будем заниматься на все траки ELD, ситил, оборудование. (тоже кредит есть.). 2 трака находятся в Атланте, 2 других - в Канзас Сити. Трейлеры - в Индиане. Ну еще деньги на комиссирование расходы.
Поделитесь, как вы планируете перевозить деньги?
Спасибо, Анатолий.

Отправлено с iPad

27 авг. 2015 г., в 5:30, Владимирович Сергей <serionkob@yandex.ua> написал(а):

Анатолий добрый! Сегодня в Украине профессиональный праздник дальнобойщиков и связанных работников.С чем Вас я поздравляю.Желаю Вам удачи и благополучия. У Вас все получается? На следующей неделе свяжемся по плану.С ув Курилов

Сергей, добрый день. 60 принял. Сейчас отправляем всю сумму, и покупку траков. На следующей неделе нужны будут деньги и на страховку. В остальном все по плану. Буду держать в курсе.
Анатолий

Sent from my iPhone

# Statement

Cargo Transport Alliance LLC
2775 Burris Rd Unit 6B-1
Davie FL 33314

| Bill To |
|---|
| Miami Logistics Services |

EXHIBIT

F

| Date | Amount Due | Enclosed |
|---|---|---|
| 05/30/17 | $133,229.85 | |

| Date | Description | Amount | Balance |
|---|---|---|---|
| | Balance forward | | 0.00 |
| 09/21/15 | INV #289-S | 686.88 | 686.88 |
| 09/28/15 | INV #322-S | 1,373.75 | 2,060.63 |
| 10/05/15 | INV #352-S | 1,373.75 | 3,434.38 |
| 10/12/15 | INV #379-S | 1,373.75 | 4,808.13 |
| 10/19/15 | INV #400-S | 1,373.75 | 6,181.88 |
| 10/19/15 | INV #401-FC | 68.69 | 6,250.57 |
| 10/26/15 | INV #431-S | 1,373.75 | 7,624.32 |
| 10/26/15 | INV #431-FC | 137.38 | 7,761.70 |
| 11/02/15 | INV #456-S | 1,373.75 | 9,135.45 |
| 11/09/15 | INV #488-S | 1,373.75 | 10,509.20 |
| 11/09/15 | INV #489-FC | 137.38 | 10,646.58 |
| 11/16/15 | INV #517-S | 1,373.75 | 12,020.33 |
| 11/16/15 | INV #518-FC | 137.38 | 12,157.71 |
| 11/23/15 | INV #559-S | 1,373.75 | 13,531.46 |
| 11/23/15 | INV #561-FC | 137.38 | 13,668.84 |
| 11/30/15 | INV #581-S | 1,373.75 | 15,042.59 |
| 11/30/15 | INV #582-FC | 137.38 | 15,179.97 |
| 12/08/15 | INV #627-S | 1,373.75 | 16,553.72 |
| 12/08/15 | INV #628-FC | 137.38 | 16,691.10 |
| 12/14/15 | INV #652-S | 1,373.75 | 18,064.85 |
| 12/14/15 | INV #653-FC | 137.38 | 18,202.23 |
| 12/21/15 | INV #688-S | 1,373.75 | 19,575.98 |
| 12/21/15 | INV #689-FC | 137.38 | 19,713.36 |
| 12/28/15 | INV #715-S | 1,373.75 | 21,087.11 |
| 12/28/15 | INV #716-FC | 137.38 | 21,224.49 |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | OVER 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| $6,044.50 | $6,181.75 | $7,418.25 | $549.50 | $113,035.85 | $133,229.85 |

# Statement

Cargo Transport Alliance LLC
2775 Burris Rd Unit 6B-1
Davie FL 33314

| Bill To |
| --- |
| Miami Logistics Services |

| Date | Amount Due | Enclosed |
| --- | --- | --- |
| 05/30/17 | $133,229.85 | |

| Date | Description | Amount | Balance |
| --- | --- | --- | --- |
| 01/04/16 | INV #730-S | 1,373.75 | 22,598.24 |
| 01/04/16 | INV #731-FC | 137.38 | 22,735.62 |
| 01/11/16 | INV #758-S | 1,373.75 | 24,109.37 |
| 01/11/16 | INV #759-FC | 137.38 | 24,246.75 |
| 01/18/16 | INV #787-S | 1,373.75 | 25,620.50 |
| 01/18/16 | INV #788-FC | 137.38 | 25,757.88 |
| 01/25/16 | INV #826-S | 1,373.75 | 27,131.63 |
| 01/25/16 | INV #827-FC | 137.38 | 27,269.01 |
| 02/01/16 | INV #865-S | 1,373.75 | 28,642.76 |
| 02/01/16 | INV #866-FC | 137.38 | 28,780.14 |
| 02/08/16 | INV #920-S | 1,373.75 | 30,153.89 |
| 02/08/16 | INV #921-FC | 137.38 | 30,291.27 |
| 02/15/16 | INV #960-S | 1,373.75 | 31,665.02 |
| 02/15/16 | INV #961-FC | 137.38 | 31,802.40 |
| 02/22/16 | INV #993-S | 1,373.75 | 33,176.15 |
| 02/22/16 | INV #994-FC | 137.38 | 33,313.53 |
| 02/29/16 | INV #1040-S | 1,373.75 | 34,687.28 |
| 02/29/16 | INV #1041-FC | 137.38 | 34,824.66 |
| 03/07/16 | INV #1090-S | 1,373.75 | 36,198.41 |
| 03/07/16 | INV #1091-FC | 137.38 | 36,335.79 |
| 03/14/16 | INV #1141-S | 1,373.75 | 37,709.54 |
| 03/14/16 | INV #1142-FC | 137.38 | 37,846.92 |
| 03/21/16 | INV #1207-S | 1,373.75 | 39,220.67 |
| 03/21/16 | INV #1208-FC | 137.38 | 39,358.05 |
| 03/28/16 | INV #1239-S | 1,373.75 | 40,731.80 |
| 03/28/16 | INV #1238-FC | 137.38 | 40,869.18 |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | OVER 90 Days Past Due | Amount Due |
| --- | --- | --- | --- | --- | --- |
| $6,044.50 | $6,181.75 | $7,418.25 | $549.50 | $113,035.85 | $133,229.85 |

# Statement

Cargo Transport Alliance LLC
2775 Burris Rd Unit 6B-1
Davie FL 33314

| Bill To |
|---|
| Miami Logistics Services |

| Date | Amount Due | Enclosed |
|---|---|---|
| 05/30/17 | $133,229.85 | |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 03/29/16 | INV #1241-FC | 137.38 | 41,006.56 |
| 04/04/16 | INV #1279-S | 1,373.75 | 42,380.31 |
| 04/07/16 | INV #1268-FC | 137.38 | 42,517.69 |
| 04/21/16 | INV #1300-FC | 137.38 | 42,655.07 |
| 04/30/16 | INV #1501-FC | 137.38 | 42,792.45 |
| 05/02/16 | INV #1548-S | 5,495.00 | 48,287.45 |
| 05/06/16 | INV #1552-FC | 137.38 | 48,424.83 |
| 05/16/16 | INV #1559-FC | 137.38 | 48,562.21 |
| 05/30/16 | INV #1633-S | 5,495.00 | 54,057.21 |
| 06/03/16 | INV #1650-FC | 549.50 | 54,606.71 |
| 06/27/16 | INV #1714-S | 5,495.00 | 60,101.71 |
| 06/30/16 | INV #1724-FC | 549.50 | 60,651.21 |
| 07/25/16 | INV #1774-S | 5,495.00 | 66,146.21 |
| 08/01/16 | INV #1795-FC | 549.50 | 66,695.71 |
| 08/22/16 | INV #1852-S | 5,495.00 | 72,190.71 |
| 08/25/16 | INV #1864-FC | 549.50 | 72,740.21 |
| 09/23/16 | INV #1937-FC | 549.50 | 73,289.71 |
| 09/26/16 | INV #1943-S | 6,868.75 | 80,158.46 |
| 10/27/16 | INV #1995-FC | 686.75 | 80,845.21 |
| 10/31/16 | INV #2001-S | 6,868.75 | 87,713.96 |
| 11/28/16 | INV #2053-S | 5,495.00 | 93,208.96 |
| 12/02/16 | INV #2061-FC | 686.75 | 93,895.71 |
| 12/29/16 | INV #2122-S | 6,868.75 | 100,764.46 |
| 12/30/16 | INV #2123-FC | 594.50 | 101,358.96 |
| 01/30/17 | INV #2186-S | 5,495.00 | 106,853.96 |
| 01/31/17 | INV #2187-FC | 686.89 | 107,540.85 |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | OVER 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| $6,044.50 | $6,181.75 | $7,418.25 | $549.50 | $113,035.85 | $133,229.85 |

# Statement

Cargo Transport Alliance LLC
2775 Burris Rd Unit 6B-1
Davie FL 33314

| Bill To |
|---|
| Miami Logistics Services |
| |
| |
| |

| Date | Amount Due | Enclosed |
|---|---|---|
| 05/30/17 | $133,229.85 | |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 02/28/17 | INV #2261-S | 5,495.00 | 113,035.85 |
| 03/01/17 | INV #2263-FC | 549.50 | 113,585.35 |
| 03/31/17 | INV #2397-FC | 549.50 | 114,134.85 |
| 04/04/17 | INV #2401-S | 6,868.75 | 121,003.60 |
| 05/01/17 | INV #2551-S | 5,495.00 | 126,498.60 |
| 05/01/17 | INV #2550-FC | 686.75 | 127,185.35 |
| 05/30/17 | INV #2709-S | 5,495.00 | 132,680.35 |
| 05/30/17 | INV #2711-FC | 549.50 | 133,229.85 |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | OVER 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| $6,044.50 | $6,181.75 | $7,418.25 | $549.50 | $113,035.85 | $133,229.85 |

# Cargo Transport Alliance
Statement
Miami Logistics Services
05/30/17

| 2015 | Gross | Adm Fee | Equipment Rent | Insurance | FuelTax | GPS | Diesel | Driver | Tolls | Other | Total week | Maintenance | LEASE | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/14-9/20/15 | 12,400.00 | 1,488.00 | 540.00 | 760.00 | 80.00 | 50.00 | 5,011.98 | 3,567.88 | 96.33 | 235.45 | 170.36 | 473.70 | 686.38 | -990.22 |
| 9/21-9/27/15 | 13,124.00 | 1,574.88 | 1,080.00 | 1,520.00 | 160.00 | 100.00 | 4,869.25 | 3,735.27 | 152.95 | 124.83 | -193.18 | 776.74 | 1,373.75 | -2,343.67 |
| 9/28-10/4/15 | 15,550.00 | 1,866.00 | 1,080.00 | 1,520.00 | 160.00 | 100.00 | 4,283.84 | 3,297.35 | 157.75 | 347.19 | 3,419.15 | 0.00 | 1,373.75 | -99.49 |
| 10/5-10/11/15 | 14,095.00 | 1,405.00 | 760.00 | 1,520.00 | 160.00 | 100.00 | 4,507.27 | 4,762.96 | 0.00 | 0.00 | 1,982.90 | 0.00 | 1,373.75 | 609.51 |
| 10/12-10/18/15 | 12,855.00 | 1,542.36 | 760.00 | 1,520.00 | 160.00 | 100.00 | 3,629.39 | 3,614.83 | 0.00 | 0.00 | 920.23 | 0.00 | 1,373.75 | -1,174.35 |
| 10/19-10/25/15 | 11,675.00 | 1,167.50 | 190.00 | 1,520.00 | 160.00 | 100.00 | 4,367.41 | 4,025.84 | 0.00 | 177.99 | 199.40 | 0.00 | 1,373.75 | -453.52 |
| 10/26-11/1/15 | 13,125.00 | 1,312.50 | 190.00 | 1,520.00 | 160.00 | 100.00 | 3,676.12 | 3,987.08 | 0.00 | 0.00 | 2,012.75 | 0.00 | 1,373.75 | 639.00 |
| 11/2-11/8/15 | 16,888.25 | 2,026.35 | 190.00 | 1,520.00 | 160.00 | 100.00 | 5,319.28 | 3,676.12 | 0.00 | 0.00 | 2,554.19 | 0.00 | 1,373.75 | 1,180.44 |
| 11/9-11/15/15 | 13,246.00 | 1,589.52 | 190.00 | 1,520.00 | 160.00 | 100.00 | 4,153.63 | 4,155.63 | 0.00 | 0.00 | 2,066.36 | 0.00 | 1,373.75 | 692.61 |
| 11/16-11/22/15 | 15,280.12 | 1,833.61 | 190.00 | 1,520.00 | 160.00 | 100.00 | 3,837.12 | 5,016.43 | 0.00 | 0.00 | 2,390.41 | 0.00 | 1,373.75 | 1,016.66 |
| 11/23-11/29/15 | 10,190.00 | 1,218.00 | 190.00 | 1,520.00 | 160.00 | 100.00 | 1,783.60 | 1,783.60 | 0.00 | 0.00 | 904.28 | 0.00 | 1,373.75 | 767.76 |
| 11/30-12/6/15 | 21,845.00 | 2,621.40 | 920.00 | 1,520.00 | 160.00 | 100.00 | 6,447.08 | 4,254.93 | 277.53 | 459.74 | 4,141.51 | 0.00 | 1,373.75 | 2,767.76 |
| 12/7-12/13/15 | 22,275.00 | 2,673.00 | 920.00 | 1,520.00 | 160.00 | 100.00 | 5,534.63 | 6,160.88 | 599.70 | 0.00 | 1,722.53 | 0.00 | 1,373.75 | 3,083.07 |
| 12/14-12/20/15 | 16,050.00 | 1,926.00 | 920.00 | 1,520.00 | 160.00 | 100.00 | 4,518.72 | 4,556.02 | 411.47 | 215.26 | 1,303.96 | 150.12 | 1,373.75 | 198.66 |
| 12/21-12/27/15 | 9,100.00 | 1,092.00 | 920.00 | 1,520.00 | 160.00 | 100.00 | 2,912.51 | 2,369.44 | 593.48 | 146.56 | -713.99 | 1,303.96 | 1,373.75 | -3,391.70 |
| Adj(Maint) #1 | | | | | | | | | | | 0.00 | 6,244.47 | | -6,244.47 |
| 12/28-01/03/16 | 6,900.00 | 828.00 | 730.00 | 1,520.00 | 160.00 | 100.00 | 1,578.53 | 2,473.13 | 7.44 | 273.07 | -770.17 | 674.80 | 1,373.75 | -2,818.72 |
| 01/04-01/10/16 | 17,800.00 | 2,136.00 | 730.00 | 1,520.00 | 160.00 | 100.00 | 4,037.54 | 4,553.38 | 935.11 | 347.71 | 3,280.26 | 0.00 | 1,373.75 | 1,906.51 |
| 01/11-01/17/16 | 14,955.00 | 1,722.60 | 730.00 | 1,520.00 | 160.00 | 100.00 | 3,312.48 | 3,166.00 | 3.66 | 840.99 | 3,419.15 | 0.00 | 1,373.75 | 1,813.45 |
| 01/18-01/24/16 | 17,688.00 | 2,122.20 | 730.00 | 1,520.00 | 160.00 | 100.00 | 5,162.44 | 5,632.01 | 454.17 | 2.17 | 963.19 | 365.97 | 1,373.75 | -776.53 |
| 01/25-01/31/16 | 16,678.32 | 1,953.16 | 920.00 | 1,520.00 | 160.00 | 100.00 | 4,231.54 | 4,027.88 | 84.17 | 694.35 | 3,277.40 | 99.19 | 1,373.75 | 1,804.46 |
| 2/1-2/7/16 | 19,870.00 | 2,384.40 | 920.00 | 1,520.00 | 160.00 | 100.00 | 5,848.80 | 4,747.05 | 155.31 | 701.22 | 3,340.09 | 853.36 | 1,373.75 | 1,112.98 |
| 2/8-2/14/16 | 16,675.00 | 2,001.00 | 920.00 | 1,520.00 | 160.00 | 100.00 | 4,747.05 | 4,487.37 | 651.93 | 613.64 | 1,241.76 | 1,090.84 | 1,373.75 | -4,323.13 |
| 2/15-2/21/16 | 15,110.00 | 1,813.20 | 920.00 | 1,520.00 | 160.00 | 100.00 | 4,487.37 | 3,662.63 | 122.45 | 2,662.20 | 2,449.25 | 527.09 | 1,373.75 | -1,222.83 |
| 2/22-2/28/16 | 13,150.00 | 1,578.00 | 920.00 | 1,520.00 | 160.00 | 100.00 | 3,745.89 | 3,584.15 | 186.10 | 432.74 | -1,310.34 | 1,642.94 | 1,373.75 | 548.41 |
| 2/29-3/6/16 | 12,396.00 | 1,487.52 | 920.00 | 1,520.00 | 160.00 | 100.00 | 3,748.83 | 3,209.60 | 63.00 | 742.29 | -1,306.44 | 1,726.68 | 1,373.75 | -1,790.69 |
| 3/7-3/13/16 | 10,820.00 | 1,298.40 | 920.00 | 1,520.00 | 160.00 | 100.00 | 3,584.15 | 3,503.38 | 707.67 | 935.10 | -1,673.58 | 475.75 | 1,373.75 | -3,523.08 |
| 3/14-3/20/16 | 12,357.84 | 1,482.94 | 920.00 | 1,520.00 | 160.00 | 100.00 | 3,132.80 | 3,613.15 | 41.78 | 56.14 | 1,175.97 | 990.75 | 1,373.75 | -1,188.53 |
| 3/21-3/27/16 | 18,911.84 | 2,269.42 | 920.00 | 1,520.00 | 160.00 | 100.00 | 3,541.84 | 5,078.27 | 56.14 | 2,115.87 | 2,115.87 | 577.82 | 1,373.75 | -1,750.40 |
| 3/28-4/3/16 | 17,523.00 | 2,103.48 | 920.00 | 1,520.00 | 160.00 | 100.00 | 2,287.86 | 4,076.72 | 935.10 | 479.85 | 2,757.59 | 1,351.40 | 1,373.75 | 164.30 |
| 4/4-4/10/16 | 9,450.00 | 1,134.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 5,813.18 | 3,389.51 | 652.38 | 763.76 | -1,664.44 | 87.29 | 1,373.75 | 32.44 |
| 4/11-4/17/16 | 8,000.00 | 960.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 4,759.00 | 3,472.60 | 205.97 | 1,146.96 | -3,542.77 | 3,288.50 | 1,373.75 | -3,125.48 |
| 4/18-4/24/16 | 16,225.00 | 1,947.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 3,075.18 | 2,330.26 | 187.11 | 938.11 | -685.74 | 0.00 | 1,373.75 | -8,205.02 |
| 4/25-5/1/16 | 8,950.00 | 1,074.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,297.24 | 2,946.14 | 184.12 | 262.11 | -542.82 | 3,777.00 | 1,373.75 | -2,059.49 |
| 5/2-5/8/16 | 14,399.00 | 1,727.88 | 920.00 | 1,280.00 | 160.00 | 100.00 | 4,530.98 | 3,831.54 | 408.15 | 450.79 | 461.81 | 0.00 | 1,373.75 | -1,916.57 |
| 5/9-5/15/16 | 16,195.00 | 1,943.40 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,709.37 | 5,083.01 | 721.87 | 455.86 | -2,242.99 | 1,785.13 | 1,373.75 | -2,697.07 |
| 5/16-5/22/16 | 13,050.00 | 1,566.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 4,733.34 | 5,439.31 | 229.24 | 699.88 | -2,887.17 | 246.87 | 1,373.75 | -1,975.10 |
| 5/23-5/29/16 | 7,775.00 | 933.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 5,074.12 | 4,614.95 | 320.05 | 216.74 | -401.35 | 2,583.44 | 1,373.75 | -6,844.36 |
| 5/30-6/5/16 | 9,670.00 | 1,160.40 | 920.00 | 1,280.00 | 160.00 | 100.00 | 5,142.58 | 3,196.22 | 250.16 | 340.45 | -1,332.53 | 0.00 | 1,373.75 | -3,863.61 |
| 6/6-6/12/16 | 8,290.00 | 994.80 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,569.38 | 2,529.86 | 403.05 | 0.00 | 0.00 | 0.00 | 1,373.75 | -3,796.37 |
| 6/13-6/19/16 | 7,445.00 | 893.40 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,787.85 | 2,819.81 | 340.45 | 0.00 | -2,422.62 | 0.00 | 1,373.75 | -2,299.57 |
| 6/20-6/26/16 | 14,405.00 | 1,728.60 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,894.37 | 4,965.49 | 431.75 | 1,425.15 | -456.96 | 469.26 | 1,373.75 | -2,299.57 |

EXHIBIT

G

**Cargo Transport Alliance**
Statement
Miami Logistics Services        05/30/17

| 2015 | Gross | Adm Fee | Equipment Rent | Insurance | FuelTax | GPS | Diesel | Driver | Tolls | Other | Total week | Maintenance | LEASE | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/26-7/3/16 | 10,450.00 | 1,254.00 | 920.00 | 1,280.00 | 160.00 | 100.00 | 2,991.62 | 2,939.09 | 851.30 | 546.57 | -642.38 | 0.00 | 1,373.75 | -2,016.13 |
| adj report 7/14/16 | 4,183.30 | | | | | | | | | | 4,183.30 | | | 4,183.30 |
| 7/4-7/10/16 | 6,800.00 | 816.00 | 720.00 | 1,280.00 | 100.00 | 100.00 | 2,648.60 | 2,103.95 | 364.35 | 300.66 | -1,643.56 | 123.29 | 1,373.75 | -3,140.60 |
| 7/11-7/17/16 | 13,250.00 | 1,590.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 3,347.23 | 3,596.58 | 561.54 | 696.49 | 1,438.16 | 0.00 | 1,373.75 | 64.41 |
| 7/18-7/24/15 | 13,595.00 | 1,631.40 | 540.00 | 1,280.00 | 100.00 | 100.00 | 3,799.68 | 3,869.65 | 342.16 | 398.13 | 1,533.98 | 753.15 | 1,373.75 | -592.92 |
| 7/25-7/31/16 | 5,450.00 | 654.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,481.16 | 1,865.64 | 255.77 | 379.94 | -1,206.51 | 2,069.97 | 1,373.75 | -4,650.23 |
| 8/1-8/7/16 | 4,275.00 | 513.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,403.31 | 1,305.87 | 35.97 | 387.88 | -1,391.03 | 337.40 | 1,373.75 | -3,102.18 |
| 8/8-8/14/16 | 4,775.00 | 573.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,025.06 | 2,156.07 | 62.09 | 187.79 | -1,249.01 | 0.00 | 1,373.75 | -2,622.76 |
| 8/15-8/21/16 | 7,370.00 | 884.40 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,950.30 | 1,891.13 | 130.38 | 1,009.41 | -525.62 | 357.40 | 1,373.75 | -2,256.77 |
| 8/22-8/28/16 | 2,000.00 | 240.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 597.80 | 1,477.24 | 205.21 | 100.71 | -2,640.96 | 38.15 | 1,373.75 | -4,052.86 |
| 8/29-9/4/16 | 4,325.00 | 519.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,365.54 | 1,446.47 | 192.35 | 114.16 | -1,332.52 | 0.00 | 1,373.75 | -2,706.27 |
| 9/5-9/11/16 | 8,150.00 | 978.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,366.61 | 2,638.68 | 24.00 | 311.23 | -188.52 | 1,601.56 | 1,373.75 | -3,163.83 |
| 9/12-9/18/16 | 7,550.00 | 906.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,239.85 | 2,074.68 | 42.41 | 47.76 | 219.30 | 1,958.35 | 1,373.75 | 454.99 |
| 9/19-9/25/16 | 12,000.00 | 1,440.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 3,109.96 | 2,840.83 | 226.23 | 58.29 | 2,304.69 | 475.95 | 1,373.75 | -523.17 |
| 9/26-10/2/16 | 8,900.00 | 1,068.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,452.46 | 2,256.80 | 175.96 | 114.56 | 850.58 | 0.00 | 1,373.75 | -2,238.55 |
| 10/3-10/9/16 | 3,625.00 | 1,035.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,831.80 | 2,629.51 | 962.49 | 11.00 | -864.80 | 0.00 | 1,373.75 | -1,959.05 |
| 10/10-10/17/16 | 9,375.00 | 1,125.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,433.46 | 2,043.10 | 406.55 | 22.00 | -585.30 | 0.00 | 1,373.75 | -3,237.98 |
| 10/13-10/23/16 | 9,200.00 | 1,104.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,740.07 | 3,554.12 | 180.51 | 0.00 | 1,396.93 | 0.00 | 1,373.75 | -1,141.43 |
| 10/24-10/30/16 | 4,050.00 | 486.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,999.57 | 2,873.62 | 80.76 | 196.00 | 23.18 | 1,145.73 | 1,373.75 | -4,925.48 |
| 10/31-11/6/16 | 10,850.00 | 1,302.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,462.38 | 1,416.20 | 101.90 | 290.97 | -1,864.23 | 3,006.83 | 1,373.75 | 1,501.25 |
| 11/7-11/13/16 | 7,900.00 | 948.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 2,621.65 | 1,992.03 | 82.30 | 0.00 | 1,378.05 | 0.00 | 1,373.75 | -3,446.91 |
| 11/14-11/20/16 | 12,325.00 | 1,479.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 3,009.55 | 2,358.65 | 150.22 | 331.49 | -544.90 | 2,875.00 | 1,373.75 | -5,495.00 |
| 11/21-11/27/16 | 5,150.00 | 618.00 | 540.00 | 1,280.00 | 100.00 | 100.00 | 1,398.74 | 1,431.63 | | 331.49 | -850.08 | 1,223.08 | 1,373.75 | -6,868.75 |
| Adj/Month1 #2 | | | | | | | | | | | | 13,827.76 | | -13,827.76 |
| 11/28-1/1/17 | | | | | | | | | | | | | 6,868.75 | -6,868.75 |
| 1/2-1/29/17 | | | | | | | | | | | | | 5,495.00 | -5,495.00 |
| 1/30-2/26/17 | | | | | | | | | | | | | 5,495.00 | -5,495.00 |
| 2/27-4/2/17 | | | | | | | | | | | | | 6,868.75 | -6,868.75 |
| 4/3-4/30/17 | | | | | | | | | | | | | 5,495.00 | -5,495.00 |
| 5/1-5/28/17 | | | | | | | | | | | | | 5,495.00 | -5,495.00 |
| Late Fees on 5/30/17 | | | | | | | | | | | | | 6,868.75 | -11,652.97 |
| **TOTALS** | 741,347.67 | 87,742.72 | 44,650.00 | 86,840.00 | 8,740.00 | 6,250.00 | 217,243.74 | 217,309.43 | 15,320.16 | 25,018.86 | 32,732.76 | 58,713.64 | 133,229.85 | -159,210.73 |

## Maintenance Report Adjustment # 1     12/31/2015

### Repair and Maintanence report/Отчет по ремонту и тех обслуживанию

| Data/Дата | Truck #/Трак № | Description/Описание выполненных работ | Credit | Debet |
|---|---|---|---|---|
| 9/21/15 | 11 | tire recap truck/ колеса | | 243.44 |
| 10/2/15 | 11 | check up and advise/ проверка и анализ | | 86.84 |
| 9/10/15 | 10 | 2 sensors/замена двух сенсоров | | 2240.78 |
| 10/11/15 | 11 | tire unstalled | | 308.29 |
| | | | | |
| | | | | |
| 10/26/15 | 10 | new tire for truck | | 585.91 |
| 10/29/15 | 12 | truck repaire (waiting for final bill) | | 2537.76 |
| | | | | |
| | | | | |
| 11/20/15 | 9 | Truck tires used | | 241.45 |
| | | | | |
| | | | | |
| TOTAL | | | | 6244.47 |

## Акт взаиморасчетов/ Reconcillation Report 7/14/2016
с компанией/ with Comp MIAMI LOGISTICS SERVICES

| Налог/ Tax | Company | период/period | мили/ miles | сумма/ Amount |
|---|---|---|---|---|
| IFTA | CTA | | | 1,152.45 |
| KY Weight Tax | CTA | 3,4-Q 2015 | 4324 | 123.23 |
| KY Weight Tax | CTA | 3-Q 2015 | 493 | 14.05 |
| OR weight Tax | CTA | 4-Q 2015 | 1077 | 176.41 |
| OR weight Tax | CTA | 3-Q 2015 | 203 | 33.25 |
| NY Weight Tax | CTA | 4-Q 2015 | 2188 | 30.63 |
| NY Weight Tax | CTA | 3-Q 2015 | 47 | 0.66 |
| NM Weight Tax | CTA | 4-Q 2015 | 917 | 40.16 |
| NM Weight Tax | CTA | 3-Q 2015 | 1238 | 54.22 |
| **TOTAL 2015** | | | | **1,625.06** |
| | | | | |
| IFTA | CTA,A&E | 1,2-Q 2016 | | 1,060.50 |
| NY Weight Tax | CTA | 1 Q-2016 | 1867 | 26.14 |
| NY Weight Tax | CTA | 2-Q 2016 | 1915 | 26.81 |
| NM Weight Tax | CTA | 1 Q-2016 | 717 | 31.40 |
| NM Weight Tax | CTA | 2-Q 2016 | 858 | 37.58 |
| KY Weight Tax | CTA | 1 Q-2016 | 2426 | 69.14 |
| KY Weight Tax | CTA | 2-Q 2016 | 1921 | 54.75 |
| OR Weight Tax | CTA | 1 Q-2016 | 1730 | 283.37 |
| OR weight Tax | CTA | 2-Q 2016 | 192 | 31.50 |
| NY Weight Tax | A&E | 2-Q 2016 | 32 | 0.45 |
| **TOTAL 2016** | | | | **1,621.64** |

| | | Удержано/Deducted | Оплачено/ Paid | Balance |
|---|---|---|---|---|
| Топливный налог | 1-26 нед 2016 | 4,160.00 | 1,621.64 | 2,538.36 |
| Топливный налог | 38-53 нед 2015 | 2,480.00 | 1,625.06 | 854.94 |
| Страховка трак №10 | 23-26 неделя | 1,280.00 | 0.00 | 1,280.00 |
| Аренда трейлера | 18-26 неделя | 1,710.00 | 0.00 | 1,710.00 |
| Налог ежегодный (форма 2290) | 01/07/15-01/07/16 | | 2,200.00 | -2,200.00 |
| | **Итого к возврату/ Total for Credit** | | | **4,183.30** |

Начисленная к возврату сумма будет добавлена 7/4/2016/ This Amount will be added on date 7/4/2016
С 4 июля 2016  произведен перерасчет удержаний топливного налога/ IFTA recalculation will start from July 4th 2016

| | | за трак/неделю | всего |
|---|---|---|---|
| 9,10,11.12 | Налог ежегодный/yearly | 12.50 | 50.00 |
| 9,11,12 | Налог топливный/Ifta | 12.50 | 50.00 |
| | **Итого  в неделю/Total weekly** | | 100.00 |

## Maintenance Report Adjustment # 2      12/31/2016

| | | | |
|---|---|---|---|
| 9/21/15 | 11 | TIRE | 243.44 |
| 10/2/15 | 11 | PARTS | 47.15 |
| 10/3/15 | 11 | CLAW CHAMBER | 11.99 |
| 10/7/15 | 12 | ALTERNAITOR | 125.40 |
| 10/31/15 | 11 | ROADSIDE ALTERNATOR TTN | 330.00 |
| 12/10/15 | 10 | VALVE, SPRING BREAK | 104.19 |
| 12/19/15 | 12 | NEW COMPRESSOR | 392.20 |
| 12/21/15 | 12 | POLY-V BELT | 29.66 |
| 12/21/15 | 12 | NEW COMPRESSOR | 1,303.96 |
| 12/29/15 | 12 | REPROGRAM | 349.00 |
| 12/31/15 | 9 | TIRE+BALANCE | 433.35 |
| 1/6/16 | 12 | LUBE | 94.02 |
| 1/11/16 | 9 | A/C | 2,472.33 |
| 2/3/16 | 11 | PUMP PIN STYLE | 23.53 |
| 2/16/16 | 9 | CK/SER BATT. & CABLES | 913.20 |
| 3/17/16 | 12 | VENT | 72.75 |
| 3/28/16 | 11 | TOWING | 500.00 |
| 4/4/16 | 9 | TRAILER LIGHTS | 100.70 |
| 4/4/16 | 9 | TRAILER LIGHTS | 112.34 |
| 4/5/16 | 12 | TIRE | 550.00 |
| 5/10/16 | 12 | ABSORBER, ELECTRICAL, OIL CHANGE | 3,727.40 |
| 6/15/16 | 12 | HOOD, BRAKES, OIL CHANGE | 782.50 |
| 6/20/16 | 12 | TIRE | 190.94 |
| 8/3/16 | 9 | LUBE | 37.09 |
| 8/22/16 | 12 | TRAILER REP PO | 270.00 |
| 9/1/16 | 11 | PROGRAMMING | 500.00 |
| 9/15/16 | 11 | AIR FILTER | 53.00 |
| 9/15/16 | 11 | FILTER | 57.62 |
| | | TOTAL | 13,827.76 |